## UNITED STATES DISTRICT COURT
## FOR DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BEAU STEPHAN, GEORGE STRAY, LEONARD KIRSCHLING, GEORGE PHIRIPES, RHONDA HABELL, CAMERON BASS and STEPHEN BUBNIAK, individually, and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | Case No.:<br><br>**CLASS ACTION COMPLAINT** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| TRADER JOE'S COMPANY, THE BOARD OF DIRECTORS OF TRADER JOE'S COMPANY, THE INVESTMENT COMMITTEE and JOHN DOES 1-30, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiffs Beau Stephan, George Stray, Leonard Kirschling, George Phiripes, Rhonda Habell, Cameron Bass and Stephen Bubniak ("Plaintiffs"), by and through their attorneys, on behalf of the Trader Joe's Company Retirement Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Trader Joe's Company ("Trader Joe's" or the "Company"), the

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Board of Directors of Trader Joe's Company ("Board") and its members during the Class Period[2] and the Investment Committee ("Committee") and its members during the Class Period for breaches of their fiduciary duties.

2.       To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Moitoso v. FMR LLC*, 2020 WL 1495938, at * 6 (D. Mass. Mar. 27, 2020) (quoting *Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).

3.       Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

4.       The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See, "A Look at 401(k) Plan Fees,*"[3]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

---

[2] As discussed in more detail below, the Class Period is defined as January 28, 2019 through the date of judgment ("Class Period").

[3] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited September 16, 2024) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b).

7.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

8.      The Supreme Court reiterated in interpreting "ERISA's duty of prudence in light of the common law of trusts" that a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 741 (2022).

9.      The duty to monitor is especially important here, where, as explained below, an unusually high percentage of the Plan's assets were/are concentrated in a single investment.

Specifically, at all times relevant, approximately **70% of Plan assets** (nearly $2 billion) were invested in one fund—*i.e.*, the American Funds American Balanced Fund R4.[4]

10.     To the financial detriment of Plaintiffs and the participants, the R4 share class of the American Balanced Fund saddled the participants with needlessly high fees. The facts show that Defendants wholly failed to fulfill their fiduciary obligations in regard to monitoring Plan investments and ensuring all fees paid by the Plan and participants were reasonable and necessary. In regard to the American Balanced Fund, Defendants allowed millions of dollars of participants' hard-earned savings to be wasted paying for a needlessly expensive R4 share class of the fund, when at all times, the same fund was available in the form of a much cheaper collective investment trust ("CIT"), in addition to the significantly less expensive R6 share class.

11.     A prudent fiduciary, following a proper process, would have recognized no later than the start of the Class Period that the CIT version of the American Balanced Fund was available, charged much lower fees, and should have been inserted into the Plan to replace the R4 share class. There is no legitimate excuse for the Defendants' failure to make the CIT version of the fund available to the Plan. Moreover, even if the Defendants had failed to recognize the availability of the CIT, they certainly should have realized that the R6 share class of the American Balanced Fund (which is identical in all respects to the R4 share class, except for its cost) was at all times  available and would have saved the Plan participants millions of dollars in unnecessary fees.

---

[4] In 2021, the assets in the American Funds American Balanced Fund were transferred to the Capital Group American Balanced Trust.

12.     As discussed *infra*, and like other investment options in the Plan, the American Funds American Balanced Fund R4 consistently overcharged and underperformed, yet the Defendants inexcusably allowed it to remain in the Plan until 2021.

13.     The Plan has at all times during the Class Period maintained over $1.6 billion dollars in assets. At the end of the Plan's fiscal year in 2023, the Plan had over $2.7 billion dollars in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2023 Form 5500 for the Trader Joe's Company Retirement Plan ("2023 Form 5500") at Schedule H, p. 2.

14.      The Plan's assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2021, only 0.2 percent (1,011 of 641,747) of Plans in the country had more than $1 billion in assets under management. In 2019, at the start of the Class Period, only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plan.[5]  The Plan's assets under management makes it among the largest plans in the United States.

15.     The Plan is also large in terms of the number of its participants. From 2019 to 2023 it had over 38,000 participants with account balances, with a high of 44,218 participants in 2023. *See* 2023 Form 5500 at 2. In 2021, only 0.1 percent (844 of 641,747) of 401(k) plans in the country were as large as the Plan.[6]

---

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.
[6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.idc.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

16.    Given the amount of Plan assets and the number of participants, the Plan should have had substantial bargaining power with recordkeepers regarding the fees and expenses to be charged for recordkeeping and administrative services ("RKA"). As is apparent, however, Defendants did not use that bargaining power to reduce the Plan's expenses, nor did they exercise appropriate review to ensure each investment option in the Plan was prudent.

17.    Defendants failed to employ a process to leverage the size of the Plan to pay reasonable fees for the Plan's RKA services. Defendants, as fiduciaries of the Plan, breached the duty of prudence they owed to the Plan by requiring the Plan to pay excessive RKA fees.

18.    Throughout the Class Period and pursuant to the Plan's recordkeeping agreements in effect during the Class Period, the Plan's recordkeeper charged a $48 per participant fee for its recordkeeping services, which was grossly excessive compared to what the Plan's fiduciaries could have negotiated based upon the size of the Plan. Without compromising the caliber of services, and as shown by the price for RKA paid by similarly-sized plans, the Defendants certainly could have negotiated lower RKA fees for Plan participants had Defendants prudently been monitoring expenses.

19.    Defendants also breached their duty to Plan participants in other respects in regard to failing to defray the expenses of administering the Plan. *See* 29 U.S.C. § 1104(a)(A)(ii). And this involved their duty of loyalty to the Plan. Specifically, Defendants used millions of dollars of Plan assets, obtained from participant forfeited funds in the Plan, to benefit Defendants by reducing certain of the Company's financial obligations, instead of using the Plan assets to benefit the Plan and participants by reducing or eliminating some of the excessive amounts charged to Plan participants for RKA. This action by the Defendants violated their duty of loyalty to Plan

participants, and deprived the participants of millions of dollars that should have been used for their benefit.

20.     During the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; (3) failing to control the Plan's RKA costs; and (4) failing to defray reasonable expenses of administering the Plan.

21.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

22.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), breach of the fiduciary duty of loyalty (Count II), breach of ERISA's Anti-Inurement Provision (Count III), and failure to monitor fiduciaries (Count IV).

## II.     JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

24.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and

because ERISA provides for nationwide service of process. Specifically, Trader Joe's conducts business in Massachusetts through its 23 stores located in Massachusetts, the most recent of which opened in Milford, Massachusetts on November 6, 2024. *See* https://www.masslive.com/news/2024/11/a-new-trader-joes-is-opening-in-mass-heres-where.html#:~:text=In%20addition%20to%20the%2023,500%20locations%20across%20the%20U.S.

25.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391, because some or all of the acts, omissions and/or violations of ERISA giving rise to the action occurred in this District, Plaintiff Stephan resides within this District, and Defendants reside and may be found in this District.

## III.    PARTIES

### Plaintiffs

26.    Plaintiff, Beau Stephan ("Stephan"), resides in Cambridge, Massachusetts. During his employment, Plaintiff Stephan participated and invested in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Stephan specifically invested in the American Funds American Balanced fund during the Class Period. He suffered injury to his Plan account from the excessive expense and underperformance of the funds in the Plan, and paying $48 or more per year for RKA. Plaintiff Stephan also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay the Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Stephan's individual account to pay for the RKA costs.

27.    Plaintiff, George Stray ("Stray"), resides in Lakewood, Washington. During his employment, Plaintiff Stray participated and invested in the options offered by the Plan that are

challenged in this lawsuit. Plaintiff Stray specifically invested in the American Funds Europacific growth fund, the American Funds Growth Fund of America, the American Funds Washington Mutual fund, the American Funds, Inc. Fund of America and the American Funds Bond Fund of America during the Class Period. He suffered injury to his Plan account from the excessive expense and underperformance of the funds in the Plan, and paying $48 or more per year for RKA. Plaintiff Stray also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay the Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Stray's individual account to pay for the RKA costs.

28.    Plaintiff, Leonard Kirschling ("Kirschling"), resides in Cary, North Carolina. During his employment, Plaintiff Kirschling participated and invested in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Kirschling specifically invested in the American Funds Europacific growth fund, the American Funds Growth Fund of American, the American Funds SmallCap World fund, the American Funds, Inc. Fund of America and the American Funds Bond Fund of America during the Class Period. He suffered injury to his Plan account from the excessive expense and underperformance of the funds in the Plan, and paying $48 or more per year for RKA Plaintiff Kirschling also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay the Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Kirschling's individual account to pay for the RKA costs.

29.    Plaintiff, George Phiripes ("Phiripes"), resides in Fair Oaks, California. During his employment, Plaintiff Phiripes participated and invested in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Phiripes specifically invested in the American Funds American Balanced Fund during the Class Period. He suffered injury to his Plan account from the excessive

expense and underperformance of the funds in the Plan, and paying $48 or more per year for RKA Plaintiff Phiripes also suffered injury due to the fact that Defendant failed to use forfeited Plan funds to pay the Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Phiripes' individual account to pay for the RKA costs.

30.    Plaintiff, Cameron Bass ("Bass"), resides in Columbus, Georgia. During his employment, Plaintiff Bass participated and invested in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Bass specifically invested in the American Funds Growth Fund of America, the American Funds Washington Mutual, the American Funds, Inc. Fund of America and the American Funds Bond Fund of America during the Class Period He suffered injury to his Plan account from the excessive expense of the funds in the Plan, and paying $48 or more per year for RKA. Plaintiff Bass also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay the Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Bass' individual account to pay for the RKA costs.

31.    Plaintiff, Stephen Bubniak ("Bubniak"), resides in Clearwater, Florida. During his employment, Plaintiff Bubniak participated and invested in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Bubniak specifically invested in the American Funds Europacific growth fund, the American Funds Growth Fund of America, the American Funds SmallCap World fund, the American Funds Washington Mutual fund and the American Funds Bond Fund of America whether these funds were in either the R4 share class or the R5E share class at any given time as described herein. He suffered injury to his Plan account from the excessive expense and underperformance of these funds. As alleged below, these funds provided

revenue to pay for the high RKA costs of the Plan. While in some cases, excess revenue taken above expenses may be returned to the Plan, there's no clear indication it was done in this case which resulted in Plaintiff Bubniak and other Plan participants paying more than the $48 contracted for RKA rate in effect for the Plan during the majority of the Class Period. Plaintiff Bubniak also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay the Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Bubniak's individual account to pay for the RKA costs.

