**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BEAU STEPHAN, GEORGE STRAY, LEONARD KIRSCHLING, GEORGE PHIRIPES, RHONDA HABELL, CAMERON BASS and STEPHEN BUBNIAK, individually, and on behalf of all others similarly situated, | No. 1:25-cv-10212-WGY |
| *Plaintiffs*, | |
| v. | |
| TRADER JOE'S COMPANY, THE BOARD OF DIRECTORS OF TRADER JOE'S COMPANY, THE INVESTMENT COMMITTEE and JOHN DOES 1-30, | **ORAL ARGUMENT REQUESTED** |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS**
**PURSUANT TO FED. R. CIV. P. 52(c)**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT ...................................................................................................... 1

    A.    Defendants Are Entitled to Judgment on Plaintiffs' Recordkeeping Theory ......... 1

        1.    Plaintiffs Have Failed To Establish a Breach of the Duty of Prudence...... 1

        2.    Plaintiffs Have Failed To Establish a "Loss" Associated With Any Alleged Breach of the Duty of Prudence ...................................................... 7

    B.    Defendants Are Entitled to Judgment on Plaintiffs' Investment-Monitoring Theory .................................................................................................................. 10

        1.    Plaintiffs Have Failed To Establish a Breach of the Duty of Prudence.... 10

        2.    Plaintiffs Have Failed To Establish a "Loss" Associated with any Breach ................................................................................................................. 13

    C.    Defendants Are Entitled To Judgment on Plaintiffs' Forfeiture Theory .............. 16

        1.    Plaintiffs Have Failed To Establish any Fiduciary Breach ....................... 16

        2.    Plaintiffs Have Failed To Establish a "Loss" Associated with any Breach ................................................................................................................. 18

    D.    Defendants Are Entitled To Judgment on Plaintiffs' "Failure to Monitor" Theory ................................................................................................................. 19

III.  CONCLUSION .................................................................................................. 20

## I.      Introduction

Plaintiffs have now presented their case, and the record evidence establishes that they have failed to meet their burden to prove either "breach" or "loss" on each of their remaining claims. Defendants thus respectfully move for entry of judgment in their favor under Federal Rule of Civil Procedure 52(c). Fed. R. Civ. P. 52(c) ("If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."). Defendants' affirmative case will reinforce Plaintiffs' failure to meet their burden, and will further establish that Defendants are entitled to judgment based on the objective prudence of their fiduciary decisions. But this Court need not hear further testimony on breach or loss, as the time has passed for Plaintiffs to make their case. The Court should grant judgment in Defendants' favor.

## II.      Argument

### A.      Defendants Are Entitled to Judgment on Plaintiffs' Recordkeeping Theory

#### 1.   *Plaintiffs Have Failed To Establish a Breach of the Duty of Prudence*

ERISA fiduciaries must employ "appropriate methods to investigate the merits" of fiduciary decisions, and "engage[] in a reasoned decision[-]making process, consistent with that of a prudent man acting in [a] like capacity." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007).[1] As this Court has recognized, "a fiduciary does not have to select the lowest fee to satisfy its duty of prudence." *Sellers v. Trs. of Bos. Coll.*, 729 F. Supp. 3d 136, 157 (D. Mass. 2024). The duty is, instead, "a process-driven obligation." *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 213 (6th Cir. 2024), *cert. pet. filed*, No. 24-1030 (U.S. Mar. 26, 2025).

---

[1] Unless stated otherwise, all internal quotations and citations are omitted.

Here, the Investment Committee's process for monitoring the Plan's recordkeeping services and fees over the relevant period fell comfortably within the range of reasonable fiduciary conduct. *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022) (explaining that "courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise"). As Trader Joe's CFO Mitch Nadler testified, the Committee members, who were high-level executives at the Company, worked with their independent investment consultants to: (i) monitor Capital Group's fees and services at the Committee's regular quarterly meetings; (ii) commission three "fee benchmarking" reports from Fiduciary Benchmarks,[2] an independent provider that even Plaintiffs' expert Eric Dyson conceded is well-respected in the industry; (iii) test the market by soliciting bids from other recordkeeping-services providers in early 2021; and (iv) negotiate two separate reductions in Capital Group's recordkeeping fees during the relevant period. As Mr. Nadler also explained, the Plan received excellent administrative services at competitive fees that the Committee succeeded in reducing even more during the relevant period.