32.    Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct which resulted in, *inter alia*, diminished Plan assets because of underperforming funds left languishing in the Plan. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

33.    Plaintiffs did not have knowledge of all material facts (including, among other things, what a competitive expense ratio is for funds in a retirement plan, what a competitive recordkeeping fee would be for the Plan and how target date funds and other funds in a retirement plan should perform as compared to their peers and benchmarks) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

34.     Trader Joe's is the "Plan sponsor." *See* 2023 Form 5500 at 1. Trader Joe's is a privately owned American chain of grocery stores established in 1967[7] that conducts business throughout the United Staes. Trader Joe's has over 503 stores nationwide in 42 states, including Massachusetts, and Washington, D.C. in 2019. *Id.*

35.     The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) for several reasons.

36.     First, the 2018 SPD identifies Trader Joe's as the "Plan Administrator." *See* Trader Joe's Retirement Plan Summary Plan Description, January 1, 2018 ("2018 SPD") at 17.

37.     Second, as part of its fiduciary responsibilities, Trader Joe's designated Capital Group Retirement Plan Services ("Capital Group"), as the Plan's recordkeeper.[8] *See* 2023 Form 5500 at Schedule C, p. 3. Trader Joe's also appointed other Plan fiduciaries in its role as a Plan Administrator and through the Board (see below). Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

38.     Third, Trader Joe's also made discretionary decisions to make employer contributions (explained below) to Plan participants. 2018 SPD at 3.

39.     Lastly, at all times, Trader Joe's acted through its officers to perform Plan-related fiduciary functions. These officers were acting in the course and scope of their employment.

---

[7] https://www.traderjoes.com/our-story/timeline.
[8] Capital Group served as the Plan's recordkeeper from 2019 through 2023.

**Board Defendants**

40.     The Company acted through the Board to perform the Company's Plan-related fiduciary functions. Upon information and belief, the Board appointed members of the Committee. *See, e.g.,* the Investment Policy Statement of Trader Joe's Company 401(k) Profit Sharing Plan ("IPS") at 1. Accordingly, the Board had the fiduciary duty to monitor and supervise the Committee while it performed its role as the fiduciary responsible for selection and monitoring of the Plan's investments.

41.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

42.     Members of the Board of Directors for Trader Joe's during the Class Period are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

43.     "The Investment Committee (the 'Named Fiduciary') is charged with responsibility for selecting an appropriate mix of investment options available to Plan participants." IPS at 1. The Committee is tasked with monitoring the prudence of the Plan investments. *Id.* The IPS provides that the Committee shall "[p]eriodically review and evaluate the selected investment options against established performance measurement criteria." *Id.*

44.     Additionally, the IPS "recapitulates the long-standing practices and approach of the Named Fiduciary and sets forth the manner in which Plan investment options are selected and monitored, consistent with the fiduciary standards of ERISA; including that (1) all transactions

undertaken by the Named Fiduciary must be in the sole interest of Plan participants and their beneficiaries to provide benefits and only pay reasonable expenses of Plan administration in a prudent manner." IPS at 1.

45.     Further, if periodic monitoring of Plan investments led to the identification of investment options that fell short of expectations, and were candidates for replacement, the Committee was obligated to "[r]eview the available 'universe' of possible investment options to identify possible alternatives that meet the criteria established under the investment option selection section." *Id.* at 4.

46.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

47.     The Committee and members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**<u>Additional John Doe Defendants</u>**

48.     To the extent that there are additional officers and employees of Trader Joe's who are/were fiduciaries of the Plan during the Class Period, or other individuals were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Trader Joe's officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

14

## IV.    CLASS ACTION ALLEGATIONS

49.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[9]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between January 28, 2019 through the date of judgment (the "Class Period").

50.    The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 44,218 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500 at 2.

51.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

52.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A.    Whether Defendants are fiduciaries of the Plan;
>
> B.    Whether Defendants breached their fiduciary duties of prudence and loyalty by engaging in the conduct described herein;

---

[9] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C.      Whether the Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.      The proper form of equitable and injunctive relief; and

E.      The proper measure of monetary relief.

53.    Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

54.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

55.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

16

## V.    THE PLAN

56.    The Plan was established on May 1, 1965, and amended and restated effective January 1, 2018. 2018 SPD at 16.

57.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### *Eligibility*

58.    Employees are generally eligible to participate in the Plan after three months of employment and if they are at least twenty years of age. *See* 2018 SPD at 1 ("You will be eligible to participate for purposes of elective deferrals when you have completed 3 months of service and have attained age 20."); *see also* Independent Auditors Report attached to 2023 Form 5500 at 7 (The Plan covers "employees who have been employed for at least three months . . .  and are at least 20 years of age.").

59.    "For purposes of elective deferrals, your Entry Date will be the first day of the Plan Year quarter coinciding with or next following the date you satisfy the eligibility requirements." *See* 2018 SPD at 1; *see also* Independent Auditors Report attached to 2023 Form 5500 at 7 ("In addition, employees must complete at least 700 hours of service and be employed on the last day of the Plan year to be eligible for Company non-elective contributions.").

### *Contributions*

60.    There are different types of contributions that can be added to a participant's account: (1) *elective deferrals* – employees may elect to reduce their compensation by a specific

percentage or dollar amount and have that amount contributed to the Plan on a pre-tax basis (2018 SPD at 2) (employees "may elect to defer not less than 1% of your Plan Year compensation and not more than 75% of your Plan Year compensation"); and (2) *catch-up contributions* – employees that attain age 50 before the end of a calendar year may elect to defer additional amounts to the Plan for that year. 2018 SPD at 3.

61.    The Company made discretionary decisions regarding matching and other Company contributions to Plan participants. *See* 2018 SPD at 3.

62.    "Each year, the Employer may make a discretionary nonelective contribution to the Plan." SPD at 3. If Trader Joe's elects to make a contribution to the Plan, Trader Joe's will pay a single amount to "be 'allocated' or divided among participants eligible to share in the contribution for the Plan Year." *Id.* Trader Joe's made a lump sum elective contribution to the Plan for each year of the Class Period.

63.    Like other companies that sponsor 401(k) plans for their employees, Trader Joe's enjoys both direct and indirect benefits by providing discretionary, nonelective contributions, if any, to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

64.    Trader Joe's also benefits in other ways from the Plan's discretionary, nonelective contribution program. It is well-known that "[m]any employers match their employees' contributions to the 401(k) plan in order to help attract and retain talent at their company. By hiring and retaining employees with a high-caliber of talent, [a company] may save money on training and attrition costs associated with unhappy or lower-performing workers." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

65.     Given the size of the Plan, Trader Joe's likely enjoyed significant tax and cost savings from offering such discretionary, nonelective contributions.

*Vesting*

66.     Plan participants are immediately vested in their contributions to their accounts. *See* 2018 SPD at 6 ("You are always 100% vested (which means that you are entitled to all of the amounts) in your accounts attributable to" elective deferrals including catch-up contributions.).

67.     However, Employees must maintain continuous years of service to be eligible to vest in any monies contributed by the Company. *See id.* ("Your 'vested percentage' for certain Employer contributions is based on vesting Years of Service.").

68.     As detailed in the 2018 SPD:

Vesting Schedule
Nonelective Contributions

| Years of Service | Percentage |
|---|---|
| Less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 | 100% |

2018 SPD at 6.

*Forfeiture*

69.     Forfeiture of non-vested money in Plan participants' accounts occurs "If a participant terminates employment before being fully vested, then the non-vested portion of the terminated participant's account balance remains in the Plan and is called a forfeiture." 2018 SPD at 4.

70.     Under the Plan, the Committee had discretion, to allocate forfeited amounts "to pay [P]lan expenses or use[] to reduce any nonelective contribution." *Id.*; *see also* Independent Auditors Report attached to 2023 Form 5500 at p. 7 ("Forfeitures of Company contributions may be used to pay Plan administrative expenses, reduce future Company contributions, and to restore forfeitures of reemployed participants."). Nevertheless, regardless of the language in a plan, fiduciaries always have the overarching responsibility to adhere to the requirements of ERISA.

71.     The Committee failed to allocate forfeited amounts "consistent with the fiduciary standards of ERISA; including that (1) all transactions undertaken by the Named Fiduciary must be in the sole interest of Plan participants and their beneficiaries to provide benefits and only pay reasonable expenses of Plan administration in a prudent manner." IPS at 1.

### *The Plan's Investments*

72.     The Plan offered multiple funds for investment each year during the putative Class Period. As noted above, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance. From 2019 through 2020, the Plan offered 16 investment options, including 15 mutual funds and 1 collective trust in the form of a stable value fund. *See* 2019 – 2020 Form 5500s. From 2021-2022, the Plan offered 16 investment options, including 14 mutual funds and 2 Collective Trusts. *See* 2021-2022 Form 5500s. In 2023, the Plan added another mutual fund. *See* 2023 Form 5500.

73.     The Plan's assets under management for all funds as of the end of 2023 was $2,772,092,019. *See* 2023 Form 5500 at Schedule H, p. 2. At all times during the Class Period the Plan maintained over $1.8 billion in assets.

*Plan Expenses*

74.    Generally, "[t]he expenses charged to the Plan may be charged pro rata to each Participant in relation to the size of each Participant's account balance or may be charged equally to each Participant." 2018 SPD at 5.

75.    During the Class Period, the Plan entered into a recordkeeping and administrative services fee agreement ("Recordkeeping Agreement") with Capital Group (defined above). Prior to 2019, Capital Research, an affiliate of Capital Bank and Trust Company[10] ("Capital Trust" or "Trustee"), was the recordkeeper. Capital Research also became the Plan's trustee as of July 21, 2015 when there were nearly 30,000 Plan participants with account balances in the Plan.

76.    At all times relevant, the Plan has always had a significant number of participants. The earliest publicly available data shows that in 2009 there were 16,834 Plan participants with account balances. *See* 2009 Form 5500 at 2.

77.    The Recordkeeping Agreement provided for the following fee schedule:

Standard Ongoing Fees

| Number of participants with account balances | Base Fee | | Per participant |
|---|---|---|---|
| 1-25 | $5,400 | + | $100 |
| 26-300 | $5,400 | + | $60 |
| 301-500 | $6,900 | + | $55 |
| 501-1,000 | $9,650 | + | $50 |
| Over 1,000 | $11,650 | + | $48 |

Recordkeeping Agreement at 9.