**Regular Monitoring of Recordkeeping Fees.** Periodic monitoring is a key hallmark of a prudent fiduciary process. *Cho v. Prudential Ins. Co. of Am.*, 2026 WL 74499, at *3-4 (3d Cir. Jan. 9, 2026) (noting the fiduciaries' engagement of a professional investment consultant, quarterly meetings, active discussion of performance evaluations, and the consideration of substantive materials prepared in advance of meetings); *Mattson v. Milliman, Inc.*, 2024 WL 3024875, at *16-18 (W.D. Wash. June 17, 2024) (noting "hallmarks of prudent processes" evidenced in the fiduciary record, including regular meetings, retention of an independent adviser, and engagement with investment adviser's reports and recommendations). Here, the Committee met at least once

---

[2] Fiduciary Benchmarks is also known as Fiduciary Decisions. *See* TX 394 at TJSTEPHAN00005789.

per quarter for the entire relevant period (with the exception of a single quarter), *see* TX 53-79, and the Plan's recordkeeping fees and services were discussed and memorialized in the Committee's minutes, *see*, *e.g.*, TX 59, 61, 63, 75 (reflecting specific discussions of Capital Group's recordkeeping fees).  This monitoring, even standing alone, evidences a prudent fiduciary process—but the Committee's process went far beyond this periodic tracking.

**Independent Benchmarking Reports.**    The Committee also commissioned three benchmarking studies of the Plan's recordkeeping fees during the relevant period: in November 2020, January 2021, and June 2024.  These reports—which were prepared by a well-regarded, independent provider, Fiduciary Benchmarks—assessed the Plan's fees in light of the services Capital Group provided, which this Court and others have recognized is prudent.  *See Sellers*, 729 F. Supp. 3d at 150 (a fiduciary's duty is "to ensure that the plan's recordkeeping fees are not excessive *relative to the services rendered*" (emphasis added)); *see also Lalonde v. Mass. Mut. Ins. Co.*, 728 F. Supp. 3d 141, 157-58 (D. Mass. 2024) (dismissing claim absent comparator showing recordkeeping "fees were excessive relative to the services rendered").

- The November 2020 report showed that the Plan received above-median Compliance & Consulting services, resulting in an upward adjustment to the "FeePoint" calculation for the Plan based on "extra work/services/meetings or fiduciary status that are not typical for plans in the Benchmark Group," and that the Plan's fees were comparable to Fiduciary Benchmarks' proprietary "FeePoint" calculation.  *See* TX 391 at TJSTEPHAN0005904-5905, -5909.

- The February 2021 report showed that the Plan's fees were $5 lower than Fiduciary Benchmarks' "FeePoint" calculation on a PPPY basis, that the Plan "received services in excess of standard," and that the "Plan [wa]s getting more value than it

is paying for." *See* TX 392 at TJSTEPHAN00003895-3896; *see also* TX 393 at TJSTEPHAN00003902.

- The June 2024 report showed that the Plan's recordkeeping fees were below Fiduciary Benchmark's peer group median (despite receiving higher service levels in three out of four service categories), and well below the "FeePoint" estimate. TX 394 at TJSTEPHAN00005784-5785.

Further evidencing the Committee's prudent monitoring process, the Committee discussed each of these benchmarking reports at their quarterly meetings with their investment advisers, worked to understand the insights and limitations of the reports, and used the information the reports provided to test the market and negotiate lower fees with Capital Group, as Mr. Nadler explained during his testimony.

**January 2021 Solicitation of Bids.** Following receipt of the November 2020 Fiduciary Benchmarks report, the Committee tasked its investment advisers with identifying alternative recordkeepers that could adequately service the Plan and soliciting bids from those recordkeepers through a "soft" RFP, in order to test the market.[3] As Mr. Nadler testified, the advisers ultimately obtained two bids—one from Fidelity and another from John Hancock—both of which were meaningfully higher than Capital Group's proposal. *See* Ex. 395. The Committee ultimately

---

[3] Plaintiffs quibble with the term "soft" RFP, but the law recognizes that fiduciaries can prudently evaluate the market for recordkeeping services through a variety of means, including by forgoing so-called "formal" RFPs in favor of other processes. *See McDonald*, 2025 WL 2325016, at *20 (M.D.N.C. Aug. 12, 2025) (crediting testimony that formal RFPs "are not the only way to determine a reasonable recordkeeping fee," and holding that plaintiffs "failed to show that LabCorp's lack of conducting an RFP constitutes a breach of fiduciary duty"); *In re Prime Healthcare ERISA Litig.*, 2024 WL 3903232, at *24 (C.D. Cal. Aug. 22, 2024) (rejecting plaintiffs' argument that it is "industry custom to always conduct an RFP"), *appeal dismissed*, No. 24-5841, 2024 WL 5277219 (9th Cir. Oct. 4, 2024). Mr. Dyson acknowledged that there is no legal requirement to conduct an RFP at regular intervals.

4

decided that there was no need to conduct a formal RFP for the Plan's recordkeeping arrangement in light of this market information and the Committee's satisfaction with Capital Group's performance, as Mr. Nadler explained during his testimony.

**Fee Negotiations with Capital Group.**  In conjunction with these processes, the Committee also leveraged its existing relationship with Capital Group to obtain two fee concessions during the relevant period: first following receipt of the November 2020 benchmarking report, *see* TX 377 (reflecting reduction in recordkeeping fees from $48 to $40, effective April 1, 2021), and later following receipt of the June 2024 benchmarking report, *see* TX 379 (reflecting further reduction effective July 1, 2024).  The periodic reduction in the Plan's recordkeeping fees over time was a direct result of the Committee's attentive monitoring of the Plan's recordkeeping fees.  Though fiduciary prudence turns on "conduct, … not result[s]," *Ellis*, 883 F.3d at 10, the Committee's diligent and effective process produced successful results by reducing the Plan's fees twice during the relevant period.