78.    Accordingly, when the Recordkeeping Agreement was executed in 2015, the number of Plan participants with account balances was well over 1,000 and remained substantially

---

[10]    *See*    https://www.jpmorgan.com/content/dam/jpm/securities/documents/adv/part-b/Capital_Group_Private_Client_Services_ADV.pdf.

above 1,000 throughout the Class Period. The number increased gradually from 2015 to 2023 as follows:

| Year | Number of Plan Participants with Account Balances |
|------|---------------------------------------------------|
| 2015 | 29,546 |
| 2016 | 31,752 |
| 2017 | 32,660 |
| 2018 | 35,474 |
| 2019 | 38,634 |
| 2020 | 43,345 |
| 2021 | 42,594 |
| 2022 | 44,205 |
| 2023 | 44,218 |

*See* 2015-2023 Form 5500s. There was no reasonable likelihood that the number of Plan participants with account balances would ever fall below 1,000 in the foreseeable future. Thus, given the structure of the Recordkeeping Agreement fee schedule, fees would remain the same even if the Plan doubled, tripled, or quadrupled in size in the future.

## VI.    THE TOTALITY OF CIRCUMSTANCES DEMONSTRATES THAT THE PLAN'S FIDUCIARIES FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.    Overview

#### 1.    ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology for Evaluating Investments

79.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

80.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent

ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

81.     Here, the Plan's fiduciaries ran the Plan in an imprudent manner as demonstrated by numerous factors, culminating in, *inter alia*, the retention of unduly expensive share classes for multiple funds as well as unreasonably poor performing investments, and forcing the Plan and participants to incur millions of dollars of unreasonable and unnecessary expenses.

82.     Plaintiffs do not have access at this time to the specifics of any process of Defendants in regard to selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

83.     For purposes of this Complaint, given Plaintiffs' lack of access to meeting minutes and other pertinent information solely in the hands of Defendants, the Court can draw reasonable inferences regarding the Plan fiduciaries' processes and methods based upon several factors as described herein.

84.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…" DOL 408(b)(2) Regulation Fact Sheet.

85.     The duty "to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[11]

86.     Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments.").[12]

87.      A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

88.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

89.     The measurement of investments against prudently managed alternative investments is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

90.     The specific methodologies used to select prudent investments are primarily data driven. Such data is provided by investment research companies like Morningstar, which is the

---

[11] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

[12] Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

most accepted source of investment performance information, as it has the most robust information

on mutual funds, CITs, and other types of investments. Indeed, Morningstar is used and trusted by

virtually all financial professionals and fiduciaries, including the Plan's fiduciaries. *See* IPS at 4

("Benchmarks used for evaluation purposes are those identified by Morningstar Associates, LLC

for the various asset categories.").

91.     Whether a plan fiduciary enlists the assistance of an investment manager,

consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and

monitoring the plan's investment options. The same is true here in this case.

92.     It is black letter law that a fiduciary's duty to conduct an "independent investigation

into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary

duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S.Ct.

at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to

determine which investments may by prudently included in the plan's menu of options.")

93.     "While the absence of a deliberative process may be enough to demonstrate

imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate

prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing

whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the

*appropriate* methods to investigate and determine the merits of a particular investment,' not

merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th

95, 111 (2d Cir. 2021) (emphasis in original).

94.     Defendants' breaches of their fiduciary duties, relating to their overall decision-

making, resulted in, *inter alia*, selection of investments with excessive fees, selection of poorly

performing investments, and the imposition of excessive administrative and record keeping fees which wasted the assets of the Plan and participants.

> ### 2. Almost 70% of Plan Assets were Concentrated in One Unnecessarily Expensive Fund

95.     In 2019 and 2020, approximately 70% of the Plan's assets were invested in the American Funds American Balanced Funds R4:

| Plan Year | Assets held in American Funds American Balanced Fund (AFABF) | Total Plan Assets | % of Plan assets held in AFABF |
|---|---|---|---|
| 2019 | $1,431,560,808 | $2,044,450,078 | 70.02% |
| 2020 | $1,650,996,496 | $2,404,298,632 | 68.67% |

96.     The high concentration of Plan assets in the American Funds American Balanced Fund R4 existed well in advance of the Class Period as well:

| Plan Year | Assets held in American Funds American Balanced Fund (AFABF) | Total Plan Assets | % of Plan assets held in AFABF |
|---|---|---|---|
| 2012 | $548,686,552 | $804,988,871 | 68.16% |
| 2013 | $710,819,944 | $1,034,230,567 | 68.73% |
| 2014 | $785,639,282 | $1,137,714,516 | 69.05% |
| 2015 | $823,869,972 | $1,186,065,423 | 69.46% |
| 2016 | $935,480,809 | $1,342,275,190 | 69.69% |
| 2017 | $1,130,991,792 | $1,627,871,697 | 69.48% |
| 2018 | $1,140,139,406 | $1,629,409,314 | 69.97% |

97.     Starting in 2021, the assets held in the American Funds American Balanced Fund R4 were transferred to the Capital Group American Balanced Trust, which is a collective investment trust ("CIT"). The CIT version of the fund, as well as the cheaper R6 share class of the fund, was available at all times relevant.

| Plan Year | Assets held in Capital Group American Balanced Trust (CGABT) | Total Plan Assets | % of Plan assets held in CGABT |
|---|---|---|---|
| 2021 | $1,902,514,234 | $2,783,027,426 | 68.36% |
| 2022 | $1,667,914,388 | $2,396,191,704 | 69.61% |
| 2023 | $1,889,634,920 | $2,772,092,019 | 68.17% |

### 3. There Was Little to No Change in Plan Investment Options For the Entirety of the Class Period

98.    One indication of Defendants' failure to prudently monitor the Plan's funds is that the majority of funds in the Plan stayed unchanged during the Class Period while the fund fees remained imprudent and several prudent alternative funds existed in the marketplace and yet went unselected by Defendants.

99.    Indicative of Defendants' hands-off approach, numerous funds in the Plan have been in place for more than 15 years, despite their poor performance and/or unreasonable fees:[13]

| Plan Investment | Year in Plan |
|---|---|
| Invesco Real Estate Fund | 2009 – 2023 |
| American Funds American Balanced Fund R4 | 2009 – 2021 |
| American Funds Growth Fund of America Mutual Fund R4 | 2009 – 2023 |
| American Funds Investment Company of America R4 | 2009 – 2023 |
| American Funds Washington Mutual Fund R4 | 2009 – 2023 |
| American Funds EuroPacific Growth Fund R4 | 2009 – 2023 |
| American Small Cap World Fund Fund R4 | 2009 – 2023 |
| American Funds Income Fund of America R4 | 2009 – 2023 |
| American Funds Bond Fund of America R4 | 2009 – 2023 |
| American Funds US Govt Securities Fund R4 | 2009 – 2023 |
| (Blackrock) iShares S&P 500 Index A | 2015 – 2023 |
| (Blackrock) iShares Russell 2000 Small Cap Index A | 2017 – 2023 |
| (Blackrock) iShares MSCI EAFE International Index A | 2017 – 2023 |
| (Blackrock) iShares US Aggregate Bond Index Fund A | 2015 – 2023 |

---

[13] All funds listed in the chart below having a share class of R4 were changed to the R5E class at some point in 2021, however, the R5E class is identical to the R4 class in all respects except that the R5E class has a marginally lower expense ratio. For any funds listed in the A class, those funds were changed to the institutional class later in the Class Period. Again, the A class is identical to the institutional class in all respects except that the institutional class has a marginally lower expense ratio.

100.    The fact that all of these funds remained unchanged for an extended period of time is indicative of a lack of a prudent process in place to continually monitor investments in the Plan to ensure that they were at all times prudent.

101.    According to the BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2021* (August 2024), the percentage of plan assets that are proprietary funds to the recordkeeper among plans with audited 401(k) filings in the BrightScope database for plans with over 10,000 participants was 65.3%. The percentage of plan assets that are proprietary funds to the recordkeeper among plans with audited 401(k) filings in the BrightScope database for plans with over 1 billion dollars in assets was 70.7%.

102.    The respective statistics pertaining to the Plan were far more extreme. From 2017 to 2023 (88.58%-90.88%) of the funds were proprietary to Capital Research and its affiliates.

103.    In 2009, including the Invesco Stable Value Fund, there were thirteen Plan investment options with an asset value of $471,964,409. Nine of the funds were actively managed R4 share class American Funds that were proprietary to Capital Research, three were actively traded mutual funds that were retail share class A, and a Stable Value Fund.

104.    Having so many excessively expensive and poorly performing funds in the Plan affiliated with the Plan's service provider is a strong indication that the funds were not selected in the sole interest of the Plan participants.

**4.    The Plan's Investment Menu Lacked True Diversification**

105.    Many of the funds in the Plan drift in capitalization and style. That means a participant may think that they are buying a Large Cap Blend investment, but they are actually buying an investment that drifts into not just Large Cap Growth and Value but also Midcap and the respective styles and thus overlapping other investments causing additional correlation, concentration, and volatility that the participant may not be quite aware of or may not understand.

This was the case in the Plan as several actively managed funds in the Plan were not managed in the style they purported to be:

| Investment | Morningstar Historic Weighting Style | Actual Weighting |
|---|---|---|
| Am Funds Am Bal R4 | Large Cap Blend | Only 36% was LCB |
| Am Funds Wash Mutual R4 | Large Cap Blend | Only 39% was LCB |
| Am Funds Inv Co Am R4 | Large Cap Blend | Only 35% was LCB |
| Ishares S&P 500 Index A | Large Cap Blend | Only 33% was LCB |
| Am Funds Gro of Am R4 | Large Cap Growth | Only 55% was LCG |
| Am Funds Inc of America R4 | Large Cap Value | Only 46% was LCV |

106.   Prudent fiduciaries monitor funds to make sure the funds adhere to their stated investment style and make changes when the funds deviate. As is apparent from the above, Defendants did not do so because these same funds remained in the Plan from at least 2009 until 2022.