This evidence that the Committee investigated the marketplace and considered alternatives during the period establishes that the Committee employed "appropriate methods to investigate" the reasonableness of Capital Group's fees in light of the excellent service levels that the Plan received.  *See Bunch v. W.R. Grace Co.*, 555 F.3d 1, 10 (1st Cir. 2009).  The Committee's processes align, for instance, with the fiduciary process blessed in *McDonald v. Laboratory Corporation of America Holdings*, where the court found for defendant after a bench trial that established that the fiduciaries conducted multiple rounds of fee benchmarking throughout the challenged period, which it used to leverage negotiations with its existing recordkeeper to obtain fee concessions. 2025 WL 2325016, at *20-21 (M.D.N.C. Aug. 12, 2025); *see Prime Healthcare*, 2024 WL 3903232, at *22-24.

5

Plaintiffs elicited testimony during their case about a grab-bag of other theories that they may wish to connect to their recordkeeping claim—on topics like "float" income, the sufficiency of Capital Group's fee disclosures to the Plan, and Capital Group's compensation for investment-management services related to the American Funds in the Plan lineup—but these theories are meritless and none is connected to any theory of loss allegedly suffered by participants.[4]  In fact, the evidence directly contradicts Plaintiffs' contention that the Committee was unaware of the full spectrum of Capital Group's earnings from the Plan—all three of the Fiduciary Benchmarking reports include a summary of Capital Group's revenue from its investment management services and Mr. Nadler testified that the Committee not only was well aware that the Plan's American Funds offerings provided Capital Group with significant revenues but specifically leveraged that information in fee negotiations with Capital Group.  *See* TX 394 at TJSTEPHAN00005771 (June 2024 Fiduciary Benchmarks report, listing Capital Group's investment management fees); *see also* TX 391, 392 (same, for 2020 and 2021 Fiduciary Benchmarks reports); TX 75 (reflecting that "Committee reviewed value and fee benchmarking information for the Plan, including total plan fees, fund manager, and recordkeeper data total plan fees" (emphasis added)).[5]

Overall, the Trader Joe's Investment Committee's diligent monitoring of Capital Group's services, in conjunction with its investigation and consideration of alternatives and effective

---

[4] As discussed further below, Plaintiffs' expert, Mr. Dyson, conceded that other plans have similar arrangements and there is no evidence as to whether any of the comparator plans identified by Mr. Dyson received additional compensation for providing additional services to their plans.

[5] Defendants could have presented additional evidence on this point but it was not pleaded in Plaintiffs' Complaint and was not a subject of discovery in this action.  Plaintiffs cannot "rais[e] issues and present[] evidence in a manner that leaves Defendants with a moving target of what to defend against," *Prime Healthcare*, 2024 WL 3903232, at *28.  This Court should thus disregard Plaintiffs' effort to kick up dust at the eleventh hour.  *See McDonald*, 2025 WL 2325016, at *23 ("A case may not proceed to trial on an [unpled] theory of recovery without express or implied consent of the parties.").

negotiation with Capital Group, establishes that Defendants did not breach ERISA's fiduciary duty of prudence in its monitoring of the Plan's recordkeeping fees.

2. *Plaintiffs Have Failed To Establish a "Loss" Associated With Any Alleged Breach of the Duty of Prudence*

Even if Plaintiffs had met their burden to prove a breach (and they have not), they have failed to proffer sufficient evidence on the loss element of their claim.  To show a loss on an ERISA claim, a plaintiff  must provide a "suitable benchmark" against which Trader Joe's recordkeeping fees can be meaningfully compared, *see Sellers*, 729 F. Supp. 3d at 185-86—i.e., they must show that lower fees were available on the market for the specific services provided to the specific plan.  A plaintiff cannot simply assert that the Plan's recordkeeping fees were too high.  *See, e.g.*, *Huang v. TriNet HR III, Inc.*, 2023 WL 3092626, at *11-12 (M.D. Fla. Apr. 26, 2023).   A sound comparison takes into account not only the dollar amount of fees, but also the services provided in exchange for those fees, because a fiduciary's duty is "to ensure that the plan's recordkeeping fees are not excessive *relative to the services rendered*."  *Sellers*, 729 F. Supp. 3d at 150 (emphasis added).  Plaintiffs have not identified a *single* comparably sized plan in the market that paid $21 PPPY for recordkeeping services, and Mr. Dyson's opinion that that was a reasonable fee for the Trader Joe's Plan is unsupported.   Defendants are thus entitled to judgment on the claim. *McDonald*, 2025 WL 2325016, at *21 (entering judgment for Defendants after ERISA bench trial where plaintiffs' expert testimony offering reasonable-fee benchmark had been excluded because it was "unreliable").