107.   There are further troubling aspects of the Plan's investment menu that evidence imprudence. From 2015 to at least January 2023, there were six mutual funds whose primary equity positions were large cap. As of June 30, 2020, the following characteristics were exhibited from the six large cap mutual funds:

- Six out of six large cap investments had Microsoft as a top 10 holding; or $1,383,351,958 of the Plan's assets were exposed to Microsoft or, 84.90% of the Plan's assets were exposed to mutual funds that purchased Microsoft as a top 10 holding;

- Five out of Six Large Cap Investments had Broadcom as a top 10 holding; or $1,343,175,851 of the Plan's assets were exposed to Broadcom or, 82.43% of the Plan's assets were exposed to mutual funds that purchased Broadcom as a top 10 holding;

29

- Four out of Six Large Cap Investments had Amazon and Facebook Cl. A as a top 10 holding; or $1,307,289,995 of the Plan's assets were exposed to both Amazon & Facebook Cl. A, or 80.23% of the Plan's assets were exposed to mutual funds that purchased both Amazon & Facebook Cl. A as a top 10 holding;

- Three out of Six Large Cap Investments had Pfizer as a top 10 holding;

- Two out of Six Large Cap Investments had Apple, Alphabet Class C, Johnson & Johnson, United Health Group, Philip Morris, Home Depot, Comcast Class A, Netflix, and the CME Group A as a top 10 holding; and

- From 2016-2020, most of the time, 4 of the Large Cap Investments were characterized as Large Cap Blend by Morningstar. The exception was American Funds Washington Mutual Fund R4 as Morningstar switched its characterization to Large Cap Value.

108.    The Plan's participants could not reasonably be expected to understand the Plan menu's lack of diversification in this manner or even understand the ramifications, which was that Plan participants were not afforded the opportunity to select funds from a truly diversified menu of options.

**B.    Failure to Utilize Lower Fee Share Classes Cost Plan Participants**

109.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

110.    Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available. Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative. Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

111.    Indeed, a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017) (*Tibble III*).

112.    Throughout the Class Period, including 2019 as specifically demonstrated below, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, or the much cheaper and/or better performing CIT version of the fund.

113.    In other words, given the size of the Plan, Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received. This directly reduces the returns on the investments.

114.    Defendants' actions and inactions cost the Plan and its participants tens of millions of dollars in damages measured in simple share cost alone from 2019 to 2023.

**1.    The Fiduciaries should Have Transferred Assets Out of the American Balanced Fund At The Start of the Class Period**

115.    The fund holding 70% of the Plan's assets was extremely and unnecessarily expensive, causing Plan participants to incur tens of millions of dollars in needless expenses. The chart below demonstrates how much more expensive the American Funds American Balanced Fund R4 was than its R6 counterpart or the CIT, which holds the same exact investments, and is managed by the same fund manager, but charges lower expenses:

| Fund in Plan | Expense Ratio | Lower Cost Share | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| American Funds American Balanced Fund R4 (2019-2020) | 0.63% | American Funds American Balanced Fund R6 | 0.28% | 76.92% |

116.    The Capital Group American Balanced Fund, the CIT in which Defendants eventually transferred the assets in the American Funds American Balanced Fund R4, was available at the beginning of the Class Period. A prudent fiduciary should have known that CITs, such as the Capital Group American Balanced Fund, typically charge reduced fees compared to mutual funds with similar investment strategies, and as a result generate better performance returns for Plan participants. *See* https://www.troweprice.com/content/dam/retirement-plan-services/pdfs/insights/investment-insights/CITs_as_investment_options_in_qualified_plans.PDF.

117. A prudent fiduciary would have known of the existence of the CIT or the cheaper, but otherwise identical, R6 share class for the American Funds American Balanced Fund R4 prior to and at the start of the Class Period. The Defendants, had they prudently monitored the investments in the Plan, would have replaced the R4 share class with either the R6 share class or the CIT version of the American Balanced Fund no later than the start of the Class Period. The fact that this single fund held approximately 70% of the Plan's investments, yet went unchanged for many years, strongly supports the inference that Defendants were asleep at the wheel and not properly monitoring the investments in the Plan so as to avoid unnecessary expenses.

118. Given the massive amount of the Plan's assets invested in this one investment, there is no excuse for the Defendants failing to ensure that the cheapest share class or CIT version of the fund was in the Plan. This should have been a clear priority as it resulted in millions of dollars of excess expenses being paid by the participants in the Plan each year, and a corresponding loss of investment returns that they otherwise would have earned.

### 2. Defendants Failed to Monitor the Other Expensive Investments

119. The chart below uses 2019 and 2020 expense ratios to demonstrate how much more expensive (difference between the lower expense ratio of the "R6-Class" and "K-Class" shares, and that of the share class of the fund in the Plan, as a percentage of the lower expense ratio) the funds were than their identical counterparts:

| Fund in Plan | Expense Ratio[14] | Lower Cost Share | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| American Funds EuroPacific R4 | 0.84% | American Funds EuroPacific R6 | 0.49% | 52.63% |
| American Funds Growth Fund of America R4 | 0.68% | American Funds Growth Fund of America R6 | 0.33% | 69.31% |
| American Funds Small Cap World R4 | 1.05% | American Funds Small Cap World R6 | 0.70% | 40.00% |
| American Funds Investment Company of America R4 | 0.64% | American Funds Investment Company of America R6 | 0.29% | 75.27% |
| American Funds Washington Mutual Fund R4 | 0.62% | American Funds Washington Mutual Fund R6 | 0.27% | 78.65% |
| Invesco Real Estate A | 1.27% | Invesco Real Estate R6 | 0.80% | 45.01% |
| American Funds Income of America R4 | 0.61% | American Funds Income of America R6 | 0.26% | 80.46% |
| American Funds Bond Fund of America R4 | 0.61% | American Funds Bond Fund of America R6 | 0.25% | 83.72% |
| American Funds US Govt Securities R4 | 0.63% | American Funds US Govt Securities R6 | 0.25% | 83.36% |
| Blackrock (iShares) S&P 500 Index A | 0.35% | Blackrock (iShares) S&P 500 Index K | 0.03% | 168.42% |
| Blackrock (iShares) Russell 2000 Small Cap Index A | 0.37% | Blackrock (iShares) Russell 2000 Small Cap Index K | 0.07% | 136.36% |
| Blackrock (iShares) MSCI EAFE International Index A | 0.36% | Blackrock (iShares) MSCI EAFE International Index K | 0.06% | 142.86% |
| Blackrock (iShares) US Aggregate Bond Index Fund A | 0.35% | Blackrock (iShares) US Aggregate Bond Index Fund K | 0.05% | 150.00% |

120.    The above is for illustrative purposes only. During the Class Period, Defendants

knew or should have known of the existence of cheaper share classes and therefore also should

---

[14] The listed expense ratios for both the funds in the Plan and the available lower cost share class are from 2019 except for the last four funds listed which are Index funds and are from 2020.

have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

121.    Given the discrepancy in share classes to the tune of tens of millions of dollars, there was no benefit to choosing a more expensive share class.

122.    Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds *could not have* (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility. *See Tibble*, 729 F.3d 1110, at 1134 (9th Cir. 2013).

123.    In fact, there was a clear detriment in choosing the more expensive share classes because of the additional fees that were included. For example, utilizing A-shares for some of the Plan's investments was a particularly egregious failure of fiduciary duty. "A-shares are one type of mutual fund share class. These shares target individual retail investors."[15] They are considerably more expensive than institutional share classes because, *inter alia*, they are "**usually characterized by a front-end sales charge when traded through a full service intermediary**." *Id.* (emphasis added). In other words, A-shares should have no place in a multi-million dollar plan, let alone a billion dollar plan like the Plan.

124.    To the extent Defendants chose the higher cost shares to obtain revenue sharing to (*see* discussion *infra*) pay for recordkeeping, this was an imprudent decision given that recordkeeping fees, as described below, were excessive.  Accordingly, it was unnecessary and against the sole interests of the Plan participants to collect revenue share from higher priced share classes to pay for recordkeeping. As noted above, qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds, although the initial investment

---

[15] *See* https://www.investopedia.com/terms/a/ashare.asp.

minimum generally is waived for financial intermediaries and retirement plans. *See, e.g., Davis v. Washington Univ.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

125.    The following is a sampling of the assets in the Plan as of the end of 2018 in addition to the American Balanced Fund R4 previously discussed:

| Fund in Plan | Category | 2018 AUM |
|---|---|---|
| American Funds EuroPacific R4 | International Equity | $54,249,277 |
| American Funds Growth Fund of America R4 | Domestic Equity | $131,917,990 |
| American Funds Small Cap World R4 | World Fund | $34,195,085 |
| American Funds Investment Company of America R4 | Domestic Equity | $30,470,929 |
| American Funds Washington Mutual Fund R4 | Domestic Equity | $76,582,123 |
| Invesco Real Estate A | Real Estate Investment Fund | $24,384,199 |
| American Funds Income of America R4 | Non-Target Date Balanced | $19,585,886 |
| American Funds Bond Fund of America R4 | Domestic Bond | $44,643,018 |
| American Funds US Govt Securities R4 | US Gov't Bond Fund | $20,632,019 |
| iShares S&P 500 Index A | Index | $59,638,998 |
| iShares Russell 2000 Small Cap Index A | Index | $48,464,215 |

126.    All of the lower share class alternatives were available during the Class Period. A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments, including the above-referenced funds, into the lower share classes at the earliest opportunity.

127.    Failure to do so violated several tenets. First, it was in violation of the IPS which required that "all transactions undertaken by the Named Fiduciary must be in the sole interest of

Plan participants and their beneficiaries to provide benefits and only pay reasonable expenses of Plan administration in a prudent manner." IPS at 1.

128.    Second, it violated long-standing DOL guidance which has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See* "*A Look at 401(k) Plan Fees*," *supra*, at n.3.

129.    Third, it violates the Restatement of Trusts, which puts cost-conscious management above all else while administering a retirement plan. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. B.

130.    Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention. Either reason is inexcusable.

**C.    The Plan's Recordkeeping and Administration Fees During the Class Period were Unreasonable**

**1.    ERISA's Fee Disclosure Rule**

131.    "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[16]

---

[16] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

132.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[17]

133.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such a contract or arrangement.

134.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

135.     The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

---

[17] *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf.     ("DOL     408(b)(2) Regulation Fact Sheet")

136.    A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

137.    Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

### 2.    Much Information Regarding the Reasonableness of Fees for Recordkeeping Services Are in the Sole Possession of Defendants

138.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

139.    A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

140.    More specifically, a RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

141.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they were "likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[18]

142.    Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information and must therefore look at circumstantial evidence showing whether or not an RFP took place in this case.

### 3.    Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Fees

#### a.    Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants

143.    Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers. Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan.