Plaintiffs attempted to establish a loss with the testimony of Mr. Dyson, who relied on reports he generated from a "PlanTools" database to opine that $21 would have been a "reasonable fee" for the Plan.  As Mr. Dyson explained, he had the PlanTools database collect two sets of anonymized plans to form his two comparator groups—one group with plans with over 10,000

7

participants, and one group with over $500 million in assets.  Mr. Dyson then plugged in a fee level that he "thought the Plan might be able to achieve," based on math he did "in his head."  He started with a hypothetical $19 fee, but found it was generally outside of what PlanTools calls the "sweet spot" against both comparison groups (between the 25th and 75th percentile of comparators).  After trying $20 and again finding that the fee was, in his estimation, too low, Mr. Dyson ultimately settled on a $21 "reasonable fee" benchmark because that was the closest he could get to satisfying the reasonableness criteria he invented.  As he conceded at trial, Mr. Dyson's own $21 proposed fee benchmark fell *outside* the "sweet spot" of his per-participant fee range in three of six years in his reports, and the Plan's own fees actually fell *within* the "sweet spot" range more often.  Yet he used his cherry-picked $21 proposed fee to calculate loss, even though it did not meet the criteria he concocted.  Mr. Dyson's testimony fails to establish loss for three essential reasons.

First, Mr. Dyson failed to establish any "sound basis for comparison," *Matousek v. MidAm. Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022), because he did not account for the Plan's services *vis-à-vis* his purported comparators.  Mr. Dyson testified that the reasonableness of a fee must be assessed based on the totality of the circumstances, but as he conceded at trial, Mr. Dyson knows nothing about the services the plans in the PlanTools reports received.  He does not even know the names of the plans PlanTools selected as comparators, or anything about them other than anonymized data about their participant counts or assets.  Mr. Dyson analogizes his methodology to the Fiduciary Benchmarks reports (which similarly do not disclose the names of plans in their comparator groups), but this analogy is no more than a distraction.  The fact that a plan can prudently conduct a reasonable benchmarking exercise of its own fees against the market without certain details of comparator plans (in order to determine if the fees are within the range of

8

reasonable fees) does not establish that *Plaintiffs* can meet their burden of showing a meaningful comparator without establishing that some plan (named or otherwise) actually paid a fee lower than the Plan for a comparable package of services. *See Sellers*, 729 F. Supp. 3d at 179 (criticizing expert for failing "to identify any plan with a $50 recordkeeping fee during the same time period"). Mr. Dyson's PlanTools analysis cannot do that. Because Plaintiffs failed to assess the reasonableness of the Plan's fees in light of the Plan's services, they have failed to establish a loss. *See Sellers*, 729 F. Supp. 3d at 150.

Second, Mr. Dyson's assertion that the Plan's services are not "extraordinary" among large 401(k) plans does not cure his failure to identify a reasonable alternative. Since the comparators on which Mr. Dyson relies for his $21 loss benchmark come *solely* from the PlanTools database, the critical question is how the Plan's services compared to those received by the plans underlying his PlanTools reports. Mr. Dyson's opinion about how the Plan's services compared to those received by large 401(k) plans in general—based on nothing more than his undefined experience— is completely tangential to that issue, because he cannot establish that the comparator plans in his PlanTools reports were similar to the "typical" plans he purports to be familiar with.[6]

Third, Mr. Dyson's opinion is not credible because core facets of the opinion are based on his "experience" alone. Mr. Dyson opined that, in his experience, plans that engage in a competitive bid process are able to secure fees at the 25th percentile fees—i.e., fees lower than 75% of other plans. That assumption is foundational—it is the key to Mr. Dyson's opinion that the Plan could have paid $21 PPPY for recordkeeping, because Mr. Dyson arrived at that number

---

[6] Nor do the Fiduciary Benchmarks reports received by the Plan suggest that the Plan received only "typical" services, despite what Plaintiffs might contend. Those reports in fact concluded that the Plan received certain "services in excess of standard" services, which required various adjustments to ensure that the Plan's fees could be meaningfully compared to other plans. *See* TX 393; *see generally* TX 391-92, 94.

simply by identifying the fee that fell closest to the 25th percentile in his PlanTools reports. And Mr. Dyson's opinion on this point is not credible: simple arithmetic negates his assertion that every plan is capable of securing fees lower than 75% of other plans by soliciting competitive bids; some plans inevitably will fall at the upper end of the range in any distribution. Perhaps most tellingly, Mr. Dyson's own analysis did not establish that there was *any* fee that would have left *any* of his comparator plans at the 25th percentile in terms of both participant counts and number of assets. Indeed, Mr. Dyson's analysis could not even establish that any of his comparator plans paid a fee as low as $21 PPPY, because his scatter plots are expressed in terms of asset-based fees, and the PlanTools reports do not have the information necessary to convert those asset-based figures into a per-participant, dollar fee for any of the comparator plans. Mr. Dyson's appeals to "experience" are not backed up by any reliable underlying methodology, and are therefore insufficient to justify his testimony on loss. *See Sellers*, 729 F. Supp. 3d at 179 (excluding expert opinion "that $50 is a prudent fee from 2016 and 2018, because [expert] fail[ed] to show how his experience led to his calculation of the reasonable fee").