144.    There are essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan), which include the following services:

---

[18] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

A.  Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B.  Multi-channel participant and plan sponsor access (e.g. phone, web);

C.  Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D.  Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E.  Participant tax reporting services (e.g., IRS Form 1099-R);

F.  Participant confirmations, statements, and standard notices;

G.  Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.  Participant education (e.g. newsletters, web articles, standard communication materials);

I.  Plan consulting (e.g., preapproved document services, operational materials);

J.  Plan consulting (e.g. preapproved document services, operational compliance support).

145.    A review of the Plan's recordkeeping agreements in effect during the Class Period reveals that Capital Research was not providing any services beyond the standard services listed above in exchange for their base fee of $48 per participant. A review of the Recordkeeping Agreement between Capital Research and Trader Joe's in effect during the Class Period reveals that the services listed there are no different than those listed on the attached standard form recordkeeping services agreement used by Capital Research which is attached hereto as Exhibit

"A." The services listed there are all for standard services for account recordkeeping, participant access to their accounts, transaction accounting, payroll services tax reporting services, account statements, financial reporting, participant education and plan consulting for operational materials and compliance. *Id.*

146.    These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. Ancillary services such as QDRO's, participant loans, and self-directed brokerage accounts are normally charged to only participants using those ancillary services.

147.    The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. Recordkeepers for large 403(b) and 401(k) plans such as Empower, Voya, Vanguard and Fidelity, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services). These costs also do not materially change if the recordkeeper gains a new plan or loses an existing plan, and don't vary based on the amount of assets in the plan or in an individual's account.

148.    In other words, although participant servicing for 403(b) and 401(k) plans can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

149.    The way participant account servicing works in part, is that each participant's account incurs transactions such as contributions, distributions, asset allocation changes, and less

frequently, loans and distributions and participant reports. Each participant's account balance is updated daily, reflecting the aforementioned activities as well as investment returns. In this manner a participant's account is somewhat similar to a simplified brokerage account with only a few investment positions. As a result, the cost of recordkeeping for a participant's account with a balance of $500,000 is the same as for a participant whose account balance is $5,000 in the same plan.

150.    Thus, the cost of providing recordkeeping services often depends on the number of participants in a plan. In other words, most of the cost of recordkeeping and administration of a 403(b) and 401(k) plan is directly linked to the number of participant accounts within the plan rather than the amount of assets in a participant's account. When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost.  As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increase, the average cost per participant decreases. *See,* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.")[19] ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.*[20]**

---

[19]    *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.

[20]    "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

151.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

152.    Here, as discussed above, the Capital Research/Capital Group set the per participant recordkeeping fee at $48 per participant for the Class Period. This amount is paid for using the Plan's assets either through revenue sharing or by simply utilizing available Plan assets.

**b.      The Plan's Recordkeeping Services Agreement with Capital Group Offered Routine Services**

153.    As discussed above, a review of the Plan's recordkeeping agreements in effect during the Class Period and the Capital Research/Capital Group bundled recordkeeping services agreement, reveal that Capital Research/Capital Group was not providing any services beyond the standard services listed above in exchange for their base fee of $48 per participant.

154.    The RKA services performed each year by Capital Research/Capital Group for the Plan during the Class Period were similar so we can look at the Plan's 2020 Form 5500, Schedule C as an example year. The Schedule C lists the following codes indicating the type of general services performed by the recordkeeper: 25, 49, 52, 60, 62, 64 and 72. Below is a description of the recordkeeping codes:

        25 – Trustee (directed)

        49 – Other Services

        52 – Investment management fees paid indirectly by plan

        60 – Sub-transfer agency/fees

        62 – Float revenue

44

64 – Recordkeeping fees

72 – Other investment fees and expenses

*See* Instructions for the 2023 Schedule C (Form 5500) *available at* https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2023-instructions.pdf at 27-31. Again, the above services are not out of the ordinary from the services other national recordkeepers provide. Any fees associated with other ancillary a la carte services performed by the Recordkeepers would be negligible because they are on a participant-by-participant basis instead of plan-wide.

155. Further, Plan sponsors have great discretion and essentially no guidance in selecting the recordkeeping codes for the Schedule C. *See* Instructions for the 2023 Schedule C (Form 5500) at 30 ("Select from the list below all codes that describe both the kind of services provided and the type of compensation received. Enter as many codes as apply").

156. The service codes identified on Schedule C are often unreliable because of inconsistencies in how the codes are interpreted and applied by different service providers. For example, all recordkeepers provide recordkeeping and information management, as well as communications to plan participants. However, Capital Group did not identify service code 15 – "Recordkeeping and information management (computing, tabulating, data processing, etc.)" or service code 38 – "Participant communication" on the Schedule C throughout the Class Period.

157. These inconsistencies regarding services provided to a plan make it difficult to compare services across different plans.

158. Capital Research/Capital Group is considered a major recordkeeper in the marketplace similar to the top ten recordkeepers in the marketplace, namely Fidelity, Empowers, the Vanguard Group, Alight Solutions, Principal Financial Group, Voya Financial, T. Rowe Price,

Prudential Financial, Inc., Bank of American Corporation and Charles Schwab. *See* https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists.

159.    These recordkeepers, including Capital Group, are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena. Had the Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs.

> c.    **There is No Indication Defendants Negotiated to Reduce the Plan's Recordkeeping Fees During the Class Period**

160.    At any point in the Class Period, the Plan's fiduciaries could have opted to conduct a RFP to any nationally recognized recordkeeper capable of providing lower recordkeeping fees as will be shown below.

161.    Given the fact that the Plan paid exorbitant amounts for recordkeeping during the Class Period, there is little to suggest that Defendants conducted a RFP at reasonable intervals – or even an effective, prudent one - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

> 5.    **The Plan's Recordkeeping Fees were/are Unreasonable When Benchmarked Against Other Similarly Situated Plans and Within the Context that Plan Recordkeeping Fees Should Decline as Plan Size Increases**

162.    Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

163.    As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees throughout the Class Period.

164.    The Plan's per participant RKA fees were as follows:

| Plan Year | Participants | $PP | Total RKA Reported[21] |
|:---:|:---:|:---:|:---:|
| **2019** | 38,634 | $48.00 | $1,854,432 |
| **2020** | 43,345 | $48.00 | $2,080,560 |
| **2021** | 42,594 | $48.00 | $2,044,512 |
| **2022** | 44,205 | $48.00 | $2,121,840 |
| **2023** | 44,218 | $48.00 | $2,122,464 |

165.    At all times during the Class Period a per participant fee of $48 was unreasonable. As noted above, a DOL study concluded that "[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases." Accordingly, the larger the plan, the lower the recordkeeping fee should be.

166.    To put things into perspective, when comparing retirement plan data, most publications utilize tranches. For example, the leading publication that collects 403(b) data is BrightScope/ICI. *See* fn. 4. It categorizes plans in the following tranches:

---

[21] To keep the total fees consistent with the comparator plans analyzed below, the total fee was determined by adding any amounts reported on Schedule C of the Plan's 5500s which are reported as either direct or indirect costs and which are coded in the categories discussed above as common RKA coding which include but are not limited to 25, 49, 52, 60, 62, 64 and 72. Excluded from these amounts are any amounts reported as, including but not limited to, legal, accounting and/or consulting fees. Although no indirect costs are reported it is expected that once the total amount of revenue sharing is known this amount will increase.

EXHIBIT I.4

**Audited ERISA 403(b) Plans and the Universe of ERISA 403(b) Plans by Plan Assets**
Distribution of 403(b) plans, participants, and assets by plan assets; 2019

| Plan assets | BrightScope audited 403(b) filings | | | Department of Labor 403(b) universe | | |
|---|---|---|---|---|---|---|
| | Plans | Participants Thousands | Assets Billions of dollars | Plans | Participants Thousands | Assets Billions of dollars |
| Less than $1M | 227 | 48.1 | $0.1 | 7,193 | 209.3 | $2.6 |
| $1M to $10M | 2,583 | 705.2 | 12.3 | 7,304 | 987.9 | 26.1 |
| >$10M to $50M | 2,069 | 860.1 | 48.2 | 2,329 | 907.1 | 52.4 |
| >$50M to $100M | 518 | 433.9 | 36.5 | 536 | 450.8 | 37.7 |
| >$100M to $250M | 432 | 754.9 | 67.4 | 440 | 781.4 | 68.7 |
| >$250M to $500M | 191 | 751.8 | 67.7 | 196 | 785.6 | 69.2 |
| >$500M to $1B | 111 | 759.5 | 77.9 | 115 | 801.4 | 81.1 |
| More than $1B | 108 | 2,092.0 | 262.5 | 109 | 2,121.6 | 264.0 |
| All plans | 6,239 | 6,405.6 | 572.6 | 18,222 | 7,045.1 | 601.8 |

Note: Audited 403(b) filings generally include plans with 100 participants or more. Assets are fair market value at the year-end of the plan and include loans.

Source: BrightScope Defined Contribution Plan Database

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex.

1.2, p. 7., available at https://www.ici.org/system/files/2023-04/23-ppr-dcplan-profile-403b.pdf.

167.    Accordingly, the billion-dollar asset mark is significant as all plans over a billion dollars are considered in a category of their own.  Additionally, plans with over 10,000 participants are also considered as in the same category.