Plaintiffs have accordingly failed to meet their burden on loss, and Defendants are entitled to judgment in their favor on the recordkeeping claim for that additional reason. *See McDonald*, 2025 WL 2325016, at *21 (granting judgment on loss because, "[e]ven assuming arguendo" that plaintiffs had established a breach related to recordkeeping-fee monitoring, plaintiffs were "unable to establish that the plan suffered a loss" at trial).

### B. Defendants Are Entitled to Judgment on Plaintiffs' Investment-Monitoring Theory

#### 1. *Plaintiffs Have Failed To Establish a Breach of the Duty of Prudence*

With respect to Plaintiffs' investment monitoring theory, the prudence inquiry likewise focuses first on the "fiduciary's conduct in arriving at an investment decision." *In re Unisys Sav.*

*Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996).  And any assessment of fiduciary prudence must pay "due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise" and the "difficult tradeoffs" inherent in fiduciary decisionmaking, *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

Applying these principles, a court in this District recently entered judgment in favor of defendants on an ERISA investment-monitoring claim where the record showed that the defendants had engaged in regular monitoring of investment options with the assistance of outside financial experts, conducted special assessments of investment options as necessary, monitored "underperforming funds" appropriately by maintaining a "Watch List," and made changes to the plan lineup as necessary.  *Waldner v. Natixis Inv. Managers, L.P.*, 2025 WL 1871290, at *25-27 (D. Mass. June 26, 2025) (finding prudent process despite the fact that, for instance, the committee "met sparsely for the first four years of the Class Period, twice going approximately a full year without meeting," had "no formal procedure for taking meeting minutes" and failed to take minutes at multiple meetings); *see also Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 693-95 (W.D. Mo. 2019) (highlighting features of prudent fiduciary processes after ERISA bench trial); *Nunez v. B. Braun Med., Inc.*, 2023 WL 5339620, at *8-9, 12 (E.D. Pa. Aug. 18, 2023) (similar).

As in *Waldner*, the Committee's diligent process here—which was guided by an Investment Policy Statement ("IPS") that established a framework for prudent monitoring of the Plan's investment lineup, TX 244, and supported by the advice the Committee received from its independent advisers at UBS and later RBC—included the quarterly review of detailed quantitative and qualitative information about all of the Plan's investment options.  *See* TX 53-79. And the GFA received particular attention when it was put on "watch" during the relevant time period.  As the Committee's meeting minutes and materials reflect, the Committee pored over the

11

GFA's performance, assessed the reasons for the Fund's performance *vis-à-vis* its benchmarks, *see, e.g.*, TX 56 (noting performance issues in that period "primarily due to healthcare and technology investments), and actively considered the fund's place in the Plan's overall lineup, as well as its continued suitability for Plan participants, *see, e.g.*, TX 70 (noting Committee's decision to retain the GFA alongside a newly added large-growth index fund, in light of the GFA's "larger and more diversified" positioning *vis-à-vis* a large growth index). As Mr. Nadler testified, the Committee also investigated alternative actively managed large-cap growth funds and decided to keep the GFA in the Plan's lineup—a decision that was vindicated by the GFA's recent strong performance against peers and benchmarks. *See* TX 52 at TJSTEPHAN00004741.[7]

Plaintiffs cannot dispute the detailed factual record reflecting the Committee's diligent investment monitoring, so they base their entire case for imprudence on a purely tangential dispute concerning the Committee's evaluation of the GFA's performance against various "benchmarks" during the relevant period. In Plaintiffs' eyes, the IPS required the Committee to evaluate the GFA's performance during the relevant period against one single benchmark: the Russell 1000 Growth Index. Plaintiffs allege that the Committee violated the IPS (and therefore the duty of prudence) by evaluating the GFA's performance against its prospectus benchmark, the S&P 500, as well. But Plaintiffs' argument finds no basis in fact or law. Factually, Plaintiffs' "benchmark" theory is founded upon a gross misreading of the IPS, which plainly contemplates review of "a

---

[7] Plaintiffs intimated in their cross-examination of Mr. Nadler that a provision in the Plan's recordkeeping agreement with Capital Group established certain "minimum investment menu requirements," but there is no evidence in the record concerning the terms of any such "requirements," whether they are binding or have ever been enforced, or whether they even exist, given the ambiguity of the agreement and Mr. Nadler's lack of personal knowledge on the subject. *See* TX 380. Mr. Nadler testified that any such provision never impacted the Committee's decisionmaking, and that the Committee had in fact never even discussed or considered the issue, to his knowledge.