168.    Looking at recordkeeping costs for plans of a similar size during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant[22] |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

---

[22] Except for the Trader Joe's Company Retirement Plan, and unless otherwise noted, these fees are taken from the Form 5500.

| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2019 | $5,675,354,000 | 42,339 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $9 |
|---|---|---|---|---|---|---|---|
| Great-West Life | Deseret 401(k) Plan | 2019 | $4,264,113,298 | 34,938 | 64 | Yes - $0 | $22 |
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2019 | $10,913,979,302 | 37,868 | 37 50 64 60 65 | Yes - $0 | $25 |
| Vanguard/ Prudential | Philips North America 401(k) Plan | 2019 | $4,898,009,752 | 28,428 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2019 | $4,708,483,795 | 77,490 | 37 60 64 65 | Yes - $0 | $31 |
| Vanguard | Kaiser Permanente Supplemental Savings and Retirement Plan | 2019 | $3,793,834,091 | 46,943 | 15 25 26 37 53 | Yes - $0 | $33 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2019 | $5,228,805,794 | 33,116 | 37 64 65 71 | Yes - $0 | $34 |
| Fidelity | General Dynamics Corporation 401(k) Plan 6.0 | 2019 | $7,674,185,804 | 45,045 | 13 15 21 25 33 37 38 50 57 62 64 65 71 99 | Yes - $0 | $37 |
| **Capital Group** | **Trader Joe's Company Retirement Plan** | **2019** | **$2,044,450,078** | **38,634** | **64 52 60 62 25 49 72** | **Yes - $0** | **$48** |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2020 | $6,618,601,000 | 43,691 | 15 21 25 28 37 38 49 50 52 59 62 64 65 99 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2020 | $5,663,746,665 | 28,348 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2020 | $5,564,538,096 | 67,149 | 37 60 64 65 | Yes - $0 | $26 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2020 | $6,148,370,238 | 35,467 | 37 64 65 71 | Yes - $0 | $30 |
| Vanguard | Kaiser Permanente Supplemental Savings and Retirement Plan | 2020 | $4,523,681,952 | 48,263 | 15 25 26 37 38 53 | Yes - $0 | $38 |
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2020 | $11,502,338,834 | 35,761 | 37 50 64 60 65 16 | Yes - $0 | $39 |

| Capital Group | Trader Joe's Company Retirement Plan | 2020 | $2,404,298,632 | 43,345 | 64 52 60 62 25 49 72 | Yes - $0 | $48 |
|---|---|---|---|---|---|---|---|
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2021 | $7,716,713,000 | 51,325 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $13 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2021 | $6,372,464,202 | 66,814 | 37 60 64 65 71 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2021 | $6,384,324,582 | 30,245 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2021 | $7,166,528,576 | 41,571 | 37 64 65 71 | Yes - $0 | $33 |
| Fidelity | General Dynamics Corporation 401(k) Plan 6.0 | 2021 | $9,863,978,096 | 48,852 | 13 15 21 25 33 37 38 50 57 62 64 65 71 99 | Yes - $0 | $34 |
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2021 | $11,824,972,858 | 34,397 | 37 50 64 60 65 16 | Yes - $0 | $38 |
| Capital Group | Trader Joe's Company Retirement Plan | 2021 | $2,783,027,426 | 42,594 | 64 52 60 62 25 49 72 | Yes - $0 | $48 |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2022 | $6,601,217,000 | 55,419 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $13 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2022 | $5,870,072,827 | 43,386 | 37 64 65 71 | Yes - $0 | $22 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2022 | $5,315,577,972 | 67,449 | 37 60 64 65 71 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2022 | $5,180,251,859 | 30,811 | 15 37 50 65 99 | Yes - $0 | $26 |
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2022 | $9,295,343,465 | 34,710 | 37 50 64 60 65 16 | Yes - $0 | $33 |
| Fidelity | General Dynamics Corporation 401(k) Plan 6.0 | 2022 | $9,624,334,376 | 59,991 | 13 15 21 25 33 37 38 50 57 62 64 65 71 99 | Yes - $0 | $39 |
| Capital Group | Trader Joe's Company Retirement Plan | 2022 | $2,396,191,704 | 44,205 | 64 52 60 62 25 49 72 | Yes - $0 | $48 |

| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2023 | $10,073,680,220 | 33,196 | 37 50 64 60 65 16 | Yes - $0 | $9 |
|---|---|---|---|---|---|---|---|
| Fidelity | General Dynamics Corporation 401(k) Plan 6.0 | 2023 | $11,166,951,949 | 63,408 | 13 15 21 25 33 37 38 50 57 62 64 65 71 99 | Yes - $0 | $16 |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2023 | $7,509,872,000 | 55,419 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $18 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2023 | $5,808,822,663 | 37,647 | 37 64 65 71 | Yes - $0 | $20 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2023 | $6,529,632,096 | 71,322 | 37 60 64 65 71 | Yes - $0 | $24 |
| Prudential | Philips North America 401(k) Plan | 2023 | $5,779,286,156 | 29,489 | 15 37 50 65 99 | Yes - $0 | $27 |
| T. Rowe Price | Sanofi U.S. Group Savings Plan | 2023 | $7,800,386,450 | 26,698 | 15 37 49 | Yes - $0 | $27 |
| **Capital Group** | **Trader Joe's Company Retirement Plan** | **2023** | **$2,772,092,019** | **44,218** | **64 52 60 62 25 49 72** | **Yes - $0** | **$48** |

169.    The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees over the course of the Class Period.

170.    As of the end of 2021 there were only 1,011 (0.2%) 401(k) plans with more than $1 billion in plan assets. *See* https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf. The Plan's $48 per participant fee from 2019 to 2023 is almost double the average fee of $26 per participant from 2019 to 2023 for the thirty-three (33) plans listed above.

171.    This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2019 through 2023. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees from 2019 through 2023.

172.    The Plan should have been able to obtain per participant recordkeeping fees of no more than $26 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

173.    Additionally, to further illustrate the excessiveness of the Plan RKA costs, numerous plans during the Class Period that were smaller in assets and in participants, and thus lacking the bargaining leverage of the Plan, paid less in RKA costs:

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant |
|---|---|---|---|---|---|---|---|
| Fidelity | First American Financial Corporation 401(k) Savings Plan | 2019 | $1,791,281,396 | 15,246 | 37, 60, 64, 65, 71 | Yes - $0 | $35 |
| Great-West Life/ TIAA | Penn State Health 401(k) Savings Plan | 2019 | $1,646,231,456 | 15,020 | 64 | Yes - $0 | $35 |
| **Capital Group** | **Trader Joe's Company Retirement Plan** | **2019** | **$2,044,450,078** | **38,634** | **64 52 60 62 25 49 72** | **Yes - $0** | **$48** |
| | | | | | | | |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15, 25, 50, 16, 26, 52, 21, 37, 57 | Yes - $0 | $23 |
| **Capital Group** | **Trader Joe's Company Retirement Plan** | **2020** | **$2,404,298,632** | **43,345** | **64 52 60 62 25 49 72** | **Yes - $0** | **$48** |
| | | | | | | | |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| Fidelity | Fortive Retirement Savings Plan | 2021 | $1,987,784,377 | 12,758 | 37, 64, 65, 71 | No | $34 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37, 60, 64, 65, 71 | Yes - $0 | $28 |
| **Capital Group** | **Trader Joe's Company Retirement Plan** | **2021** | **$2,783,027,426** | **42,594** | **64 52 60 62 25 49 72** | **Yes - $0** | **$48** |
| | | | | | | | |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2022 | $1,475,238,032 | 16,973 | 37, 60, 64, 65, 71 | Yes - $0 | $29 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2022 | $1,099,817,927 | 11,787 | 37, 60, 64, 65, 71 | Yes - $0 | $30 |

| Capital Group | Trader Joe's Company Retirement Plan | 2022 | $2,396,191,704 | 44,205 | 64 52 60 62 25 49 72 | Yes - $0 | $48 |
|---|---|---|---|---|---|---|---|
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2023 | $1,837,546,518 | 18,163 | 37, 60, 64, 65, 71 | Yes - $0 | $32 |
| Fidelity | Fortive Retirement Savings Plan | 2023 | $1,915,519,824 | 13,503 | 37, 64, 65, 71 | Yes - $0 | $30 |
| Capital Group | Trader Joe's Company Retirement Plan | 2023 | $2,772,092,019 | 44,218 | 64 52 60 62 25 49 72 | Yes - $0 | $48 |

174.    Thus, the Plan, with over 30,000 participants and over $1.8 billion dollars in assets in 2019, should have been able to negotiate recordkeeping costs in the $26 per participant range from the beginning of the Class Period to the present. Anything above that would be an outlier, especially later in the Class Period when RKA costs per participant should have been at the cheapest.

175.    Further, because Capital Group received income from the funds it maintained in the Plan, the Plan's fiduciaries should have taken these additional sources of income into consideration in considering whether RKA fees paid to Capital Research/Capital Group were reasonable. When considered together, the fees being paid to Capital Group were clearly unreasonable.

176.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

### D.    The Failure to Include a Target Date Suite in the Plan was Imprudent

177.    Defendants failed to include in the Plan menu of investment offerings what's known in the industry as a target date suite.

178.    Target date funds are designed to provide a single diversified investment vehicle for plan participants. Target date funds are offered as a suite of funds, with each fund based on the participant's anticipated retirement date.

179.    The first target date funds in the industry were offered as early as 1994, and since then the market for target date funds has exploded with numerous investment managers offering a variety of different target date fund investments.

180.    By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years or more.

181.    Multiple types of assets are included in a target date fund portfolio, including equity (stock) and fixed income (bond) securities. Target date funds offer diversity and balanced exposure to a broad array of underlying securities included in the fund.

182.    An investment in a single target date fund can be attractive to plan participants who do not want to actively manage their retirement savings and periodically convert to more conservative holdings as their retirement date draws near. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement.

183.    This rebalancing occurs based on the fund's "glide path." A glide path determines how the fund's target asset allocations across the underlying securities are expected to change over time and how they become more conservative as the target retirement date approaches.

184.    The target date refers to the participant's expected retirement year. For example, "target date 2030" funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

185.    Here, it appears that the Defendants have attempted to mimic the performance of a target date suite by using a mixture of some of the already excessively expensive funds in the Plan, discussed above, such as the American Funds Growth Fund of American, the American Funds SmallCap World, the American Funds, Inc. Fund of America, the American Funds Washington Mutual fund and/or the American Funds Bond Fund of America. Depending on a participants' retirement goals, it appears that the Plan engages in a balancing process with these funds whereby a certain percentage of a participants' money is invested in certain funds to increase the returns or to lower the risk whichever is more appropriate.

186.    It's unlikely that the Defendants could have accomplished this goal as well as a well-established target date suite. For this reason, the Plan should have included a well-respected target date suite. Accordingly, the Plaintiffs are entitled to the difference between the returns they would have received had they been in an excellent performing target date suite as opposed to the solution offered by the Defendants which included a balancing of several poor performing funds.

E.    **The Plan's Fiduciaries Failed to Adequately Monitor and Remove Investment Options that Significantly Underperformed Its Peers and Benchmarks**

187.    Prior to the start of the Class Period, four of the Plan's investments underperformed their peers and their Morningstar benchmark, the: (1) American Funds the Growth Fund of America, (2) American Funds Washington Mutual Investors Fund, (3) American Funds EuroPacific Growth Fund, and (4) Invesco Real Estate Fund (collectively, the "Challenged Funds"). Since at least 2014 the Challenged Funds underperformed on a 3- and 5- year average basis.