12

wide range of criteria" and welcomes consideration of all information that bear upon the prudence of particular investments. TX 244 at TJSTEPHAN00003907. And, consistent with Mr. Nadler's trial testimony, the Committee made the reasonable judgment that evaluating *more* information was better than constraining their evaluations to an artificially small universe of comparisons. This was particularly true because, as both Mr. Nadler and Plaintiffs' expert, Dr. Pomerantz acknowledged, the GFA was not a pure growth fund but rather a diversified mix of growth and value assets, which warranted review against both the S&P 500 and the Rusell 1000 benchmarks. Legally, Plaintiffs have pointed to no authority that evaluating performance against multiple benchmarks suggests fiduciary imprudence. To the contrary, Mr. Dyson testified that there is nothing wrong with fiduciaries performing additional research as part of their prudent monitoring of investments.

The Committee's monitoring of the GFA thus satisfied the duty of prudence. Defendants can present further testimony from expert witnesses to confirm that conclusion if necessary, but Plaintiffs' deficient showing on this element alone supports granting judgment in Defendants' favor on Plaintiffs' GFA claim.

2. *Plaintiffs Have Failed To Establish a "Loss" Associated with any Breach*

Plaintiffs have likewise failed to establish any "loss" on their investment-monitoring claim—as their expert, Dr Pomerantz, failed to identify any "prudent alternative" to the GFA that would have left Plan participants in a better position. *Sellers*, 729 F. Supp. 3d at 178; *Waldner*, 2025 WL 1871290, at *21 ("Plaintiffs bear the burden of identifying a comparable fund that outperformed" the challenged option). Comparators are "meaningful" only to the extent they "hold similar securities, have similar investment strategies, and reflect a similar risk profile," *see Matousek*, 51 F.4th 281, yet Dr. Pomerantz failed to identify an adequate loss comparator because he refused to engage with the GFA's strategic choices, put forth "alternatives" that were

13

inconsistent with the Committee's investment mandate for the fund, and selected his comparators with the benefit of hindsight bias. His eight alleged comparators include five passive investments and three actively managed comparators. For different reasons, none of them is adequate to establish a "loss."

Dr. Pomerantz's five passive comparators fail for three reasons. First, three of the five are non-investable: the S&P 500 Index, Russell 1000 Growth Index, and Morningstar US Large-Mid Broad Growth Index. A "prudently invested portfolio" could not have invested in them, *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008), so all three funds are unfit to serve as loss comparators, as Dr. Pomerantz conceded during his testimony.

Second, there is no credible record evidence that the Committee viewed passive funds as potential "alternatives" to the actively managed GFA.[8] Plaintiffs may point to the inclusion of a passively managed Vanguard fund in the Committee meeting materials, *see* TX 42, but nothing in the record suggests that the Committee considered that fund a true "alternative."[9] And further, the Committee's 2023 decision to retain the GFA at the same time it added a passive large cap fund, the Fidelity Large Cap Growth Index Fund, *see* TX 73-74, shows the Committee viewed those offerings as complementary rather than as substitutes for one another.

---

[8] When the Committee decided to consider potential alternatives to the GFA at its Q3 2023 meeting, it specifically "determined to research the availability of actively managed large growth funds as potential replacements for GFA in the Plan." TX 72. At the Q4 2023 meeting, after considering those actively managed options, the Committee "discussed a variety of actively managed large growth funds as potential replacements" for the GFA, then "determined to maintain GFA and Fidelity Large Cap Growth Index Fund (FSPGX) as the growth fund options for Plan participants." TX 73.

[9] The Parties also stipulated that the Committee was considering only "actively managed large growth funds" as potential alternatives to the GFA. *See* ECF 118 (Amended Stip. Facts) ¶¶ 37-38.

14

Third, while there is some precedent for comparing active funds to passive comparators to determine "loss," that approach is viable *only* where expert testimony creates a dispute as to whether a prudent fiduciary should have considered passive investments as alternatives.[10]  In *Mattson*—which closely resembles this case—the court held after trial that the plaintiff could not "prove any Plan losses" by comparing the challenged active strategy to a passive index that matched the challenged fund's asset allocations but *did not* incorporate the active fund's key strategic choice, which was intended to reduce the challenged fund's volatility.  *Mattson*, 2024 WL 3024875, at *20.

The key difference between *Mattson* and cases like *Brotherston* and *Sellers* is that, in *Mattson*, the fiduciary judgment to pursue an actively managed strategy to reduce volatility was ultimately *prudent*, whereas the plaintiffs in *Brotherston* and *Sellers* plausibly asserted that the active managers' strategic approaches were *imprudent*.  *Id.* (noting that plaintiffs' deficient loss testimony showed only the "result that an investor might have achieved using the same asset allocations and assuming an unlimited amount of risk (or, in other words, having no risk protection from a hedging strategy)").  In other words, in *Mattson* (as here), the trial record established only that the challenged funds "performed as expected during the Class Period." *Id.* at *21.[11]

---

[10] In *Brotherston*, for instance, the plaintiffs attacked the fiduciaries' choice to offer actively managed options instead of passive options, and it was therefore reasonable to assess "loss" by examining the "returns that would have been generated by a portfolio of benchmark funds or indexes comparable but for the fact that they do not claim to be able to pick winners and losers." 907 F.3d at 34.  Similarly, in *Sellers*, where it was the challenged fund's "exposure to foreign stock that allegedly resulted in losses," this Court reasoned that an index fund without that defect was a "suitable alternative" to measure a "loss" associated with the challenged fund.  729 F. Supp. 3d at 187.