188.    Pursuant to the Plan's IPS, "Benchmarks used for evaluation purposes are those identified by Morningstar Associates, LLC for the various asset categories." IPS at 8.

189.    Morningstar benchmarks' corresponding Morningstar Categories group funds "according to their actual investment style, not merely their stated investment objectives, nor their ability to generate a certain level of income. To ensure homogeneous groupings, Morningstar normally allocates funds to categories on the basis of their portfolio holdings. Several portfolios are taken into account to ensure that the fund's real investment stance is taken into account." *See* https://www.morningstar.co.uk/uk/glossary/98381/morningstar-category.aspx[23]

190.    Morningstar categories are more reliable than simply comparing fund prospectuses, because Morningstar is a third party providing neutral information. Meanwhile, "the investment objective stated in a fund's prospectus may or may not reflect how the fund actually invests, the Morningstar category is assigned based on the underlying securities in each portfolio. Morningstar categories help investors and investment professionals make meaningful comparisons between funds." *See* https://sg.morningstar.com/sg/news/115635/morningstar-category-definition.aspx[24]

191.    Morningstar is the most accepted source of investment performance information, as it has the most robust information on all types of investment vehicles. Indeed, Morningstar is used and trusted by virtually all financial professionals and fiduciaries. In particular, Morningstar's historical performance data is used by professionals to predict future fund performance.

192.    Industry experts have concluded that the three- and five-year period is the most appropriate timeframe for evaluating investment performance, because it covers a full market cycle. *See* The PNC Financial Services Group, Inc., Assembling a Robust Investment Policy Statement for Endowments and Foundations, June 17, 2021 (a "fund's investment performance should be reviewed regularly, such as on an annual basis; however, the emphasis with regard to

---

[23] Last accessed September 5, 2024.
[24] Last accessed September 5, 2024.

performance should be focused on results achieved over a full market cycle (typically a three-to-five year period)"). Available at: https://www.pnc.com/insights/corporate-institutional/manage-assets/assembling-a-robust-investment-policy-statement-for-endowments-foundations.html[25]

193.    The Challenged Funds consistently materially underperformed industry-accepted benchmarks for funds used by investment professionals (*i.e.*, three-to-five year periods and against Morningstar Category funds). Based on the below data, there's no justifiable reason why the Challenged Funds would have been permitted to continue to languish in the Plan, unheeded, during the Class Period.

194.    As seen in the chart below, the Challenged Funds (in yellow) underperformed compared to the peers (in red text) in their Morningstar Categories and their Morningstar benchmarks[26] on a 3- and 5-year average basis before the start of the Class Period and continued to underperform throughout the Class Period.

| Investment and Benchmark | 3 Year Return 1/1/2016 - 12/31/2018 | 5 Year Return 1/1/2014 - 12/31/2018 |
|---|---|---|
| **American Funds The Growth Fund of America Class R4** | **9.89** | **8.84** |
| **American Funds The Growth Fund of America Class R5E** | **10.21** | **9.16** |
| American Funds The Growth Fund of America Class R5 | 10.09 | 8.97 |
| American Funds The Growth Fund of America Class Class R6 | 10.27 | 9.22 |
| T. Rowe Price Large-Cap Growth Fund I Class | 13.91 | 12.09 |
| MFS Massachusetts Inv Gr Stk R6 | 11.61 | 9.31 |
| American Century Ultra Fund I Class | 11.70 | 10.30 |
| Fidelity OTC Portfolio - Class K | 11.54 | 12.44 |

[25] Last accessed September 5, 2024.

| | | |
|---|---|---|
| Calvert Equity Fund Class I | 10.97 | 9.70 |
| Eaton Vance-Atlanta Capital Focused Growth Fund Class I | 12.76 | 9.89 |
| **Benchmark: Morningstar US Large Growth** | **11.34** | **11.21** |
| **Benchmark 2: Russell 1000 Growth Index** | **10.35** | **9.78** |
| | | |
| **American Funds Washington Mutual Investors Fund Class R4** | **9.72** | **7.93** |
| **American Funds Washington Mutual Investors Fund Class R5E** | **9.91** | **8.08** |
| American Funds Washington Mutual Investors Fund Class R5 | 10.03 | 8.25 |
| American Funds Washington Mutual Investors Fund Class R6 | 10.09 | 8.30 |
| T. Rowe Price Dividend Growth Fund I Class | 9.76 | 8.75 |
| Jensen Quality Growth Fund Class I | 12.42 | 10.13 |
| Touchstone Large Cap Focused Fund Institutional Class | 10.42 | 8.43 |
| Alger Growth & Income Fund Class Z | 10.43 | 7.84 |
| Benchmark: Morningstar US LM | 11.48 | 8.20 |
| | | |
| **American Funds EuroPacific Growth Fund Class R4** | **3.72** | **1.50** |
| **American Funds EuroPacific Growth Fund Class R5E** | **3.92** | **1.63** |
| American Funds EuroPacific Growth Fund Class R5 | 4.04 | 1.81 |
| American Funds EuroPacific Growth Fund Class R6 | 4.08 | 1.86 |
| Vanguard International Growth Fund Admiral Shares | 8.41 | 3.67 |
| MFS International Growth Fund Class R6 | 7.52 | 3.46 |
| MFS International Intrinsic Value Fund Class R6 | 6.54 | 5.59 |
| WCM Focused International Growth Fund Institutional Class | 6.98 | 5.25 |
| Virtus SGA International Growth Fund Class I | 6.69 | 2.92 |
| Benchmark 1: Morningstar Gbl X US Gro | 4.07 | 1.53 |
| | | |
| **Invesco Real Estate Fund Class A** | **2.67** | **7.12** |

| | | |
|---|---|---|
| **Invesco Real Estate Fund Class R5** | **3.07** | **7.53** |
| Invesco Real Estate Fund Class R6 | 3.16 | 7.61 |
| Cohen & Steers Real Estate Securities Fund, Inc. Class Institutional | 3.77 | 9.76 |
| Cohen & Steers Realty Shares Fund Class L | 2.71 | 8.17 |
| Principal Real Estate Securities Fund Institutional Class | 3.39 | 8.80 |
| Principal Real Estate Securities Fund Class R6 | 3.36 | 8.70 |
| Benchmark 1: Morningstar US RE | 3.36 | 7.62 |

195.     This underperformance continued throughout the Class Period:

| | 5 Year Return (annualized) |
|---|---|
| **Investment and Benchmark** | **1/1/2017-12/31/2022** |
| **American Funds The Growth Fund of America Class R4** | **7.19** |
| **American Funds The Growth Fund of America Class R5E** | **7.52** |
| American Funds The Growth Fund of America Class Class R5 | 7.41 |
| American Funds The Growth Fund of America Class Class R6 | 7.57 |
| T. Rowe Price Large-Cap Growth Fund I Class | 8.35 |
| MFS Massachusetts Inv Gr Stk R6 | 12.34 |
| American Century Ultra Fund I Class | 11.27 |
| Fidelity OTC Portfolio - Class K | 11.00 |
| Calvert Equity Fund Class I | 13.92 |
| Eaton Vance-Atlanta Capital Focused Growth Fund Class I | 14.77 |
| **Benchmark: Morningstar US Large Growth** | **N/A** |
| **Benchmark: Russell 1000 Growth Index** | **10.96** |
| | |
| **American Funds Washington Mutual Investors Fund Class R4** | **9.03** |
| **American Funds Washington Mutual Investors Fund Class R5E** | **9.26** |
| American Funds Washington Mutual Investors Fund Class R5 | 9.35 |

| | |
|---|---|
| American Funds Washington Mutual Investors Fund Class R6 | 9.41 |
| T. Rowe Price Dividend Growth Fund I Class | 10.95 |
| Jensen Quality Growth Fund Class I | 11.37 |
| Touchstone Large Cap Focused Fund Institutional Class | 10.47 |
| Alger Growth & Income Fund Class Z | 10.09 |
| **Benchmark: Morningstar US LM** | **9.14** |
| | |
| **American Funds EuroPacific Growth Fund Class R4** | **1.18** |
| **American Funds EuroPacific Growth Fund Class R5E** | **1.39** |
| American Funds EuroPacific Growth Fund Class R5 | 1.49 |
| American Funds EuroPacific Growth Fund Class R6 | 1.53 |
| Vanguard International Growth Fund Admiral Shares | 4.75 |
| MFS International Growth Fund Class R6 | 4.61 |
| MFS International Intrinsic Value Fund Class R6 | 3.36 |
| WCM Focused International Growth Fund Institutional Class | 6.72 |
| Virtus SGA International Growth Fund Class I | 5.37 |
| **Benchmark 1: Morningstar Gbl X US Gro** | **1.58** |
| | |
| **Invesco Real Estate Fund Class A** | **2.66** |
| **Invesco Real Estate Fund Class R5** | **3.04** |
| Invesco Real Estate Fund Class R6 | 3.13 |
| Cohen & Steers Real Estate Securities Fund, Inc. Class Institutional | 5.30 |
| Cohen & Steers Realty Shares Fund Class L | 5.76 |
| Principal Real Estate Securities Fund Institutional Class | 4.87 |
| Principal Real Estate Securities Fund Class R6 | 4.96 |
| **Benchmark 1: Morningstar US RE** | **3.74** |

196.    Not only did the Challenged Funds underperform against their peers and benchmarks during the Class Period, but they also underperformed on a 10-year[27] average basis compared to their readily available alternative suites. The below chart shows that, in 2022, the Challenged Funds underperformed against each comparator funds' performance.

| Investment and Benchmark | 10 Year Return (annualized) 1/1/2013-12/31/2022 |
|---|---|
| **American Funds The Growth Fund of America Class R4** | **11.54** |
| **American Funds The Growth Fund of America Class R5E** | **11.87** |
| American Funds The Growth Fund of America Class Class R5 | 11.70 |
| American Funds The Growth Fund of America Class Class R6 | 11.93 |
| T. Rowe Price Large-Cap Growth Fund I Class | 13.85 |
| MFS Massachusetts Inv Gr Stk R6 | 13.69 |
| American Century Ultra Fund I Class | 14.24 |
| Fidelity OTC Portfolio - Class K | 16.44 |
| Calvert Equity Fund Class I | 14.26 |
| Eaton Vance-Atlanta Capital Focused Growth Fund Class I | 14.06 |
| **Benchmark: Morningstar US Large Growth** | **N/A** |
| **Benchmark: Russell 1000 Growth Index** | **14.10** |
| | |
| **American Funds Washington Mutual Investors Fund Class R4** | **11.86** |
| **American Funds Washington Mutual Investors Fund Class R5E** | **12.03** |
| American Funds Washington Mutual Investors Fund Class R5 | 12.19 |
| American Funds Washington Mutual Investors Fund Class R6 | 12.25 |