[11] Dr. Pomerantz acknowledged that he was not critiquing the GFA's asset allocations, or the merits of active management in general, or raising any other issue with respect to the GFA's strategy.

Finally, Dr. Pomerantz's three actively managed comparators are also inapt. Again, Dr. Pomerantz disclaims *any* analysis of his comparators' holdings or strategies, and would apparently view *any* fund classified by Morningstar as a "large growth" fund as an appropriate comparator so long as its historical returns were favorable. Dr. Pomerantz's theory conflicts with foundational investment principles; Plaintiffs cannot establish a "loss" just by establishing that some other funds in Morningstar's "large growth" category happened to have higher returns. *Cf. Sellers*, 729 F. Supp. 3d at 185-86 (explaining "suitable benchmark" requirement, noting that lesser standard would permit plaintiffs to measure loss based on "any alternative fund" and functionally "eliminate the [plaintiff's] burden to show loss").

### C.    Defendants Are Entitled To Judgment on Plaintiffs' Forfeiture Theory

#### 1.    *Plaintiffs Have Failed To Establish any Fiduciary Breach*

Plaintiffs allege breaches of the duties of prudence and loyalty with respect to the application of Plan forfeitures to offset the annual, discretionary contributions Trader Joe's has made to participants' accounts over the relevant period, but they have not proffered evidence sufficient to prove either claim.

With respect to ERISA's duty of loyalty, "[i]t is not enough for a plaintiff to identify a potential conflict of interest"; it is Plaintiffs' burden to actually "demonstrate that the fiduciary's subjective motivation was improper." *Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 134 (D. Mass. 2021); *see Vander Luitgaren v. Sun Life Assur. Co. of Canada*, 765 F.3d 59, 65 (1st Cir. 2014) (ERISA fiduciary need not "don the commercial equivalent of sackcloth and ashes," but must not "place its own interests ahead of those of the Plan beneficiary"). Plaintiffs adduced no evidence during their case suggesting that Defendants' allocation decisions flowed from disloyal motivations. Plaintiffs concede, as they must, that Defendants' forfeiture allocation decisions complied at all times with the permissible uses established by the Plan's governing

16

documents, *see* TX 7, 5, 9, and therefore complied with ERISA. Namely, (1) the Plan document permitted the use of Plan forfeitures to offset the Plan's voluntary contributions to participants, Amended Stip. Facts (ECF 118) ¶¶ 47-48, and (2) Plan fiduciaries were not required to exhaust all same-year forfeitures in the year that they accrued.  Further, in practice, all forfeiture funds were ultimately used to benefit Plan participants by offsetting voluntary employer contributions, as Mr. Nadler testified.  There is no record evidence suggesting that Defendants' "operative motive was to further [their] own interests," *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 6 (1st Cir. 2018), by using *previous* contributions that had been forfeited to the Plan to offset the costs of providing *even more* voluntary contributions to Plan participants.

Nor have Plaintiffs established any imprudence in Defendants' process for forfeiture allocations, as Mr. Nadler's testimony confirmed.  Long before the relevant period began, Trader Joe's had determined that allocating Plan forfeitures to offset Company contributions would best serve Plan participants.  That practice remained in place throughout the relevant period, and the Company continued to treat Plan forfeitures in the same manner, consistently with the Plan document.  Each year, Company decisionmakers undertook a process to determine allocation amounts, including to ensure that Plan forfeitures could be put to use by participants without jeopardizing other necessary uses of forfeitures—namely, the need to have enough forfeiture money on hand to cover money owed to re-employed participants who had previously forfeited money to the Plan.  As Mr. Nadler explained, the Committee was made aware of how the forfeitures were being applied, understood that they were being used in a manner that was

permitted under the Plan document, and thus had no reason to raise any concerns. Defendants' allocation of forfeitures thus did not violate any fiduciary duties.[12]