---

[27] The IPS states that Committee shall "review and evaluate investment options on a periodic basis. The evaluation process will be based [a 10 Year Performance Peer Rank]." IPS at 7.

| | |
|---|---|
| T. Rowe Price Dividend Growth Fund I Class | N/A |
| Jensen Quality Growth Fund Class I | 13.64 |
| Touchstone Large Cap Focused Fund Institutional Class | N/A |
| Alger Growth & Income Fund Class Z | 12.32 |
| **Benchmark: Morningstar US LM** | **12.34** |
| | |
| **American Funds EuroPacific Growth Fund Class R4** | **4.94** |
| **American Funds EuroPacific Growth Fund Class R5E** | **5.08** |
| American Funds EuroPacific Growth Fund Class R5 | 5.26 |
| American Funds EuroPacific Growth Fund Class R6 | 5.3 |
| Vanguard International Growth Fund Admiral Shares | 7.84 |
| MFS International Growth Fund Class R6 | 6.38 |
| MFS International Intrinsic Value Fund Class R6 | 8.07 |
| WCM Focused International Growth Fund Institutional Class | 8.91 |
| Virtus SGA International Growth Fund Class I | 6.98 |
| **Benchmark 1: Morningstar Gbl X US Gro** | **4.32** |
| | |
| **Invesco Real Estate Fund Class A** | **2.66** |
| **Invesco Real Estate Fund Class R5** | **3.04** |
| Invesco Real Estate Fund Class R6 | 3.13 |
| Cohen & Steers Real Estate Securities Fund, Inc. Class Institutional | 5.30 |
| Cohen & Steers Realty Shares Fund Class L | 5.76 |
| Principal Real Estate Securities Fund Institutional Class | 4.87 |
| Principal Real Estate Securities Fund Class R6 | 4.96 |
| **Benchmark 1: Morningstar US RE** | **3.74** |

197.    Together, these three charts span from the first day of 2013 until the last day of 2022, demonstrating that the Challenged Funds underperformed in both good markets and bad markets.

198.    To make matters worse, the Challenged Funds ranked poorly as compared to its peers in its Morningstar Category as demonstrated in the chart below:

| Investment | 2019 Percentile Rank | 2023 Percentile Rank |
|---|---|---|
| American Funds The Growth Fund of America Class R4 | 83rd | 53rd |
| American Funds The Growth Fund of America Class R5E | 81st | 52nd |
| | | |
| American Funds Washington Mutual Investors Fund Class R4 | 85th | 80th |
| American Funds Washington Mutual Investors Fund Class R5E | 84th | 79th |
| | | |
| American Funds EuroPacific Growth Fund Class R4 | 64th | 59th |
| American Funds EuroPacific Growth Fund Class R5E | 61st | 55th |
| | | |
| Invesco Real Estate Fund Class A | 42nd[28] | 93rd |
| Invesco Real Estate Fund Class R5 | 37th | 91st |

199.    Looking at this data together, the Challenged Funds underperformed across several metrics for *years before* the Class Period, and for *years into* the Class Period. This consistent underperformance data was publicly available to the Committee at the time of their decision-making, whether they reviewed the funds annually or quarterly (if at all). Furthermore, this Morningstar data and ten-year timeframe is the same data the Committee was directed to use by

---

[28] Although the percentage rankings for Invesco Real Estate Fund Class A and Class R5 were in the top 50th percentile in 2019, the percentage rankings for funds dropped to 86th and 83rd in 2020, respectively.

the Plan's IPS. Hence, the Committee would have been aware of the Challenged Funds' underperformance had they followed the binding IPS. Prudent fiduciaries would have acknowledged that this pattern of underperformance did not bode well for the Challenged Funds' future performance and would have made a timely switch to any of the numerous safer, better managed, and ultimately more optimistic investment options.

200.    Given the long history of underperformance, it's inexplicable why the Challenged Funds would have been included as Plan investment options by the start of the Class Period and kept in place.

**F.    The Company Improperly Reduced its Plan Contributions Through Forfeiture Accounts**

201.    A Trust, adopted by Trader Joe's under a trust agreement between Trader Joe's and Capital Bank, the trustee, was established to, among other things, hold contributions to the Plan. *See* Trust Agreement dated July 15, 2015. Further, "[a]ll money that is contributed to the Plan is held in a trust fund." SPD at 17.

202.    "The Trustee is responsible for the safekeeping of the trust fund and must hold and invest Plan assets [including employer contributions] . . . in a prudent manner and in the best interest of" the Plan participants. SPD at 17.

203.    During the Class Period, Defendants breached their ERISA fiduciary duties by misusing the Plan's assets for Defendants' own benefit and to the detriment of Plan participants.

204.    As explained above, any contributions in the Trust which do not vest, or which are not claimed by a Plan participant, are forfeited.

205.    As alleged above, Defendants had a choice on how to utilize forfeited amounts. Since at least the beginning of the Class Period, Defendants have improperly used forfeited non-

vested Plan assets for the Company's own benefit to reduce future Company contributions instead of using the funds to benefit Plan participants.

206.    According to information from the Plan's Form 5500, the following represents the balance in the Plan's forfeiture accounts during the Class Period, the amount of the forfeiture improperly used to offset the Company's contributions to the Plan, and the amounts used to pay for Plan administration costs:

| Plan Year | Forfeiture Amount | Offset Contributions | Offset Plan Fees | Restore re-employed participants |
|---|---|---|---|---|
| 2019 | $7,940,352 | $5,882,708 | - | $90,972 |
| 2020 | $7,031,600 | $7,682,319 | - | $102,643 |
| 2021 | $7,553,804 | $6,845,700 | - | $61,572 |
| 2022 | $10,117,187 | $7,459,845 | - | $43,448 |
| 2023 | $6,439,749 | $9,152,140 | - | $102,562 |
| **Total** | | **$37,022,712** | | **$401,197** |

207.    Based on the above chart, from the beginning of the Class Period through 2022, over $37 million was improperly steered from paying RKA costs and instead used to benefit the Company.

208.    Defendants effectively placed their own interests above the interests of the Plan and its participants and caused harm to the Plan and its participants by reducing Plan assets, not allocating forfeited funds to Plan participants' accounts, and also caused Plan participants to incur at least $37 million in expenses that could otherwise have been covered in whole or in part by forfeited funds.

## COUNT I
### Breaches of Fiduciary Duty of Prudence
### (Asserted against the Committee Defendants)

209.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

210.    At all relevant times, the Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

211.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA Section 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

212.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds and poor performance in relation to other comparable investments. The Prudence Defendants failed to include a target date suite in the Plan. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. Likewise, the Prudence Defendants failed to monitor the manner in which recordkeeping services was paid.

213.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

214.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for the Prudence Defendants' breaches as set forth in their Prayer for Relief.

215.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Prudence Defendant is also liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Breach of Fiduciary Duty of Loyalty**
**(Asserted against the Company, the Committee and Board Defendants)**

216.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

217.    At all relevant times, the Company, the Committee Defendants, and the Board Defendants ("Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA §

3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

218.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

219.    Pursuant to 29 U.S.C. § 1104(a)(1)(A), the Loyalty Defendants were required to discharge their duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

220.    The Loyalty Defendants failed to exercise their duty of loyalty to the Plan and its participants by utilizing forfeited funds in the Plan for the benefit of the Company instead of the sole interest of the Plan participants and beneficiaries.

221.    The Loyalty Defendants used these Plan assets for the purpose of reducing the Company's own contributions to the Plan, thereby saving the Company millions of dollars each year at the expense of the Plan which received decreased Company contributions, and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

222.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses.

223.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

224.    Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### Breach of ERISA's Anti-Inurement Provision
### (Asserted against the Company and the Board Defendants)

225.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

226.    Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

227.    Because all forfeited Plan participant funds are initially placed in the Plan's trust, these forfeited funds are Plan assets.

228.    The Companies' use of the forfeited funds to defray its own contributions to the Plan in order to save itself millions of dollars in funds that the Company would otherwise have to contribute to the Plan, caused the assets of the Plan to inure to the benefit of the Company in violation of 29 U.S.C. § 1103(c)(1).

229.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of ERISA's anti-inurement provision, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

230.    Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT IV
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against the Company and the Board Defendants)

231.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

232.     Trader Joe's and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

233.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

234.     The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

235.     The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

> (a)     Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, and imprudent choices of funds' class of shares that adversely affected the

investment performance of the Funds' and their participants' assets as a result of the Committee Defendants' imprudent actions and omissions;

(b)     Failing to monitor the processes by which Plan investments were evaluated, and the Committee Defendants' failure to investigate the availability of lower-cost share classes; and

(c)     Failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay unreasonable recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

236.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

237.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

71

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs'
counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary
duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan
resulting from Defendants' breaches of their fiduciary duties, including restoring to the Plan all
losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the
Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the
participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendant to disgorge all profits received from,
or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of
an accounting for profits, imposition of a constructive trust, or a surcharge against the Company
Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust
enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated
among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary
responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the
provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or
fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary
duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund

doctrine; and

L.     Such other and further relief as the Court deems equitable and just.

Dated: January 28, 2025                         Respectfully submitted,

/s/ *Jeffrey Hellman*
Jeffrey Hellman
BBO # 549896
**Law Offices of Jeffrey Hellman, LLC**
195 Church Street, 10th Floor
New Haven, CT 06510
Tel.: 203-691-8762
Fax: (203) 823-4401
Email: jeff@jeffhellmanlaw.com

Mark K. Gyandoh
(*pro hac vice* admission to be applied for)
James A. Maro
(*pro hac vice* admission to be applied for)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
Email:   markg@capozziadler.com
            jamesm@capozziadler.com

Peter A. Muhic
(*pro hac vice* admission to be applied for)
**Muhic Law LLC**
923 Haddonfield Road
Suite 300
Cherry Hill, NJ 08002
Telephone: (856) 324-8252
Email:peter@muhiclaw.com

*Counsel for Plaintiffs and the Putative Class*