### 2. *Plaintiffs Have Failed To Establish a "Loss" Associated with any Breach*

In any event, Plaintiffs have not established any "loss" related to forfeitures. The loss calculation proffered by Plaintiffs' expert Mr. Dyson characterizes as a "loss" to the Plan any instance in which the amount of forfeitures used in a plan year was less than the amount accrued in the same year, but nothing requires forfeitures to be used in the same year they accrue, and Plaintiffs cite no authority suggesting otherwise. It is, in fact, exceedingly common for such amounts to be carried forward so that they can be used in future years. *See Donelson v. Meijer, Inc.*, 2025 WL 3754241, at *5 (W.D. Mich. Dec. 29, 2025) ("[T]he IRS has recognized (and common sense confirms) that it is sometimes practical to not immediately use forfeitures."); *Tillery v. WakeMed Health & Hosps.*, 2026 WL 125784, at *7 (E.D.N.C. Jan. 15, 2026) ("merely alleging that forfeiture balances existed does not give rise to an inference that defendants breached the duty of prudence"). Mr. Dyson's analysis ignores that forfeiture money not put toward Company contributions in one year could be (and in fact was) put toward contributions in future years, so Plaintiffs' own case establishes that Plan participants suffered no loss from the Defendants' allocation decisions.[13]

---

[12] At the appropriate time, and if necessary, Defendants intend to renew their argument that Defendants' forfeiture allocation decisions were settlor decisions not subject to ERISA's fiduciary duties. *See* ECF 32 (Defendants' Mem. ISO Mot. to Dismiss) (citing, *inter alia*, *Hutchins v. HP Inc.*, 2025 WL 404594, at *4 (N.D. Cal. Feb. 5, 2025), *appeal docketed*, No. 2025 WL 404594 (9th Cir. Feb. 7, 2025)). But the Court need not consider that argument on this record, because Plaintiffs' failure to establish breach or loss with respect to Defendants' forfeiture allocations is sufficient to dispense with Plaintiffs' claims.

[13] Mr. Dyson also chose to excise from his damages calculations any years in which participants had negative "losses" under his methodology. In both 2020 and 2023, the amount of forfeitures applied as employer contributions was greater than the amount of forfeitures that accrued that year, but without explanation or justification, Mr. Dyson chose to ignore those years rather than factor

Plaintiffs also ignore that Trader Joe's employer contributions are *entirely voluntary*, as Mr. Nadler explained. *See, e.g.*, TX 9 at TJSTEPHAN0004090-92 (confirming that all employer contributions are "[d]iscretionary"); TX 14 (same). And those contributions have in fact fluctuated over the relevant period, including during the Covid era, when the Company determined to contribute less money than it did in other years based on uncertain market conditions, and the needs of the Company and its employee base at the given time. The record points in only one direction: Plaintiffs cannot show any "loss" because in Plaintiffs' "prudent alternative" world where the Company allocated additional same-year forfeitures to cover certain recordkeeping expenses, every indication from the factual record is that Plan participants would have been in the *exact same* position given the likelihood that Trader Joe's would account for that change in determining the amounts of the Company's voluntary contributions.

### D.    Defendants Are Entitled To Judgment on Plaintiffs' "Failure to Monitor" Theory

Finally, Plaintiffs allege that the fiduciaries responsible for appointing the Committee breached their duty to monitor those appointees. Plaintiffs' failure to monitor claim fails for two independent reasons. First, any claim against monitoring fiduciaries is derivative of—and cannot survive without—an underlying ERISA claim. *See, e.g.*, *Lalonde*, 728 F. Supp. 3d at 158. Since Plaintiffs have failed to establish any successful ERISA claim for the reasons already addressed, their failure-to-monitor claim necessarily fails, too.

Second, Plaintiffs have not demonstrated any deficiency in the process used by Trader Joe's or the Board to monitor the Committee. Plaintiffs adduced no evidence of any breach or any resultant loss. In fact, the only relevant record evidence—the testimony of Mr. Nadler—

---

them into his opinion. The broader point is the more important one, though—participants suffered no loss in *any* year, because any "leftover" contributions in any given year were used in the next.

demonstrates that members of the Board had insight into the Committee's relevant activities, and that many Committee members were also Board members during the relevant period, including Trader Joe's current Chairman and CEO, Bryan Palbaum.

## III.    Conclusion

For these reasons, the Court should grant judgment to Defendants on all of Plaintiffs' claims, in accordance with Proposed Findings of Fact and Conclusions of Law to be filed forthwith.

Respectfully submitted this seventh day of May, 2026.

/s/ Catalina J. Vergara
Catalina J. Vergara*
Noah Ickowitz*
Yasmin Moreno*
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
T: (213) 430-6000
cvergara@omm.com
nickowitz@omm.com
ymoreno@omm.com

Deanna M. Rice*
Gregory Comeau (BBO #661505)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC, 20006
T: (202) 383-5300
derice@omm.com
gcomeau@omm.com

William D. Pollak*
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
T: (212) 326-2000
wpollak@omm.com

Evan Hindman*
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
T: (415) 984-8700
ehindman@omm.com

*Attorneys for Defendants*
*  Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I, Catalina J. Vergara, hereby certify that on this 7th day of May, 2026, a true copy of the foregoing was filed through the ECF System, which will be sent electronically, along with all relevant attachments and Exhibits, to the registered participants as identified on the Notice of Electronic Filing.

/s/ Catalina J. Vergara
Catalina J. Vergara