UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BEAU STEPHAN, GEORGE STRAY, LEONARD KIRSCHLING, GEORGE PHIRIPES, RHONDA HABELL, CAMERON BASS, and STEPHEN BUBNIAK, individually and on behalf of all similarly situated,<br>Plaintiffs,<br><br>v.<br><br>TRADER JOE'S COMPANY, THE BOARD OF DIRECTORS OF TRADER JOE'S COMPANY, THE INVESTMENT COMMITTEE, And JOHN DOES 1-30,<br><br>Defendants. | ) | CIVIL ACTION<br>No. 25-10212-WGY |

YOUNG, D.J. September 28, 2026

**FINDINGS OF FACT AND RULINGS OF LAW**

## I. INTRODUCTION

Beau Stephan ("Stephan"), George Stray ("Stray"), Leonard Kirschling ("Kirschling"), George Phiripes ("Phiripes"), Rhonda Habell ("Habell"), Cameron Bass ("Bass"), and Stephen Bubniak ("Bubniak") (collectively, "the Plaintiffs"), bring an Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., class-action lawsuit against Trader Joe's Company ("Trader Joe's" or "the Company"), The Board of Directors of Trader Joe's Company ("the Board"), The Investment Committee ("the Committee"), and John Does 1-30 (collectively, "the

Defendants") for their failure to act prudently and loyally in managing the recordkeeping fees associated with the Trader Joe's Company Retirement Plan ("the Plan"); their failure adequately to monitor the performance of and prudently manage a fund on the Plan's menu of investment options; their imprudent and disloyal allocation of forfeited, non-vested Company contributions; and the failure of the Company and the Board to monitor the Committee.

The Plaintiffs bring three counts: (1) breaches of the fiduciary duty of prudence (asserted against the Committee Defendants); (2) breach of the fiduciary duty of loyalty (asserted against the Company, the Committee and Board Defendants); and (3) failure adequately to monitor other fiduciaries (asserted against the Company and the Board Defendants).

Following a six-day bench trial, the Court makes the following findings of fact and rulings of law pursuant to Federal Rule of Civil Procedure 52(a), finding in favor of the Plaintiffs regarding fiduciary breaches of the duties of recordkeeping, and against them on the remaining claims.

## II. PROCEDURAL HISTORY

On January 28, 2025, the Plaintiffs filed suit against the Defendants. Compl., ECF No. 1. The complaint alleged in count

I that the Committee and members of the Committee (John Does 11-20), id. ¶ 47, breached their fiduciary duty of prudence by failing to monitor the recordkeeping fees of the Plan, and by failing to manage the Plan's menu of investment options on the basis of "the merits of each investment and what was in the best interest" of the Plaintiffs. Id. ¶ 212. The Plaintiffs also alleged in count II of their complaint that the Company, the Committee, and the Board breached their fiduciary duty of loyalty for the reasons just stated. Id. ¶ 216. An additional reason alleged that the Company, the Committee, and the Board breached their fiduciary duty of loyalty was because they utilized forfeited funds to "reduc[e] the Company's own contributions to the Plan . . . at the expense of the Plan", which led Plan participants to "incur avoidable expense deductions to their individual accounts." Id. ¶¶ 220-221.

The Plaintiffs asserted a third count against the Company and the Board for breaching the ERISA anti-inurement provision, id. ¶¶ 225-230, but this was later dropped on July 21, 2025, during a hearing on a motion to dismiss the case in its entirety filed by the Company, the Committee, and the Board, Defs.' Mot. Dismiss Compl., ECF No. 31, which motion the Court denied. Elec. Clerk's Notes, ECF No. 47. The Plaintiffs alleged as their fourth and final count that the Company and the Board failed to monitor the Committee and its members by "standing

idly by" as the Committee, among other actions, made imprudent decisions regarding the payment of "unreasonable" recordkeeping fees, maintained "poorly performing investments", and failed to seek out "lower-cost share classes." Compl. ¶ 235.

The Plaintiffs moved for class certification on October 24, 2025, ECF No. 67, which the Court allowed, ECF No. 73, given the Defendants' notice of non-opposition, ECF No. 71. The operative class period is "any time between January 28, 2019, through the date of judgment." Mem. L. Supp. Pls.' Mot. Class Certification at 1, ECF No. 68.

On February 17, 2026, the parties filed a joint stipulation regarding the scope of the Plaintiffs' claims in anticipation of the Defendants' motion for summary judgment. Stipulation Regarding Scope Pls.' Claims, ECF No. 77. The parties agreed that the Plaintiffs would not pursue damages regarding the following funds offered by the Plan during the class period: Invesco Real Estate Fund, American Funds EuroPacific Growth Fund, American Funds Washington Mutual Investors Fund (also referred to in the complaint as the American Funds Washington Mutual Fund, see, e.g., Compl. ¶ 99), and the American Funds Balanced Fund. Id. ¶ 1.

The parties additionally agreed that with the exception of their experts' opinions on the American Funds Growth Fund of America ("the GFA"), the Plaintiffs would not argue that the

Defendants breached their fiduciary duties during the class period "by failing to select lower-cost share classes for the Plan's investment options" or " by offering investment options . . . that had an allegedly 'high concentration' of assets in certain market sectors or investment options and/or exhibited 'style drift'". Id. ¶¶ 2, 4. The parties also agreed that the Plaintiffs would not continue on the theory that the Defendants breached their fiduciary duties "by not offering a target-date fund in the Plan" or "failing to offer a collective investment trust earlier," id. ¶ 3; or based on any actions the Defendants took regarding forfeitures beyond January 1, 2024. Id. ¶ 5.

The Defendants then moved for summary judgment on February 18, 2026. Defs.' Mot. Summ. J., ECF No. 84. The Court heard argument on the motion on April 28, 2026, taking it under advisement as to the forfeiture issue and denying the motion as to the recordkeeping and investment fund (GFA) issues. Elec. Clerk's Notes, ECF No. 110. On April 29, 2026, the Court denied the Defendants' motion for summary judgment on the forfeiture issue and a motion in limine to preclude certain testimony and arguments concerning forfeitures filed by the Plaintiffs. See Elec. Order, ECF No. 114.

The Court held a bench trial lasting 6 days, beginning on May 4, 2026, and ending on May 11, 2026. Elec. Clerk's Notes, ECF Nos. 120-123, 126, 127. During the trial, the Defendants

moved for judgment on partial findings. Defs.' Mot. J. Partial Findings, ECF No. 124; Mem. L. Supp. Defs.' Mot. J. Partial Findings, ECF No. 125. The Court allowed the motion as to the forfeiture issue and denied the remainder of the motion on the penultimate day of the trial, May 8, 2026. Elec. Clerk's Notes, ECF No. 126. The Court now addresses the case in full.

## III. FINDINGS OF FACT

### A. The Parties

#### 1. The Plaintiffs

Stephan began working as an employee at Trader Joe's in late 2006, starting as a 'Crew Member' and eventually working under other various titles such as 'Novitiate', 'Merchant,' and 'Mate.' Trial Tr. 38:25-39:2; 39:21-23, May 6, 2026, ECF No. 132. Stephan left the Company in February 2020. Id. at 41:18-20. Stephan was first offered the opportunity to create a 401(k)-employee retirement savings account in 2007, which he took. Id. at Trial Tr. 42:3-13. He continues to be a Plan participant. Amed. Prop. Stip. Facts ("Stip. Facts") ¶ 52, ECF 118; Trial Tr. 47:17-25, May 6, 2026. Stephan was not involved in choosing the recordkeeper for the Plan and had no say about the recordkeeping fees. Id. at 45:12-17. He also had no say in which investment options were added to the Plan and was limited

to what was available on the Plan's menu of investment options. Id. at 44:17-20.

Stray is a former Trader Joe's employee, and a Plan participant until 2024. Stip. Facts ¶ 53. During his time as a Plan participant, Stray invested in the GFA. Id.

Kirschling is a former Trader Joe's employee and a Plan participant until 2022, during which he invested in the GFA. Id. ¶ 54.

Phiripes is a former Trader Joe's employee and is still a Plan participant. Id. ¶ 55.

Habell is a former Trader Joe's employee and was a Plan participant until 2021. Id. ¶ 56.

Bass is a former employee of Trader Joe's and was a Plan participant until 2022, during which he invested in the GFA. Id. ¶ 57.

Bubniak started working at Trader Joe's as a Crew Member in June 2001, holding various other roles during the period of his employment such as 'Mate' (the equivalent of an assistant manager) and 'Captain' (the equivalent of a general manager) until his resignation in October or November 2020. Trial Tr. 41:8-19; 42:2-4, May 5, 2026, ECF No. 131. He became a Plan participant in 2004. Id. at 42:12-17. He was not involved in choosing the recordkeeper for the Plan and had no say in the recordkeeping fees. Id. at 44:25-45:8. He also had no say in

which investment options were added to the Plan and was limited to -- and invested based on -- what was available on the Plan's menu of investment options. Id. at 43:19-25.

The GFA was made available to Bubniak as an investment option, and he invested in it during a part of the class period -- which began Jan 28, 2019, and extends through the present -- because of its historical performance. Id. at 51:22-52:1; Trial Tr. 6:22-23, May 4, 2026, ECF No. 130. For instance, during the third quarter of the 2019 Plan year, Bubniak had not invested in the GFA, see Ex. 257 at 22, but by the end of the second quarter of the 2020 Plan year, he had. See Ex. 257 at 56. Bubniak took into account the matching contributions from Trader Joe's when deferring some of his paychecks to his retirement savings account, which the Company did make matching contributions to. Trial Tr. 46:20-47:9, May 5, 2026.

All the above-mentioned Plaintiffs invested in funds, which generated revenue used at least partially to pay off recordkeeping fees and other expenses charged to the Plan. Stip. Facts. ¶¶ 52-58. The Plaintiffs also received mail about the Plan and quarterly account statements. Id. ¶ 14.

### 2. The Defendants

Trader Joe's Company is a privately-owned grocery store chain, established in 1967. Compl. ¶ 34; Defs.' Answer ¶ 34,

ECF No. 48. The Company offers its qualifying employees -- Crew Members employed for three months who were 20 years of age (lowered to 18 years, effective January 1, 2024) -- the opportunity to participate in the Plan. Stip. Facts ¶¶ 2, 10. Trader Joe's is the sponsor of the Plan. Id. ¶ 4; Ex. 244 at 1; Exs. 351-356 at 4. The Company selected an investment platform and investment menu, which the Plan participants could select investment options or funds from. Ex. 380 at 2; Trial Tr. 90:19-21; 92:7-8, May 5, 2026.

Mitch Nadler ("Nadler"), the Chief Financial Officer ("CFO") of the Company testified to the Company employees who serve as members on the Board. Trial Tr. 55:14-23, May 6, 2026. Nadler has never been on the Board but attends Board meetings. Trial Tr. 55:10-13; 63:23-25, May 6, 2026. Dan Bane, Bryan Palbaum ("Palbaum") and Mitch Heeger served on the Board during the class period. Trial Tr. 55:15-23, May 6, 2026.

The Committee was a fiduciary of the Plan during the class period and included the following Crew Members:

| Investment Committee Member | Last Title at Trader Joe's | Approx. Dates of Service on Investment Committee During Applicable Time Period |
|---|---|---|
| Dan Bane | Chairman/Chief Executive Officer | 01/2019-07/2023 |
| Bryan Palbaum | Chairman/Chief Executive Officer | 01/2019-Present |
| Mitch Nadler | EVP, Chief Financial Officer, Treasurer | 01/2019-Present |
| Laurie Mead | SVP, Human Resources | 01/2019-06/2025 |
| Mitch Heeger | Senior EVP, Stores | 05/2023-Present |
| Fonda Burke | Senior Director, Risk Management & Treasury | 05/2023-11/2023 |
| Sharon Drabeck | Vice President, Treasurer | 01/2019-09/2021 |
| Isaac Chitica | Vice President, Human Resources | 07/2025-Present |

Stip. Facts ¶¶ 8-9. Committee member Nadler oversees the financial operations of the Company and is involved with the Company's treasury, financial accounting, and risk and safety departments. Trial Tr. 55:2-7, May 6, 2025. Only Company employees are members of the Committee. Trial Tr. 57:5-7, May 5, 2026. The Committee has no chair. Id. at 57:8-10, May 5, 2026. As part of the changes made to the Plan during the class period, the Committee added both the Capital Group American Balanced Trust and the Fidelity Large Cap Growth Index Fund while removing the American Funds American Balanced Fund. Stip. Facts ¶ 13.

### 3. The Plan

The Plan is a defined-contribution retirement plan sponsored by the Company and governed by ERISA. Stip. Facts ¶¶ 3-4. Retirement or 401(k) plan fiduciaries select the

investment options from the Plan's investment menu, which the Plan's participants can select when investing their retirement assets. Id. ¶ 5. Between 2019 and 2024, the Plan had the following total assets and number of participants with account balances at the end of each year:

| Date | Participant Count | Total Assets ($) |
|---|---|---|
| December 31, 2019 | 38,634 | 2,044,450,078 |
| December 31, 2020 | 43,345 | 2,404,298,632 |
| December 31, 2021 | 42,594 | 2,783,027,426 |
| December 31, 2022 | 44,205 | 2,396,191,704 |
| December 31, 2023 | 44,218 | 2,772,092,019 |
| December 31, 2024 | 45,337 | 3,202,630,979 |

Id. ¶¶ 6-7. The Plan offered additional investment options for its participants -- a stable value fund, a real estate fund, bond funds, and actively and passively managed domestic and international equity funds -- as alternatives to the Plan's Qualified Default Investment Alternative during the class period. Id. ¶ 11. The Plan received no special or unique services. See Trial Tr. 63:9-15, May 7, 2026, ECF No. 133.

**4. The Recordkeeper and the Recordkeeping Fees**

Capital Group Retirement Plan Services ("Capital Group")[1] has served as the recordkeeper for the Plan throughout the class period, and since at least 2009. Stip. Facts ¶¶ 21, 50. In addition to being the recordkeeper, Capital Group is also a trustee of the Plan. Trial Tr. 81:25-82:2, May 5, 2026; Ex. 380 at 1; Ex. 9 at 2. Capital Group, however, did not undertake to provide advice in a fiduciary capacity regarding the Company's selection of an investment platform. Trial Tr. 92:9-93:6, May 5, 2026; Ex. 380 at 2. Capital Group is affiliated with American Funds,[2] and provided proprietary funds as investment options on the Plan's menu, including the GFA. Trial Tr. 9:9-10, May 4, 2026; Trial Tr. 83:4-6; 83:13-84-2, May 5, 2026. The default and largest investment option is provided by American Funds. Id. at 84:19-22.

Capital Group provided compliance, investment management, administrative, transfer agency services, educational materials, tracked participants' accounts, provided account information, tracked deposits, and so on. Ex. 380 at 2, 8; see also Trial Tr. 51:15-21, May 5, 2026 (Bubniak acknowledges that Capital

---

[1] Capital Group includes or is affiliated with Capital Research and Management Company or Capital Bank and Trust Company. See Ex. 380 at 1.

[2] 'Capital Group' and 'American Funds' are used interchangeably in the Plan document. See Ex. 391 at 1; Trial Tr. 83:4-12, May 5, 2026.

Group helped in navigating risk and reward in investing); Trial Tr. 48:12-49:3, May 6, 2026 (Stephan acknowledged that Capital Group helped in explaining investments, but he expected that they would provide that service). As part of its administrative services, Capital Group tracks forfeitures, prepares IRS forms including Form 5500s, and fulfils similar duties as contracted for in the Recordkeeping and Administrative Services Agreement. Trial Tr. 134:13-135:5, May 5, 2026; Ex. 380 at 8. As part of its recordkeeping services, it also provides access to a Plan Service Center for the transmission of contribution and participant data. Ex. 380 at 8; Trial Tr. 116:6-17, May 5, 2026.

Capital Group also earned direct and indirect compensation[3] throughout the class period. See Exs. 351-356 at 6. In direct compensation, which is paid from the Plan assets, Capital Group earned $224,470 in 2019, $186,966 in 2020, $265,271 in 2021, $395,929 in 2022, $320,059 in 2023, and $320,109 in 2024. Id.; Trial Tr. 138:20-21, May 5, 2026.

Recordkeeping fees are paid to Capital Group using Plan assets. Trial Tr. 101:23-102:1, May 5, 2026; see also Ex. 380 at 9-11. Capital Group also earns float income for its services

---

[3] The amount of indirect compensation earned by Capital Group is not listed in the Company's Form 5500s. See Exs. 351-356. See also Albert v. Oshkosh Corp., 47 F.4th 570, 580 (7th Cir. 2022) (explaining indirect compensation).

on plan assets in an account it maintains for deposits into the Plan. Trial Tr. 107:24-108:2, May 5, 2026; Ex. 380 at 6. Though Plan assets are generally invested immediately, there can be periods where the assets are sitting in the deposit account and accruing float income for Capital Group until they are invested. Trial Tr. 108:12-108:24, May 5, 2026; Ex. 380 at 6. Similarly, until a check is cashed, Capital Group earns float income on the check. Trial Tr. 109:9-110:19, May 5, 2026.

Recordkeeping fees reduced from $48 in 2019 to $40 effective April 1, 2021, and then to $38 effective July 1, 2024. Trial Tr. 79:15-18, May 6, 2026; Exs. 377, 379. The base fee for the Plan has remained consistent at $11,650 per annum. Trial Tr. 80:12-19, May 6, 2026; see Ex. 380 at 9. On January 22, 2021, investment advisor Roger Stephens ("Stephens") informed Palbaum, Sharon Drabeck, and Nadler that American Funds informed them of the 16% reduction in the recordkeeping fees per participant from $48 to $40 effective April 1, 2021. Trial Tr. 88:11-89:11, May 6, 2026; Ex. 61. The Committee discussed recordkeeping fees during at least three of their quarterly meetings. See Ex. 61; Trial Tr. 30:19-25, May 7, 2026.

There was no formal request for proposal ("RFP") or request for information ("RFI") or any evidence of active, competitive testing of the market for an optimal recordkeeping fee. Trial Tr. 59:11-14, May 5, 2026; Trial Tr. 10:5-10, May 4, 2026. On

January 22, 2021, Stephens informed the Committee that he and investment advisor Dan Rothenberg ("Rothenberg") were conducting a 'soft RFP' with two recordkeepers. Ex. ES. A 'soft RFP' is not an industry-recognized term or process. Trial Tr. 48:23-25, May 7, 2026; Trial Tr. 37:23-38:11, May 8, 2026.

An RFP is a comprehensive, competitive bidding process where a plan sponsor identifies potential recordkeepers to service the plan. Trial Tr. 150:23-25, May 6, 2026. The questioning process targets topics such as how the recordkeepers service plans, who their clients are, what their business practices entail, and so on. Id. at 151:2-7. The process takes several months, and the incumbent recordkeeper is involved. Id. at 151:7-8; 151:16-21. The purpose of an RFP is to find the best possible offer, and the process reveals the range of fees available. Id. at 153:9-13. The industry suggestion for how often an RFP should be conducted is every 3-5 years, though nothing in the ERISA statute requires this pace. Id. at 154:1-4; Trial Tr. 105:20-22, May 7, 2026.

Though an RFI is not quite as comprehensive as an RFP, it still allows a plan sponsor to conduct a live bid or a market check. Id. at 15:16-23; 17:19-25. It is a sort of middle ground between a plan benchmark and an RFP -- it would generally consist of questions about how a recordkeeper would handle a company's large stock and what their pricing is, but not any

questions geared toward who the client base of the recordkeeper is, for example. Id. at Trial Tr. 14:1-12.

Fee benchmarking involves taking plan data such as fund expenses, asset size, and participant count as it relates to a recordkeeper, and then comparing that data against a peer group of plans similar in size based on assets and number of participants. Id. at 19:2-10. Generally, the identity of plans in peer groups are not identified in any way in third party aggregate tools. Id. at 19:7-20:21. Benchmarking serves as an interim check to determine whether a plan compared to its peers is still in balance, i.e. whether it is still meeting expectations from the information about fees, pricing, business practices, etc. obtained from an RFI or an RFP. Id. at 21:12-22:10. It is also a helpful method of identifying outliers. Id. at 108:8-13.

Committee members have not had formal training, at least since the start of the class period, regarding how to conduct RFIs or RFPs. Trial Tr. 132:23-133:4, May 5, 2026; Trial Tr. 4:19-5:6, May 6, 2026.

### 5. The Committee Meetings

The Committee met quarterly during the class period, except for the first quarter of 2022. Stip. Facts ¶ 15. Its investment advisors distributed agendas and quarterly reports detailing information about the Plan and its investments prior

to these meetings. Stip. Facts ¶¶ 16, 24; Trial Tr. 65:20-24, May 6, 2026. Trial Tr. 57:11-15, May 5, 2026; see, e.g., Ex. 42 at 2. The Committee applied the so-called Investment Policy Statement, see Section III.A.5, infra, as a framework during its meetings. Trial Tr. 113:21-114:7, May 6, 2026. At each meeting, the Committee walked through investments in the Plan, Plan disbursements, market news, contributions, Crew Member concerns, and educational information. Id. at 67:9-21.

Stephens would walk the Committee through the previously distributed agenda, which would stir up discussion. Id. at 70:8-15. Such discussion would include topics like asset breakdown, the Plan investment performances against benchmarks and peer funds, and what the overall market looked like over different periods of time. Id. at 71:18-20; 72:12-21; Ex. 42 at 2; Ex. 57. The Committee's investment advisors would also answer any questions from the Committee. Id. at 97:12-13. The Committee also kept minutes for each meeting. Trial Tr. 61:12-15, May 5, 2026; Stip. Facts ¶ 16. These meeting minutes are summaries of some of the discussions had during the meetings, and not verbatim copies. Trial Tr. 62:1-3, May 5, 2026.

### 6. The Committee's Investment Advisors

The Committee employed investment advisors Stephens and Rothenberg, who were affiliated with UBS Financial Services ("UBS") at the time, to advise on the Plan's investment options

from January through December of 2019. Stip. Facts ¶ 17; Trial Tr. 57:16-22, May 5, 2026. After December 2019, the Committee retained Stephens and Rothenberg even after they became affiliated with RBC Institutional Consulting Group ("RBC"). Stip. Facts ¶ 18. Trial Tr. 58:17-20, May 5, 2026.

UBS and RBC are paid direct compensation as service providers with the Plan's assets. Id. at 138:1-22; Ex. 351 at 6; Ex. 352 at 6. Any indirect compensation earned is paid out of expense ratios, for example. Trial Tr. 138:20-139:1, May 5, 2026.

Stephens and Rothenberg attended and led each of the Committee's quarterly meetings through the end of the class period, and prepared materials for the Committee members to review ahead of the meetings, which included information about the performance of each investment option included in the Plan. Trial Tr. 71:18-20; 72:12-21, May 6, 2026; Stip. Facts ¶¶ 19-20, 24, 39. Benchmarking reports prepared by Capital Group, which were generated by the independent benchmarking platform Fiduciary Benchmarks (formerly Fiduciary Decisions), were made available to the Committee in November 2020, February 2021, and June 2024. Stip. Facts ¶ 22.

The Committee also worked with its investment advisors to monitor the Plan's investment options throughout the class

period, and this included discussions about the performance of the GFA at certain Committee meetings. Id. ¶¶ 23, 27.

### 7. The Investment Policy Statement

The Investment Policy Statement ("IPS") "sets forth the manner in which Plan investment options are selected and monitored, consistent with the fiduciary standards of ERISA." Ex. 244 at 1. Among other things, the IPS sets out the Committee's duties and responsibilities regarding the Plan's investment options, and establishes standards and criteria for the selection, monitoring, or review, and replacement of investment options. Id. 1, 4; Trial Tr. 58:15-24, May 4, 2026. The IPS charges the Committee to take a long-term view in monitoring investment options. Ex. 244 at 3. In selecting investment options for the Plan, there are three checked boxes in a table which indicate the standards or criteria an option must meet: 1) it must perform better than 50% of its peers over a 10-year period; 2) its 10-year performance must exceed the Category Benchmark[4] in the IPS; and 3) its net expense ratio must be lower than 1.25%. Id. at 6; Trial Tr. 11:8-14, May 4, 2026.

[4] The IPS directs the Investment Committee to Morningstar Associates, LLC's "Category Classifications Methodology document" to identify the specific benchmarks associated with each investment option, which it refers to as 'category benchmarks'. Ex. 244 at 4, 8. Category benchmarks are used in the Committee's investment option selection and evaluation processes.

For reviewing investment options, the IPS states that the Committee must conduct periodic evaluations based on a range of criteria including "investment performance versus benchmark, performance peer rankings, risk and return statistics [and] general operations/expense information." Ex. 244 at 4. Acceptable performance requires no further action, but unsatisfactory performance, based on such criteria over extended periods of time, requires "a more thorough review". Id. The guiding details of what such a review entails are set out in the section describing the process for replacing an investment option, id., and additionally in a table where two specific criteria are selected out of many. Id. at 7. The table indicates that a thorough review is required where: 1) an investment option is outperformed by greater than 50% of its peers over a 10-year period, and 2) its 10-year performance falls below the Category Benchmark. Id. In other words, there is a problem if a fund or an investment option falls in the lower half of its peer group, and if it performs less than its category benchmark over a 10-year period.

The Committee looked at a range of criteria during its quarterly reviews of the Plan's investment options outside the two just mentioned, including: investment performance against relative benchmarks and peer groups; 1-year, 3-year, 5-year, and 10-year absolute rates of return; manager tenure; expense

ratios; risk adjusted returns; and style discipline or style drift. See, e.g., Ex. 40 at 14; Trial Tr. 125:16-128:2, May 4, 2026.

In deciding whether to remove or replace an investment option, the Committee **may** continue closely to monitor the investment option for some time; review the investment needs of the Plan participants, and decide whether replacement with a similar option, a different option, or a complete overhaul of the Plan's menu of investment alternatives would be appropriate; review the Plan participants' use of the underperforming fund and decide whether to replace it with a similar investment option, or keep that similar option as an addition to the Plan's menu; and research possible alternatives which meet the investment option selection criteria. Ex. 244 at 4.

A notable point of contention is the benchmark the IPS directs the Committee to use in its investment option selection and review processes. The IPS directs the Committee to Morningstar Associates, LLC's "Category Classifications Methodology document" to identify the specific benchmarks associated with each investment option. Id. at 4, 8. In this document, the Russell 1000 Index is identified as the category benchmark for the GFA. Trial Tr. 36:6-10, May 4, 2026; see also Ex. 17 at 60.

In an appendix entitled 'Appendix A' to the IPS, however, the benchmark associated with the GFA is the S&P 500. Ex. 244 at 5. The Committee sometimes used both the Russell 1000 and S&P 500, or used one but not the other, as benchmarks in reviewing the performance of the GFA throughout the class period. Trial Tr. 38:9-12; 38:15-18, May 4, 2026. In 2019, 2023, and 2024, both the Russell 1000 and S&P 500 were used as benchmarks, whereas in 2020 and 2021 only the S&P 500 was used, and in 2022 only the Russell 1000 Index was used. See Stephan exhibit for years 2018-2024 at TJSTEPHAN00005047, TJSTEPHAN00001684 , TJSTEPHAN00002305 , TJSTEPHAN00002596 , TJSTEPHAN00002864 , TJSTEPHAN00003283, TJSTEPHAN00003655.

The IPS sets out further considerations for the selection and review of investment options. Ex. 244 at 8. For instance, it states that some criteria may be inapplicable to index funds, passively managed funds, or funds with newly offered share classes. Id.

### 8. The Growth Fund of America

The GFA is an actively managed mutual fund in Morningstar Inc.'s ("Morningstar") US Fund Large Growth category, Stip. Facts ¶ 26, and was made available to Plan participants as an investment option during the class period. Id. ¶ 25. The Plan offered the R4 share class of the GFA between January 28, 2019, and the second quarter of 2021, which generated 35 basis points

of Fund Revenue. Id. ¶ 28. Fund Revenue refers to the expense ratio proceeds that are charged to account for various administrative expenses. Trial Tr. 100:3-17, May 5, 2026. Any money left over after administrative expenses is then returned to the Plan participants' accounts. Id. at 98:23-99:4.

Between the second quarter of 2021 and May 3, 2026, the Plan offered the R5-e share class, which generated 15 basis points of Fund Revenue. Stip. Facts ¶ 30. As of December 2018, the GFA was rated as a 3-star[5] fund by Morningstar. Id. ¶ 32; see Trial Tr. 49:21-50:6, May 11, 2026. Morningstar also has its own medalist rating system, which awards a limited number of investment options medals -- gold, silver, or bronze -- based on their potential to provide risk-adjusted returns. Id. at 48:20-49:4. The GFA achieved a medal every year during the class period. Id. at 49:14-20.

By September 30, 2019, the Committee had placed the GFA on a 'watch list'[6] because of "its historical performance compared to its benchmark." Stip. Facts ¶ 33; Ex. 56; Trial Tr. 64:24-65:4, May 5, 2026. During the May 5, 2020, Committee meeting,

---

[5] Morningstar has a star rating system where it rates funds between 1 and 5 based on historical risk adjusted returns. Trial Tr. 49:24-50:4, May 11, 2026, ECF No. 128; Trial Tr. 82:8-23, May 4, 2026.

[6] The watch list was included in the materials handed out to the Committee members in advance of a quarterly meeting. Trial Tr. 67:5-13, May 5, 2026. A fund stays on the list until it is removed. Id. at 67:14-17.

the Committee decided that no funds would be added to the watch list that quarter, but all would be monitored through the COVID-19 pandemic, and "more informed decisions" would be made as "volatility settle[d]". Stip. Facts ¶ 34; Ex. 58. Nadler, the CFO of the Company, testified that investments after COVID-19 were extremely volatile -- meaning they would rise and drop depending on the day -- and so all investment options were being watched and increasingly scrutinized until volatility had decreased. Trial Tr. 68:23-69:2, May 5, 2026.

At a Committee meeting on October 27, 2022, after discussing and reviewing the data provided by RBC where the GFA was "underperforming in all time periods," -- though its expense ratio compared to its peers was favorable -- the Committee decided to place the GFA on the watch list again on Stephens' recommendation. Ex. 67; Stip. Facts ¶ 35; Trial Tr. 70:10-71:17, May 5, 2026. On January 25, 2023, the Committee decided at the quarterly meeting to keep the GFA on watch for the first quarter of 2023, though it slightly outperformed the Russell 1000 benchmark in the last quarter of 2022,[7] and for about three weeks into the first quarter of 2023, where it also outperformed its peers during those three weeks. Ex. 68.

[7] It had returns of 2.26% against the 2.20% of the benchmark. Ex. 68.

During a Committee meeting held on June 28, 2023, the Committee decided to maintain the GFA as an investment option and keep it on the watch list for the third quarter of 2023, but it also decided to add an alternative, passively managed option for Plan participants "seeking growth in an index fund" -- the Fidelity Large Cap Growth Index Fund. Stip. Facts ¶ 36; Ex. 70. At a Committee meeting on November 6, 2023, the GFA was removed from the watch list, because it had recovered the previous year and also because of the addition of the Fidelity Large Cap Growth Index Fund, but the Committee also made a commitment actively to research managed large growth funds which could potentially replace the GFA. Stip. Facts ¶ 37; Ex. 72; Trial Tr. 75:4-17, May 5, 2026. The following year at a meeting held on February 21, 2024, the Committee did discuss the potential of several actively managed large growth funds to replace the GFA, but ultimately decided to keep the GFA and the Fidelity Large Cap Growth Index Fund as investment options in the Plan. Stip. Facts ¶ 38.

**9. Forfeitures**

Eligible Crew Members could contribute to their Plan accounts from their pre-tax annual compensation and were immediately vested in these contributions throughout the class period. Id. ¶¶ 40, 43. From January 28, 2019, to January 1, 2021, the Plan allowed the Company to contribute to the Plan

participant accounts through non-elective employer contributions, which changed after January 1, 2021, to a choice between matching contributions or non-elective contributions. Id. ¶¶ 41, 42; Ex. 9 at 24; Ex. 5 at 1. The Company contributions are discretionary contributions Trader Joe's can make to the Plan. Trial Tr. 145:21-22, May 5, 2026. Under the Plan's 6-year graded vesting schedule, the Plan participants become fully vested in Trader Joe's contributions only after six years of service (excluding any years served before a Plan participant turned 18 years old). Stip. Facts ¶ 44.

If a Plan participant's employment terminated prior to becoming fully vested in Company contributions, their non-vested Company contributions are forfeited, and these forfeited funds are held in a Plan forfeiture account until they are reallocated. Id. ¶¶ 45-46. Trial Tr. 97:13-15, May 7, 2026. Whatever remained in the account plus interest would roll over into the following Plan year; nothing reverted to the Company. Trial Tr. 104:17-23, May 6, 2026. The assets of the forfeiture account are Plan assets. Id. at 104:20-21; Trial Tr. 97:16-18, May 7, 2026. Re-employed participants resume their vesting schedule from where they left it, if it is unvested when they leave the Company. Trial Tr. 104:4-12, May 6, 2026. The Committee was responsible for reinstating the balances of

returning Plan participants and used the retained forfeitures to do so. Id.

The Plan allowed these forfeitures to be used to pay the Plan's expenses, or to reduce any Company non-elective contributions from January 28, 2019, through December 31, 2020, and as of January 1, 2021, expanded to include the option for forfeitures to be used to reduce any matching contributions. Stip. Facts ¶¶ 47-48; Ex. 352 at 27. The Plan was later amended to have forfeitures applied in the following order effective January 1, 2024: first they would be applied to reduce matching contributions, then any remaining funds would be applied to reduce non-elective contributions, and only if any forfeitures were still left over after the second application would they be applied to pay reasonable Plan expenses. Id. ¶ 49; Trial Tr. 23:11-24:5, May 6, 2026. Notably, forfeitures have never been used to pay the Plan expenses throughout the class period. Id. ¶ 51. They have, however, been applied to the Company contributions. Trial Tr. 27:23-28:1, May 6, 2026.

The Company would write a check allocated to the Plan, and that plus an amount taken from the forfeiture account went to Plan participants. Trial Tr. 106:4-12, May 6, 2026. For example, in 2019, the Company's discretionary contribution was $127,142,947, and $7,682,319 of forfeitures were utilized in addition to bring the total Company contribution to

approximately $135,000,000. Ex. 351 at 27. The amounts contributed by the Company were adjusted based on the performance of the economy, the Company itself, benefits given to participants, and similar factors. Trial Tr. 108:2-9, May 6, 2026. The Board and its advisors would determine what amounts would be applied, and the Committee would inform the recordkeeper of the agreed amount. Trial Tr. 103:2-10, May 6, 2026; see, e.g., Ex. 18 at 29.

One overarching conclusion emerges from this rather disparate fact finding: Trader Joe's, the trust's settlor and Capitol Bank (and its affiliates) as plan administrator, record keeper, and investment plans provider, enjoy a long standing, mutually beneficial, indeed rather cozy relationship. Indeed, so close are these two that the Plan requires offering a minimum of three Capitol investment plans to employees. This is problematic. Were one of these required investment plans to turn out to be non-productive, the Committee would have an unswerving fiduciary duty to Trader Joe's employees to get rid of such plan.

Fortunately, no such conflict is remotely present in the instant case. The Court cites the possibility only to emphasize the relationship.

## IV. RULINGS OF LAW

### A. Applicable Law

Under ERISA, the Plan is an "employee pension benefit plan" per 29 U.S.C. § 1002(2)(A) because it is a plan maintained by an employer that "provides retirement income to employees". 29 U.S.C. § 1002(2)(A)(i). The Plan is also a "defined contribution plan" or "individual account plan" because it is "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." Id. § 1002(34).

A fiduciary under ERISA is a person who "exercises any discretionary authority or . . . responsibility in the administration of [a] plan" or "exercises any discretionary authority or discretionary control respecting management of [a] plan or . . . disposition of its assets." 29 U.S.C. § 1002(21)(A). An ERISA fiduciary to a plan is also one named or identified as such by the plan or by the employer. 29 U.S.C. § 1102(a)(2). See also Bowers v. Russell, 717 F. Supp. 3d 165, 175 (D. Mass. 2024) (Saris, J.) (quoting Mertens v. Hewitt Assocs., 508 U.S. 248, 251 (1993)).

The fiduciaries of employee pension benefit plans and of defined contribution plans or individual account plans have "two primary duties" under ERISA: (1) a duty of prudence and (2) a duty of loyalty. Waldner v. Natixis Inv. Managers, L.P., No. CV 21-10273-LTS, 2025 WL 1871290, at *20 (D. Mass. June 26, 2025) (Sorokin, J.). These duties "are among 'the highest known to the law.'" Moitoso v. FMR LLC, 451 F. Supp. 3d 189, 204 (D. Mass. 2020) (quoting Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 598 (8th Cir. 2009)). Where a fiduciary, such as a plan sponsor, -- which could be an employer -- appoints other fiduciaries, the appointing fiduciary has a duty to monitor the appointed fiduciary. Id. at 221; see also Daggett v. Waters Corp., 731 F. Supp. 3d 121, 137-138 (D. Mass. 2024) (Dein, M.J.) ("Under ERISA, '[i]mplicit in the power to appoint fiduciaries is the duty to monitor. . .'") (quoting Bowers, 717 F. Supp. 3d at 175).

To prevail on a civil action for the breach of an ERISA fiduciary duty under 29 U.S.C. § 1132, a plaintiff must demonstrate the following: "(1) th[e] defendants acted as the Plan's fiduciar[ies]; (2) th[e] defendants breached their fiduciary duties; and (3). . . the breach caused a loss to the Plan." Sellers v. Trustees. of Bos. Coll., 729 F. Supp. 3d 136, 148 (D. Mass. 2024).

Here, the fiduciary status of the Company, the Board, and the Committee are undisputed. See, e.g., Stip. Facts ¶ 8. The Committee is a named fiduciary of the Plan. See Ex. 244 at 1. All three are "functional fiduciaries" per 29 U.S.C. § 1002(21)(A) -- the Company as the Plan sponsor has overall discretionary responsibility in the administration of the Plan while the Board and the Committee exercise discretionary authority regarding the management and disposition of the Plan assets. See Bowers, 717 F. Supp. 3d at 175.

The second element places the burden on the plaintiffs to show a breach of a fiduciary duty. The duty of prudence requires a fiduciary to "discharge his duties with respect to a plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). This duty must be exercised "in selecting investments at the outset" and includes a "continuing duty to monitor trust investments and remove imprudent ones." Tibble v. Edison Int'l, 575 U.S. 523, 529 (2015).

Importantly, "the content of the duty of prudence turns on 'the circumstances ... prevailing' **at the time the fiduciary acts.**" Barchock v. CVS Health Corp., 886 F.3d 43, 44 (1st Cir.

2018) (emphasis added) (quoting Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409, 425 (2014)). Determining the prudence of a fiduciary is "not a test of the result of performance of the investment" but one of conduct. Id. at 44-45 (quoting Bunch v. W.R. Grace & Co., 555 F.3d 1, 7 (1st Cir. 2009)). Thus, the key question to be determined when examining the breach of the duty of prudence is "whether the fiduciary 'took into account all relevant information in performing its fiduciary duty under ERISA.'" Moitoso, 451 F. Supp. 3d at 204 (citation omitted). This involves looking at the "'totality of the circumstances' and assess[ing] a fiduciary's procedures, methodology and thoroughness." Sellers, 729 F. Supp. 3d at 149.

The duty of loyalty compels a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of:(i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). This "does not require a fiduciary to don the commercial equivalent of sackcloth and ashes" but simply necessitates "that the fiduciary not place its own interests ahead of those of the Plan beneficiary." Vander Luitgaren v. Sun Life Assur. Co. of Canada, 765 F.3d 59, 65 (1st Cir. 2014).

Thus, "a plaintiff needs to show that the fiduciary served an interest or obtained a benefit at the expense of the plan beneficiaries" to demonstrate a breach of the duty of loyalty. Ellis v. Fidelity Mgmt. Tr. Co., 257 F. Supp. 3d 117, 126 (D. Mass. 2017), aff'd, 883 F.3d 1 (1st Cir. 2018). In determining whether this has been achieved, a court "considers the totality of the circumstances" and "take[s] into account the fiduciary's subjective motivation in making a decision for the plan." Moitoso, 451 F. Supp. 3d at 204.

The third and final element is split into two requirements: loss and causation. Waldner, 2025 WL 1871290, at *21; Brotherston v. Putnam Invs., LLC, 907 F.3d 17, 30 (1st Cir. 2018). A fiduciary who is liable for breach of a fiduciary duty must "make good to [a] plan any losses to the plan resulting from . . . such breach." 29 U.S.C. § 1109(a). Loss here refers to "the amount required to restore the value of the . . . [plan] . . . to what it would have been if the portion of the [plan] affected by the breach had been properly administered." Brotherston, 907 F.3d at 32 (quoting Restatement (Third) of Trusts, § 100.).

In determining loss, a court may, "with the help of expert analysis, . . . compar[e] the performance of the imprudent investments with the performance of a prudently invested portfolio." Evans v. Akers, 534 F.3d 65, 74 (1st Cir. 2008)

(citing Graden v. Conexant Sys. Inc., 496 F.3d 291, 301 (3d Cir. 2007)); see also Brotherston, 907 F.3d at 34 ("So to determine whether there was a loss, it is reasonable to compare the actual returns on that portfolio to the returns that would have been generated by a portfolio of benchmark funds or indexes comparable but for the fact that they do not claim to be able to pick winners and losers, or charge for doing so."). It is the plaintiff who "bear[s] the burden of identifying a comparable fund that outperformed the improper Plan fund." Waldner, 2025 WL 1871290, at *21. The plaintiff also bears the burden of identifying "a prudent alternative" to a plan's recordkeeping fee to show loss. Sellers, 729 F. Supp. 3d at 180.

Turning to the causation requirement, the burden shifts to the fiduciary defendant. Brotherston, 907 F.3d at 35, 39. Once a beneficiary plaintiff shows loss to the plan from an imprudent investment, a fiduciary must "prove that the resulting investment decision was objectively prudent." Id. at 39. A fiduciary demonstrates objective prudence where it shows that "based on the information available at the time of the challenged decisions [it] **would** have selected the same funds or other funds that performed the same or worse than the selected funds." Waldner, 2025 WL 1871290, at *21 (emphasis added); see also Sellers, 729 F. Supp. 3d at 178 ("A fiduciary shows objective prudence when it provides evidence that a prudent

fiduciary 'would' have rather than 'could' have made the same decision.") (citing Tatum v. RJR Pension Inv. Comm., 761 F.3d 346, 365 (4th Cir. 2014)).

The Court's analysis follows the elements above for each of the Plaintiffs' claims. The Court's analysis starts with breaches of the duties of prudence and loyalty, then an analysis of loss if a breach has been demonstrated, and then finally turning to discuss causation if loss has been shown.

**B. Forfeitures**

The Plaintiffs argue that the Committee had no process, deliberation or involvement with respect to the allocation of forfeitures, and this, along with the Plaintiffs' allegation that the forfeiture dollars were used to save the Company money, resulted in a breach of fiduciary duties. Trial Tr. 13:16-14:8, May 4, 2026. The Defendants rebut this argument, arguing that the Plan permissibly used forfeitures to offset the Company's voluntary contributions made to the Plan participants. Trial Tr. 16:9-15, May 4, 2026. The Court allowed the Defendants' motion for judgment on partial findings with respect to forfeitures and reasons as follows.

As explained earlier, although the Plan allows the use of forfeitures to pay administrative expenses, to reinstate re-employed participants, and to reduce Company contributions, see Ex. 353 at 29, "a plaintiff needs to show that the fiduciary

served an interest or obtained a benefit at the expense of the plan beneficiaries" to demonstrate a breach of the duty of loyalty. Ellis, 257 F. Supp. 3d at 126. A plaintiff must also show that in the prevailing circumstances, the Defendants did not take into account all relevant information when performing their duty of prudence. Moitoso, 451 F. Supp. 3d at 204.

Nadler confirmed -- and the Plan document reflects -- that from 2019 through 2023, it was the Company, and not the Committee, that dictated how forfeiture funds would be allocated, see Ex. 5 at 1; Ex. 7 at 24, and that the Committee played no role in directing how the plan assets in the forfeiture account would be used. Trial Tr. 24:22-25:6; 31:22-32:2, May 7, 2026. Nadler testified, though, that the Committee saw to it that the forfeitures were being used as governed by the Plan, i.e., that the forfeitures were allocated according to the permissible uses designated by the Plan. Trial Tr. 28:14-29:1, May 6, 2026.

Nadler further explained that the Committee did not believe that there was an issue with how the forfeiture funds were applied because they were allocated in accordance with the terms of the Plan. Trial Tr. 33:10-12; 105:22-25, May 6, 2026. For instance, none of the amounts in the forfeiture account (which are Plan assets) went to the Company -- the forfeitures used by the Company to offset the Company contributions went straight

from the forfeiture account into the Plan participant accounts. Id. at 106:1-12. So, in 2021, the $6,845,700 in forfeitures, used to reduce the 2020 Company contribution, was transferred directly into the participants' accounts from the forfeiture account. Ex. 353 at 29; Trial Tr. 145:11-16, May 5, 2026.

The Plaintiffs' conclusion that the Committee breached its fiduciary duties, for failing to establish a process by which they determined how the forfeited funds were to be allocated, does not resonate with the Court. Expert witness Eric Dyson ("Dyson") testifies that because forfeitures are a Plan asset, the Committee is required to follow a process in considering how to use those funds, and based on his findings, they failed to do so. Trial Tr. 99:16-100:7, May 7, 2026. This is inapposite -- the Plan document says what it says. The Plan administrator is specifically designated by the Plan document as the allocating body for forfeited funds, see Ex. 5 at 1; Ex. 7 at 24, and thus it follows that the Committee would not be responsible for determining a forfeiture allocation process.

This is not to say, however, that the Committee is absolved of all responsibility regarding forfeitures. Nadler testified to the Committee's commitment to ensuring that the Company and the Board allocate the forfeited funds according to the terms of the Plan, and the Plaintiffs have failed to demonstrate that this is imprudent or indicative that the Committee has "place[d]

its own interests ahead of those of the Plan beneficiar[ies]." Vander Luitgaren, 765 F.3d at 65. Thus, the Court rules that the Defendants' have not breached their fiduciary duties in their management of forfeitures and need not decide the issues of loss and causation.

**C. The Growth Fund of America**

The Plaintiffs argue that the Defendants breached their fiduciary duties because the GFA failed to meet the two express objective criteria in the IPS governing the selection and review of investment options for the Plan -- that the investment option or fund must be in the top half of its Morningstar peer group, and that it must meet or exceed Morningstar's asset category benchmark. Trial Tr. 11:4-16, May 4, 2026. The Defendants rebut that the question of prudence does not focus on the performance of the GFA in hindsight -- which is what they claim the Plaintiffs do -- but rather turns on process, which they argue the Committee did rather well by meeting on a quarterly basis to discuss investment options, including the GFA, using a holistic assessment procedure along with the IPS criteria in evaluating the GFA, and closely monitoring it as well. Trial Tr. 22:1-25, May 4, 2026.

The Court first addresses the issue of breach, which resolves the claim in favor of the Defendants.

To reiterate, determining the prudence of a fiduciary is "not a test of the result of performance of the investment" but one of conduct. Barchock, 886 F.3d at 44-45 (quoting Bunch v. W.R. Grace & Co., 555 F.3d 1, 7 (1st Cir. 2009)). This involves looking at the "'totality of the circumstances' and assess[ing] a fiduciary's procedures, methodology and thoroughness." Sellers, 729 F. Supp. 3d at 149 (quoting Tracey v. Massachusetts Inst. of Tech., 404 F. Supp. 3d 356, 361 (D. Mass. 2019) (Gorton, J.)). The Plaintiffs must show that the Defendant fiduciaries served an interest or obtained a benefit at the expense of the plan beneficiaries. Ellis, 257 F. Supp. 3d at 126. In deciding whether a fiduciary breached the duty of loyalty, the Court must "take into account the fiduciary's subjective motivation in making a decision for the plan." Moitoso, 451 F. Supp. 3d at 204.

**1. Benchmarks**

The Plaintiffs, relying on the expert testimony of Steve Pomerantz ("Pomerantz"), first take issue with the Committee's use of two benchmarks in evaluating the GFA: the Russell 1000 and the S&P 500. Nadler testified that while the Committee understood that the GFA did not line up perfectly with either the S&P 500 or the Russell 1000 benchmarks, they only looked at the benchmarks being a factor in the broad range of information they considered. Trial Tr. 116:6-17, May 6, 2026.

Pomerantz opines that when there are two benchmarks that differ from each other significantly, it comes down to a 50/50 chance regarding whether a positive or negative outcome results from the comparison with the particular investment option, which defeats the purpose of the benchmark. Trial Tr. 42:18-43:2, May 4, 2026. In his analysis of the GFA against the two benchmarks, Pomerantz found that the answer regarding the performance of the fund was ambiguous, because he achieved different results across the class period on an annual basis, quarterly basis, and monthly basis. Trial Tr. 43:3-19, May 4, 2026. He further opined that the reason for the varied outcomes when comparing the GFA to both benchmarks is that the Russell 1000 and S&P 500 differ meaningfully over varying time periods. Id. at 43:25-44:11. For instance, Pomerantz observed that on a monthly basis the benchmarks tracked similarly only 70% of the time, instead of a desired 95%, which is indicative of a lack of any material differences between the benchmarks. Id. at 44:17-45:10. On an annual basis, the benchmarks agreed only 50% of the time. Id. at 45:11-13.

Overall, Pomerantz's opinion is that the question of whether the GFA performed well cannot be answered because of the different answers received from measuring it against the different benchmarks. Id. at 45:14-46:9. For instance, he testified that against the S&P 500, the GFA oscillates around

zero -- meaning sometimes the GFA trails and sometimes it beats the S&P 500 benchmark, Id. at 130:18-21 -- over a 10-year period (which includes the class period). The GFA underperformed the Russell 1000 benchmark over the same period on a risk-adjusted basis. Id. at 49:17-50:14; 53:21-54:6. Regarding the latter, Pomerantz determined that the GFA's underperformance of the Russell 1000 benchmark means that there is a structural problem with the fund that cannot be explained by putting it up to "bad luck", and it indicates that the GFA is not truly growth oriented. Id. at 54:9-55:11, May 4, 2026; Trial Tr. 35:22-37:5, May 5, 2026.

Pomerantz also opines that the Russell 1000 benchmark is the correct benchmark to use because the IPS provides a formula for discerning the appropriate benchmark -- the **category** benchmark, see Ex. 244 at 4, 8 --, which indicates the Russell 1000 benchmark as such, and thus renders Appendix A indicating the S&P 500 as the GFA's **prospectus** benchmark meaningless, Trial Tr. 36:24-37:6; 37:23-38:1; 38:23-39:2; 52:24-53:8; 130:11-12, May 4, 2026. Pomerantz also observes that this presents an inconsistency, which he leaves to the author of the IPS to clarify. Id. at 135:25-136:18.

On the other hand, the Defendants' expert, Lee Heavner ("Heavner"), opined that utilizing two benchmarks provides more information, which is especially helpful because there is no

perfect benchmark for an actively managed fund. Trial Tr. 38:22-24, May 11, 2026. Thus, knowing that the S&P 500 is less growth-oriented than the Russell 1000, and measuring how the GFA compared to both the S&P 500 and the Russell 1000, provides more information about what caused the GFA's returns. Id. at 38:24-39:24. Nadler testified that while the Committee understood that the GFA did not line up perfectly with either the S&P 500 or the Russell 1000 benchmarks, they only looked at the benchmarks being a factor in the broad range of information they considered. Trial Tr. 116:6-17, May 6, 2026.

### 2. Review and Selection Criteria

Another issue regarding the Court's analysis of breach is Pomerantz's analysis of the GFA's performance over the class period, primarily -- and arguably solely -- focusing on the criteria set forth in the IPS, for reviewing and selecting investment options. Pomerantz admits that while he looked at other factors such as the Morningstar ratings, tracking error, and the information ratio, Trial Tr. 96:8-97:4, May 4, 2026, he only evaluated the two IPS criteria in his analysis of the GFA. Id. at 99:20-23.

While Pomerantz also agrees that fiduciaries consider qualitative factors when evaluating a plan's investment options, he again admits he did not assess any in reaching his conclusions about the GFA. Id. at 114:22-115:4. He did not

consider for instance, how the GFA was managed, what strategy it pursued, the tenure of the GFA's management team, the prevalence of the GFA in approximately 9,500 other plans,[8] or Morningstar's medalist ratings.[9] Trial Tr. 115:5-117:16; 120:11-21, May 4, 2026. He also admitted in his testimony that once an investment option has met the IPS evaluation criteria, a fiduciary could "turn the page, and go have a cup of coffee." Id. at 121:14-15.

Pomerantz also acknowledges that nothing in the IPS criteria for reviewing investment options restricts the evaluation of an option to just its 10-year performance against its benchmark, or against its peer group. Id. at 122:13-123:15. Notably, Pomerantz admits that part of a diligent selection process for investment options for a retirement plan involves looking at a range of qualitative and quantitative factors meaningful to the Plan -- such as historical performance, manager experience, investment process, institutional expertise, and expenses. Id. at 94:12-95:16.

---

[8] Pomerantz contextualizes this amount, stating that it only represents about one percent of the total number of defined contribution plans in the country. Trial Tr. 117:8-10, May 4, 2026.

[9] To Pomerantz's credit, he testified that he did not take the medalist ratings into account, because he faults them for being forward-looking, and generally never takes such predictive ratings into account, because they are unreliable. Trial Tr. 120:11-18, May 4, 2026; Trial Tr. 34:4-35:10, May 5, 2026.

Pomerantz also agrees that performing types of due diligence such as screening for positive past performance on a risk-adjusted basis, lower expenses, and sound institutions, improves the likelihood of a fund outperforming its benchmark. Id. at 150:13-24. Though Pomerantz did not offer any opinion regarding a fund's pursuit of a more diversified or more conservative strategy, id. at 108:16-109:1, he conceded that diversification across styles, market cap, and geography may improve a fund's risk and return profile, and undiversified funds heavily concentrated in one market sector could be volatile. Id. at 104:3-21. He further agreed that an investment option's allocation across different classes affects the return of its portfolio, and so does active management. Id. at 105:9-15. Interestingly, Pomerantz did not believe that the characteristics of the GFA, such as its asset allocations, were relevant in reaching his conclusions. Id. at 106:23-107:3.

Yet, the Committee quarterly reports show, and Pomerantz agrees, that the Committee reviewed more than just the two IPS criteria for investment option review, such as information on trailing returns, expense ratios, yields, 1-, 3-, 5-, and 10-year absolute rates of return, manager tenure, risk-adjusted returns, style discipline, and Morningstar fund fact sheets. Id. at 125:16-128:2, May 4, 2026; see Ex. 40 at 14, 49.

Pomerantz himself admits that he did not evaluate the GFA's 3-year performance or 5-year performance. Id. at 138:21-23.

Nadler additionally testified that the GFA was monitored by placing it on watch, discussing it at the quarterly Committee meetings, and utilizing recommendations from the investment advisors. Trial Tr. 100:6-14, May 6, 2026. As of September 30, 2019, the GFA was added to the watch list because it was likely underperforming. Trial Tr. 64:24-65:4, May 5, 2026; see Ex. 56. At the time of a quarterly Committee meeting on May 5, 2020, all investment options were essentially on the watch list and were being increasingly scrutinized due to volatility caused by the COVID-19 pandemic. Trial Tr. 67:22-69:8, May 5, 2026; see Ex. 58. Then, according to a Committee meeting on October 27, 2022, the Committee returned to its normal procedures, because the volatility caused by the pandemic was settling down, and it agreed to place the GFA on the watch list again to track it. Trial Tr. 70:5-72:3, May 5, 2026; see Ex. 67.

A development in the GFA's performance was noted in the Committee minutes dated January 25, 2023, where the GFA slightly outperformed the Russell 1000 benchmark during the last quarter of 2022, and up until the date the minutes were recorded, January 25, 2023, also outperforming its peers -- the Committee continued to keep it on watch for the first quarter of 2023. Trial Tr. 72:16-74:18, May 5, 2026; see Ex. 68. As of June 28,

2023, the Committee decided to add a passively managed index fund and keep the GFA on watch for the third quarter of 2023. Trial Tr. 74:19-75:20; 76:24-77:4, May 5, 2026. In the minutes for November 6, 2023, the Committee decided to remove the GFA from the watch list, partially based on its one-year recovery, and continue searching for the availability of actively managed large growth funds to potentially replace the GFA.[10] Trial Tr. 77:6-78:12, May 5, 2026. Nadler further explained that the funds that ended up on the watch list were reviewed in greater detail. Trial Tr. 72:16-18; 97:4-12, May 6, 2026; see Ex. 42 at 2, 10-13.

Nadler also testified that in monitoring investment options, the Committee took a long-term view of the performance of the investments, looking for instance at the metrics and materials provided by the investment advisors, and this was done against the backdrop of the IPS guidelines, which gave the Committee discretion in making decisions in the best interests of the Plan participants. Trial Tr. 98:14-99:15, May 6, 2026. All of these bolstered the confidence of the Committee in the management of the GFA over the class period. Id. at 101:4-7.

---

[10] As of the time of trial, the GFA remained in the Plan as the only actively managed large-cap growth fund. Trial Tr. 78:19-79:2, May 5, 2026.

Pomerantz further testified that he did not assess the historical risk-adjusted returns of the GFA compared to other funds in the large growth category. Trial Tr. 111:5-11, May 4, 2026. Heavner posited that Pomerantz's failure to look at risk-adjusted returns -- instead of just absolute returns -- on a 10-year basis does not provide enough information on what informed a fund's returns, and without that information, one cannot tell how the fund is likely to perform in other market conditions. Trial Tr. 52:8-53:2, May 11, 2026. To Pomerantz's credit, he admitted that generally it is important to consider risk when evaluating an investment's performance, because riskier investments can sometimes perform better under certain market conditions, and this does not necessarily indicate that an investment is good. Trial Tr. 103:18-104:2, May 4, 2026.

Specifically, Pomerantz testified that there are dangers to "performance chasing", where it happens that poorly performing funds are replaced with new, better-performing funds, and then the removed fund starts to perform better. Trial Tr. 148:14-21, May 4, 2026. In that vein, Nadler testified that the Committee retained the GFA again because they took a long-term view, taking into consideration several investment factors separate from the benchmarks, and being mindful that while a fund could underperform in one period, it could overperform in another. Trial Tr. 100:15-101:2, May 6, 2026.

It is evident to the Court that the Plaintiffs have failed to show any disloyal motivation for the Defendants' decision to retain the GFA, or that the Defendants engaged in any imprudent conduct. Waldner, 2025 WL 1871290, at *25. The Defendants adequately exercised their duties in monitoring the GFA. Tibble, 575 U.S. at 529. The Committee engaged in a sufficiently robust process in reviewing the GFA by taking into consideration several varied criteria as permitted by the IPS, and closely and consistently monitoring the GFA's performance over the class period. The Court thus need not engage in discussion on loss or causation.

**D. Recordkeeping Fees**

The crux of the Plaintiffs' recordkeeping theory is that the Defendants failed to consider alternative fees for recordkeeping, thus breaching their fiduciary duties. Trial Tr. 9:20-10: 14, May 4, 2026. The Plaintiffs argue that the fiduciaries failed to competitively test the market or leverage the size of the Plan, in terms of its assets and participant count, to draw an ideal recordkeeping fee and avoid paying top market price. Id. The Defendants agree that the success of the recordkeeping theory turns on the process of the fiduciaries, which they present as prudent. Id. at 18:25-19:9. The Court first discusses breach of fiduciary duties.

**1. Breach**

This Court addresses the three overarching concerns the parties debate in determining whether the Defendants breached their fiduciary duties.

**a. Total Compensation**

The Plaintiffs raise concerns regarding the total amount of compensation earned by Capital Group and American Funds and how that played a role -- or not -- in the Defendants' consideration and monitoring of the Plan's recordkeeping fees. Trial Tr. 105:16-21, May 5, 2026. The Plaintiffs' argument is essentially that the more revenue earned by a recordkeeper, the lower the recordkeeping fees will be, and the Defendants should have used the information they had about the amount of revenue earned by Capital Group to negotiate for better recordkeeping fees. Trial Tr. 24:12-14, May 7, 2026. The CFO, Nadler, agreed in his testimony to the importance of considering the recordkeeper's total compensation -- for instance, the ancillary fees would need to be reasonable in the context of total fees -- in evaluating the reasonableness of the compensation earned by a recordkeeper. Trial Tr. 128:24-129:1, May 5, 2026.

This logic is sound -- a court must "assess a fiduciary's . . . thoroughness." Sellers, 729 F. Supp. 3d at 149. Nadler testified that the Committee evaluated all streams of income to Capital Group and American Funds through its relationship with

the Plan, in addition to the base and participant fees. Trial Tr. 105:16-106:7, May 5, 2026. Capital Group earned direct and indirect compensation throughout the class period. See Exs. 351-356 at 6. In direct compensation, which gets paid out of the Plan assets, Capital Group earned $224,470 in 2019, $186,966 in 2020, $265,271 in 2021, $395,929 in 2022, $320,059 in 2023, and $320,109 in 2024. Id.; Trial Tr. 138:20-21, May 5, 2026.

Nadler also affirmed the validity of the fee schedule in the Recordkeeping and Administrative Services Agreement, which sets out the different types of fees Capital Group earns from the services it provides to the Plan. See, e.g., Trial Tr. 119:11-120:24. For instance, Capital Group charges an annual fee of $1 per participant for maintaining Plan beneficiary information, meaning that in 2024, where the participant count was 45,337, Capital Group earned $45,337 for maintaining participant information. Ex. 356 at 2; Ex. 380 at 10; Trial Tr. 129:10-23, May 5, 2026.

In support of the Plaintiffs' argument that more revenue earned by a recordkeeper could result in lower recordkeeping fees, one of their expert witnesses, Dyson, testified that recordkeepers receive additional revenue from having their proprietary products in the Plan. Trial Tr. 23:21-24:18, May 7, 2026. A benchmarking report provided by American Funds, and generated by Fiduciary Benchmarks on November 24, 2020, reflects

that as of November 10, 2020, Capital Group earned investment manager fees totaling $5,699,183[11] from the nine American Funds investment options included on the Plan menu. Ex. 391 at 5. This accounts for the majority of the total investment manager fees charged to the Plan of $6,310,788 in that Plan year. Id. A benchmarking report dated February 5, 2021, indicates that Capital Group earned $5,695,179 in investment manager fees out of the total $6,306,455. Ex. 392 at 4; Trial Tr. 126:3-6, May 6, 2026. Again, as of June 17, 2024, Capital Group earned $5,898,209 out of the total $6,610,815 of investment manager fees. Ex. 394 at 4.

Similarly, the Plaintiffs argue that based on the number of American Funds investment options (and the amount of Plan assets associated with them) in the Plan during other Plan years in the class period, the number insinuates that Capital Group earns very high revenue, and thus, unless the Defendants failed adequately to abide by their duties of loyalty and prudence, the recordkeeping fee should necessarily have been lower. See Trial Tr. 9:4-18, May 4, 2026. For instance, as of July 31, 2019, nine out of the fifteen investment options in the Plan were funds from American Funds and accounted for 90.54 percent or approximately $1.74 billion of the $1,927,735,132 total Plan

[11] This figure was calculated using the table of figures in Ex. 391, 5. See Trial Tr. 124:9-125:4, May 6, 2026.

assets. Ex. 19 at 7; Trial Tr. 4:6-6:16, May 11, 2026. Correspondingly, as of June 30, 2025, ten of the Plan's seventeen investment options were issued by American Funds, and they accounted for 87.96 percent or approximately $3 billion out of the total $3,492,554,449.15 of Plan assets. Ex. 52 at 7; Trial Tr. 7:2-10, 8:15-24, May 11, 2026.

The parties agree that the amount of a recordkeeper's proprietary funds available in a plan is only one factor for consideration in the determination of the imprudence of recordkeeping fees. See Trial Tr. 9:3-7, May 11, 2026. Given that this Court must consider the totality of the circumstances, Sellers, 729 F. Supp. 3d at 149; Moitoso, 451 F. Supp. 3d at 204, it turns to the discussion on RFPs and RFIs.

b. **RFPs and RFIs**

The Plaintiffs fault the Defendants for failing to conduct either an RFP or RFI and characterize this as a greater failure to draw any competitive bids for better recordkeeping fees. Trial Tr. 9:24-10:10, May 4, 2026. The Defendants push back against the strictness of the Plaintiffs' standards, for what it means to actively negotiate or competitively test the market, by referencing a 'soft RFP' that the Committee's advisors conducted to solicit better fees. See Ex. 395. The Plaintiffs refuse to credit this process as robust, and so does this Court.

To Nadler's understanding, a large plan should leverage its size to negotiate for better recordkeeping fees, Trial Tr. 9:15-19, May 6, 2026, and yet he was unaware of any Committee member inquiring, for example, what other clients of Capital Group paid, or what the lowest fee paid by a client of theirs was. Id. at 11:4-15. The Plaintiffs also suggest that Capital Group typically services smaller plans with about 77 percent of the plans they service falling under $10 million in assets, and with the Plan possessing approximately $2 billion in assets, it should have prompted the Committee to perform a market check. Trial Tr. 60:16-61:7, May 7, 2026.

According to an email dated January 22, 2021, that the Committee advisors sent to the Committee, one of the two recordkeepers that they were conducting a 'soft RFP' with notified them that they would charge $55 per participant -- $7 more than the $48 per participant charge at the time, and it is Nadler's understanding that the advisors were unable to secure a lower fee from either of the two recordkeepers. Ex. 395; Trial Tr. 91:3-9, May 6, 2026. In the same email, the advisors informed the Committee that Capital Group had reduced the recordkeeping fees from $48 to $40, effective April 1, 2021. Ex. 395.

Acting on the information regarding the 'soft RFP', the Committee decided not to conduct a formal RFP. Trial Tr. 91:16-

19, May 6, 2026. Instead, the Committee commissioned a benchmarking report in February 2021 to "see where they stood" after the $8 fee reduction. Trial Tr. 92:6-15, May 6, 2026. Dyson testified that fee benchmarking exercises, while effective for comparing where a plan sits in its peer group of comparator plans, is not a market check in the sense that an RFP or and RFI is, because it does not look at the whole market -- it does not compare different service providers. Trial Tr. 18:5-25, May 7, 2026.

The Defendants attempt to characterize the fee reduction as the result of, at the very least, some sort of discussion between themselves and the recordkeeper, but the Committee quarterly meeting minutes and the language used by the advisors in the January 22, 2021, email strongly indicate that Capital Group proposed the change without being prompted by, or engaging in negotiation with, the Committee. See Exs. 61, 395; Trial Tr. 47:9-21, May 7, 2021; Trial Tr. 35:19-36:3, May 8, 2026.

The Committee in this case has provided no robust evidence indicating that it engaged in a process compliant with its fiduciary duties of prudence and loyalty, to ensure that the recordkeeping fees were adequately monitored and controlled. While conducting an RFP or an RFI would have strongly indicated that the Committee engaged in a competitive process to engage a lower or more ideal recordkeeping fee, the lack of these

processes **along with** the other prevailing circumstances -- such as the lack of evidence of negotiations with the recordkeeper regarding its fees -- is what is the nail in the Defendants' coffin. The Court thus concludes that the Defendants breached their fiduciary duties and turns to discuss loss.

**2. Loss**

The Plaintiffs rely on Dyson's expert opinion and testimony to show loss based on Dyson's findings of a 'prudent alternative', through a series of benchmarking reports. The Defendants fault Dyson's benchmarking exercises as "pure fee comparisons", arguing that he fails to consider relevant factors such as services the Plan received. Trial Tr. 21:7-25, May 4, 2026.

**a. Benchmarking**

As explained earlier, the Plaintiffs must show that it would have been prudent to pay an alternative, lower recordkeeping fee in order to prove loss. Sacerdote v. New York Univ., 9 F.4th 95, 113 (2d Cir. 2021). Dyson performed a benchmarking exercise to demonstrate just that, by using PlanTools, a plan benchmarking platform which -- like other platforms such as Fiduciary Benchmarks -- produces a report based on the information for a specific plan inputted into it, showing where the fees for that particular plan fall among the

benchmark group of comparator plans provided by PlanTools. Trial Tr. 67:1-22, 69:11-16, May 7, 2026.

From that exercise, Dyson arrived at a $21 per participant recordkeeping fee which, per his opinion, a prudent fiduciary should have been able to achieve. Trial Tr. 66:17-24, May 7, 2026. In PlanTools, Dyson entered the number of participants, the recordkeeping fees, the investment options, and the balances in each investment option (which generated the total assets for the Plan) of the Plan, and then also entered a proposed recordkeeping fee he thought the Plan could have achieved. Trial Tr. 69:22-70:5, May 7, 2026.

Based on the results PlanTools generated, derived from the number of participants and the amount of assets, Dyson entered his proposed recordkeeping fee based on what he believed would fall in the "sweet spot" -- PlanTools' terminology for the midpoint between the 25th and 75th percentiles of recordkeeping fees (with the 25th percentile representing the least expensive quarter, and the 75th the highest), which is indicative, but not definitively so,[12] of a reasonable recordkeeping fee. Trial Tr. 70:19-71:13, May 7, 2026.

[12] Dyson agrees that PlanTools indicates that plans with fees above or below the sweet spot range are not necessarily unreasonable. Trial Tr. 129:20-130:7, May 7, 2026.

In aiming for the sweet spot, Dyson entered different proposed fees based on what he assumed, from his experience in the industry, would enable the two cohorts of comparator plans -- plans distinguished by the number of participants and plans distinguished by the amount of assets -- between 2019 and 2024 to fall around the 25th percentile, because they did not line up when he inputted the initial information about the Plan. Trial Tr. 77:2-19; 70:21-71:2; 72:10-15, May 7, 2026. Dyson started with a proposed fee of $19 per participant, because based on his industry experience, it was an achievable recordkeeping fee. Trial Tr. 76:5-8, May 7, 2026.

This proposed fee was, however, too low according to Dyson, because for the majority of the years between 2019 and 2024 inclusive, $19 fell below the 25th percentile. Trial Tr. 75:23-76:1, May 7, 2026. Dyson repeated the process for $20, which he also testified did not work. Trial Tr. 77:20-78:1, May 7, 2026. He then attempted $21, which worked, meaning that for the large majority of the class period between 2019 and 2024, $21 was at the 25th percentile for the participant size cohort, and fell within the "sweet spot" -- closer to the 60th or 75th percentile as he describes -- for the asset-based cohort. Trial Tr. 78:2-16, May 7, 2026.

In one of the PlanTools benchmarking reports Dyson generated for 2021, it shows that on an asset basis the $21 fee

fell at the 25th percentile, and the Plan's fee (which -- given that the recordkeeping fee that year was reduced from $48 to $40 in April 2021 -- would have been a blended rate between $48 and $40) fell above the 75th percentile. Trial Tr. 88:17-89:7; 81:21-82:2, May 7, 2026; Ex. 390 at 260. On a participant size basis, the Plan's fee falls within the sweet spot, and the $21 proposed fee falls beneath the 25th percentile. Trial Tr. 89:17-22, May 7, 2026. Dyson concedes that he failed to identify a figure that fell in the sweet spot in both comparison groups -- asset and participant size -- during the class period. Trial Tr. 141:20-23, May 7, 2026.

Variations similar to the 2021 PlanTools benchmarking report apply for each year of the class period Dyson generated a benchmarking report for. Trial Tr. 89:23-90:9, May 7, 2026. For instance, for the 2019 and 2020 Plan years on the participant basis, the Plan's fee fell around the 75th percentile, at the upper end of the sweet spot, and the $21 fee at the 25th percentile. Ex. 390 at 229, 245; Trial Tr. 133:6-14, 19-24, May 7, 2026.

On the asset basis for those years, the $21 fee fell at the upper end of the sweet spot. Ex. 390 at 228, 244; Trial Tr. 140:18-141:12, May 7, 2026. In the benchmarking reports for 2021, 2022, 2023, and 2024, again on the participant basis, the Plan's fee falls somewhere between the 50th and 75th percentiles,

while the $21 fee falls below the 25th. Ex. 390 at 261, 277, 293, 309; Trial Tr. 135:2-137:25; 139:3-15, May 7, 2026. The Defendant's expert, Steven Gissiner ("Gissiner"), believes that Dyson's PlanTools benchmarking reports do not reveal that the Plan's recordkeeping fees were excessive, because they still fell within the sweet spot on several of the graphs Dyson generated. Trial Tr. 47:1-14, May 8, 2026.

Further, in his examination of the benchmarking reports generated by Capital Group for the Committee, Dyson estimates that the recordkeeping fees fall roughly between the 60th and 65th percentile of comparator plans, which he considers high, and opines that it should have prompted the Committee to take action, such as conducting an RFP or an RFI.[13] Ex. 392, 17; Trial Tr. 53:8-54:5, May 7, 2026.

In this Court's previous opinion in Sellers, the Court ruled there was insufficient evidence of loss where expert methodology for determining a prudent alternative fee was unreliable. Sellers, 729 F. Supp. 3d at 179. Gissiner testified that based on his industry experience, Dyson's use of a proposed fee is not how benchmarking is typically done. Trial

[13] Dyson also does quantitatively calculate losses to the Plan based on the $21 proposed recordkeeping fee, Trial Tr. 90:25-92:18, but as the Court ruled in Sellers, the Plaintiffs need not specifically calculate loss to prove it. 729 F. Supp. 3d at 183.

Tr. 47:15-18, May 8, 2026. He finds Dyson's entry of a $21 fee arbitrary and draws the Court's attention to the fact that the $21 fee was oftentimes at or below the 25th percentile. Id. at 47:20-48:3.

In Sellers, the expert was unable to identify a plan that paid his suggested alternative recordkeeping fee. Sellers, 729 F. Supp. 3d at 179. Likewise, Dyson admits that he did not identify any specific plan similar in size to the Plan that received similar recordkeeping services for $21 per participant, Trial Tr. 124:17-21, May 7, 2026, and is unaware of what the peer plans paid for recordkeeping on a per participant basis, and consequently, whether any of them paid fees as low as $21 per participant. Id. at 130:25-131:11.

Comparatively, Gissiner conducted what he refers to as a "back check", where he used the Form 5500 data sets of plans made publicly available by the Department of Labor -- which contain information about the sizes of those plans in terms of participant counts and assets -- to identify what he considered to be peer plans to the Plan, which in this case were plans of 20,000 to 50,000 participants and plans with assets between $1 and $5 billion. Trial Tr. 42:9-19, May 8, 2026. He further screened those plans to ensure that they were 401(k) plans and that the fee information for those plans was available, such as looking at fee disclosure notices which provide exactly or at

least approximately what the participants of those plans paid in recordkeeping fees. Id. at 42:20-43:5; 43:17-23. He then compared his findings against the Plan. Id. at 43:24-44:2.

Unlike the expert in Sellers, though, most of the comparator plans referenced by Dyson's benchmarking reports were smaller than the Plan, and thus PlanTools' lack of maximum values for the asset-based and participant size comparison cohorts does not negatively impact the comparative value of the peer plans. Trial Tr. 127:21-128:3, May 7, 2026; Sellers, 729 F. Supp. 3d at 179. As Dyson explains, this is because larger plans have lower costs associated with recordkeeping on a per-participant or per-asset basis, with the opposite ringing true for smaller plans. Trial Tr. 23:7-20, May 7, 2026. The small size of the comparator peer plans should thus theoretically work in the Plan's favor. Notably, however, the smaller peer plans in Dyson's PlanTools reports still had lower recordkeeping fees than the Plan. See, e.g., Ex. 390 at 256; Trial Tr. 84:7-20, May 7, 2026.

Gissiner testified that the Plan's recordkeeping fees fell between the 50th and 75th percentiles compared to the peer group of plans, trending upwards toward the 75th percentile at the start of the class period, and downward to, and even lower than the 50th percentile nearing the latter part of the class period. Trial Tr. 44:4-13, May 8, 2026.

The Plaintiffs counter that Gissiner's findings reveal that even with the drop in the Plan's recordkeeping fee, from $48 to $40, the fees were still at, around, or slightly higher than the 75th percentile between 2019 and 2023. See Exs. 118, 130 at 1; Trial Tr. 63:20-67:4, May 8, 2026. For instance, Gissiner's findings show that in 2022, the 75th percentile of fees for peer plans fell at $40, which was the Plan's fee as well; and in 2023, the Plan fee remained at $40, $4 above the 75th percentile at $36. See Ex. 130 at 1; Trial Tr. 72:25-73:3, May 8, 2026. Gissiner also agrees, though he did not have this fee disclosure information at the time, that one of his peer comparators, the Boston Scientific Corporation 401(k) Retirement Savings Plan, paid $17 per participant in recordkeeping fees in 2022. See Ex. 130 at 2; Trial Tr. 72:13—17, May 8, 2026.

Again, in 2021, the Carmax Inc. Retirement Savings Plan ("Carmax"), which was smaller than the Plan in both participant size and assets -- Trader Joe's having $2.7 billion in assets and 42,594 participants; and Carmax having $1.3 billion in assets and about half of Trader Joe's participants --, paid $26 per participant in recordkeeping fees, whereas the Plan paid $42 (the blended rate of $48 and $40). Ex. 130 at 3; Trial Tr. 76:1-19, May 8, 2026. A similar story unfolds with the other peer plans in Gissiner's report paying lower recordkeeping fees

than the Plan throughout the class period. See Ex. 130 at 3-5, 8-9; Trial Tr. 78:20-83:3, May 8, 2026.

As this Court ruled in Sellers, the Plaintiffs only needed to show that an alternative fee was **a** prudent alternative, and not the **only** prudent fee. Sellers, 729 F. Supp. 3d at 180; see also Sacerdote, 9 F.4th at 113. So, although $21 may not have always fallen in the "sweet spot" on an asset or participant count basis (similar to the Plan's fees), the Court rules that the Plaintiffs have identified lower prudent alternatives to the Plan's recordkeeping fees through reliable expert methodology.

#### b. Recordkeeping Services

During trial, the Defendants placed great emphasis on Capital Group's services in relation to the Plan, suggesting that these services were complex and this was a contributing factor to the Plan's recordkeeping fees, which they claim Dyson did not take into account. Trial Tr. 124:13-18, May 5, 2026. See, e.g., Ex. 394. To be sure, recordkeeping fees must be "excessive relative 'to the services rendered'" to show loss. Young v. Gen. Motors Inv. Mgmt. Corp., 325 F. App'x 31, 33 (2d Cir. 2009); see also Albert v. Oshkosh Corp., 47 F.4th 570, 580 (7th Cir. 2022); Smith v. CommonSpirit Health, 37 F.4th 1160, 1169 (6th Cir. 2022).

Gissiner factored in the Plan's specific characteristics in his analysis of the recordkeeping fee, which included for

example a recordkeeping cost associated with administering the large number of active, non-contributing participants, for which no participant fee was charged. Trial Tr. 44:22-45:14, May 8, 2026. He opined that he took into consideration the demographics of the Plan because each plan is different, and such provisions and features are informative of and influence recordkeeping fees. Id. at 45:18-20; 94:19-25. He further testified that the plans in his report are not limited to plans that receive the same recordkeeping and administrative services as the Plan did, and based on his experience, nothing in his analysis led him to the conclusion that the Plan could have paid the lowest fees paid by any of the peer plans included in his report. Trial Tr. 23:11-21, May 11, 2026.

Nadler also testified to the impact of services, explaining that the nature of the retail industry is that turnover is very common, and it involves constantly setting up new accounts, for example. Trial Tr. 77:2-8, May 6, 2026. Gissiner bolstered this, opining that given the constant level of change in the population of employees in the retail industry, a recordkeeper must go back to collect prior participant information, which involves many moving parts, and from his experience recordkeeping for these types of plans, doing so is "much more difficult". Trial Tr. 45:22-46:11, May 8, 2026.

Dyson, on the other hand, does concede that in determining whether a plan's recordkeeping fee is reasonable, the totality of the circumstances needs to be considered, and a fee does not necessarily need to be in a particular quartile compared to its peers to be reasonable. Trial Tr. 113:13-114:4, May 7, 2026. Specifically, he acknowledged in his testimony that the quality of the recordkeeper and level of services provided could impact the amount of fees charged by a recordkeeper in comparison to others, id. at 115:5-8, but again, found that there was nothing particularly special about the recordkeeping services provided to the Plan, and as such, operated from that standpoint when preparing his benchmarking reports. id. at 86:17-87:1.

For instance, Dyson testified that provisions and services such as branded materials or trained customer service representatives are typical for a large plan, and not indicative of any special or unique service provided by the recordkeeper. Trial Tr. 64:23-65:23, May 7, 2026. He also did not believe that turnover would make a plan particularly complex (and in fact, considers it table stakes). Id. at 62:23-64:5.

The Court likewise struggles to find that the nature of the Plan's recordkeeping services provides adequate justification for the Plan's recordkeeping fees. For instance, a Committee benchmarking report generated on November 24, 2020, reveals the Plan received less services compared to the fees it paid. See

Ex. 391, 15; Trial Tr. 34:22-35:14, May 7, 2026. Compared to the benchmark group indicated in the report, the Plan received 21 percent less recordkeeping services, 7 percent less administrative, education and communication services, and 60 percent more[14] compliance and consulting services. Ex. 391 at 15, 18; Trial Tr. 37:9-38:15, May 7, 2026.

Additionally, in Mcdonald v. Laboratory Corporation Of America Holdings, 1:22-cv-00680-LCB-JLW, (M.D.N.C. August 12, 2025), despite all the complexities found in the plan in that case, that the Plan here lacks -- 26 account types[15] or money sources in LabCorp versus 2 money sources for the Plan; a complex[16] after-tax contribution account; 13 types of in-service withdrawal and one type of hardship withdrawal; and 82 revisions

[14] Dyson takes issue with this figure. He testified that the Court need not credit it because Capital Group did not accurately represent its compliance services when it inputted that information on the Fiduciary Benchmarks platform (which has no input or decision as to the truth of the information entered into it, given it simply generates the reports). Trial Tr. 38:16-42:10, May 7, 2026. He adds, however, that even with this anomaly, the Plan still pays higher fees in relation to the services it receives. Ex. 391, 16; Trial Tr. 42:18-43:4, May 7, 2026.

[15] This is the portion of a participant's account balance attributable to either current or prior contributions. Trial Tr. 95:22-96:1, May 8, 2026. Gissiner further explained that LabCorp had several account types because of several acquisitions it had made, which meant that the recordkeeper had to maintain separate accounts for the merged assets subject to different rules under the plan in that case. Trial Tr. 96:1-6, May 8, 2026.

[16] Complex because there are different withdrawal rules associated with after-tax contributions.

of the plan's administrative manual due to merger activity -- the committee in that case was able successfully to negotiate with its recordkeeper a reduction in its fee from $32 to $29 per participant. Trial Tr. 96:7-99:17, May 8, 2026.

Thus, the Court concludes that the Plaintiffs have shown loss, and moves to discuss causation, where the burden shifts to the Defendants.

### 3. Causation

The Defendants can prevail on causation if they can show that "a hypothetical fiduciary would have made the same decision[s] anyway." Brotherston, 907 F.3d at 33 (quoting Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994)). The Defendants have failed to make this showing.

Acting on the information they received regarding the 'soft RFP', the Committee decided not to conduct a formal RFP, taking into consideration the time and cost associated with performing one, considerations which Gissiner also testified to. Trial Tr. 91:20-92:2, May 6, 2026; Trial Tr. 41:3-11, May 8, 2026. Gissiner testified to his experience in the industry that plan sponsors may refrain from conducting RFPs if they have determined that their recordkeeping fees are reasonable. Id. at 40:14-41:2.

Gissiner also found that the Committee's commission of the three benchmarking reports by Fiduciary Benchmarks was evidence

of a robust process consistent with his industry experience. Id. at 35:10-18. Additionally, in Committee meeting minutes dated August 3, 2021, investment advisor Stephens commented to the Committee that their recent fee benchmarking study (which at the time would have been the Fiduciary Benchmarks report generated February 5, 2021) revealed that all other providers charged higher fees than were being charged to the Plan. Ex. 63.

Dyson, however, explained that though there is work and there are costs associated with performing an RFP, they are generally insignificant regarding plans as large as the Plan. Trial Tr. 106:16-21, May 7, 2026. The Plaintiffs additionally counter that the Defendants' concern regarding the complexities of the Plan ought have been more reason for the Committee to entertain bids from recordkeepers on the market, who could handle such complexities proven by experience handling large plans, for example. Id. at Trial Tr. 61:14-62:15.

Dyson additionally opined that based on the Committee's meeting minutes, recordkeeping fees were not discussed enough times to meet their fiduciary standard of care. Id. at 30:19-31:6. While the meeting minutes, which indicate discussion of recordkeeping fees, show that the Committee discussed them generally or against benchmarks, see Ex. 63, they do not reflect that there was any communication or negotiation with Capital

Group regarding the recordkeeping fees. See Exs. 53-79; Trial Tr. 31:7-14, May 7, 2026.

Taking everything into consideration, the Court is not persuaded that a hypothetical fiduciary would have acted in the manner the Defendants did here. At the very least, a hypothetical fiduciary would have engaged in some negotiations with the recordkeeper for better fees -- a notification from Capital Group informing the Committee of a reduced fee does not count as a negotiation. A hypothetical fiduciary would also have engaged in some competitive market research to determine what potential recordkeepers are offering in fees per Plan participant. As Dyson explained to the Court, the incumbent recordkeeper is usually involved in the RFP process, which indicates to them that it is at risk of losing the Plan to a competitor, which then prompts the recordkeeper to discover ways to keep the Plan's business, such as seeing which areas of service it can improve in. Trial Tr. 151:16-152:12, May 6, 2026.

An RFP also presents to the potential recordkeepers a possibility to gain a new book of business, thus prompting them to "put their best foot forward". Id. at 152:13-23. Negotiations then "almost always" begin after proposals from an RFP are received. Trial Tr. 16:10-15, May 7, 2026. Dyson also testified that though the Plan is unlikely to get "the sharpest

pencil" through RFIs compared to RFPs -- since recordkeepers on the market view it as a low probability of getting new business -- the potential recordkeepers will still provide the information needed. Id. at 15:12-16:3. Either way, an actual market check would have revealed, as Plaintiffs argue, that the trend in the industry has been a decrease in recordkeeping fees. Id. at 27:15-28:11.

While the Court credits Gissiner's testimony that an RFP or RFI does not necessarily guarantee reduced fees, Trial Tr. 41:12-14, May 8, 2026, a hypothetical fiduciary would have performed, at the very least, some competitive market research to increase the chances of a reduced recordkeeping fee, which the Court finds has not been here.

Thus, the Court rules that the Defendants caused losses to the Plan participants by breaching their fiduciary duties of prudence and loyalty.

**E. Duty to Monitor**

The Plaintiffs assert that the Company and the Board failed to perform their fiduciary duty to monitor the Committee, to ensure it was conducting its fiduciary obligations adequately. Compl. ¶¶ 231-237. "A claim for failure to monitor is derivative of the underlying breach." Lalonde, 728 F. Supp. 3d at 158 (quoting Velazquez v. Massachusetts Fin. Servs. Co., 320 F. Supp. 3d 252, 260 (D. Mass. 2018) (Zobel, J.). As this Court

ruled that the Defendants' breached their fiduciary duties with respect to the recordkeeping fees, it subsequently rules that the Company and the Board failed to monitor the Committee.

### F. Surcharge

This Court may grant relief for finding liability as to recordkeeping under the equitable doctrine of surcharge. See Moitoso, 410 F. Supp. 3d at 327-28 (D. Mass. 2019). "[W]hile . . . damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931).

Plaintiffs argue that the damages for the recordkeeping liability finding ought total $9,247,000 (based on Dyson's $21 prudent alternative calculation), had the difference been invested and earned on the Plan's annualized return from 2019-2025. Pls.' Proposed Findings of Fact and Rulings of Law ¶ 111, ECF No. 140. Trader Joe's argues that damages are not appropriate, but that if it is then it ought range from between "approximately" $200,000 to $700,000. Defs.' Amend. Proposed Findings of Fact and Rulings of Law ¶ 38, n.43, ECF No. 141.

Trader Joe's has the better of the argument. Though Dyson's $21 "prudent alternative" price was sufficient to demonstrate liability as a "possibility," Dyson's methodology

did not persuasively demonstrate that Trader Joe's could actually have obtained that recordkeeping rate for the purpose of surcharge. See Sellers, 729 F. Supp. 3d at 180; Sacerdote, 9 F.4th at 113. The only actual price in evidence is the $40 price that Trader Joe's obtained in April 2021 from Capital Group without negotiation. The Court reasonably infers from Capital Group's spontaneous price drop that $40 was an actual alternative to the $48 price, at least as early as the beginning of the class period in 2019. The Plan's recordkeeping fees "should have been reduced to $40 at the beginning of the Class Period" instead of April 2021. Defs.' Proposed Findings of Fact and Rulings of Law ¶ 38, n.43. The class period runs from January 28, 2019, and the share price dropped on April 1, 2021. Defs. Proposed Findings of Fact and Rulings of Law ¶ 5, n.3; Id. ¶ 32. The amount of overpaid recordkeeping fees thus amounts to $715,264.00.[17]

District Courts retain the discretion to award prejudgment interest in ERISA actions. See Radford Tr. v. First Unum Life Ins. Co. of Am., 491 F.3d 21, 23-24 (1st Cir. 2007) ("In ERISA

[17] In 2019, the Plan had 38,634 participants; in 2020, it had 43,345 participants; in 2021, it had 42,594 participants. See Appendix C, Expert Report of Steven K. Gissiner. Trader Joe's overpaid by $8 per participant from January 28, 2019, through April 1, 2021. This figure excludes the month of January 2019 (as the Class Period begins at the end of the month) and prorates the 2021 overpayment to three months, as the reduced pricing began on April 1, 2021.

cases, the district court has broad discretion both to determine whether to award prejudgment interest and to determine the parameters of such an award."). This Court has previously determined that the Massachusetts statutory rate of 12 percent simple interest, codified at MASSACHUSETTS GENERAL LAWS chapter 231, section 6C, represents the best justice for an ERISA plaintiff. See Radford Tr. v. First Unum Life Ins. Co. of Am., 321 F. Supp. 2d 226, 257-58, n.25 (D. Mass. 2004), rev'd in part, appeal dismissed in part, 491 F.3d 21 (1st Cir. 2007). The amount of the recordkeeping overpayment, accounting for 12% simple interest beginning in 2021 through the date of judgment, is $1,187,221.00 (rounded to the nearest dollar).[18]

**V. CONCLUSION**

For the foregoing reasons, this Court finds for the Defendants on the breach of duty of prudence and breach of duty of loyalty claims, regarding the allocation of forfeitures and the maintenance of the GFA in the Plan. This Court finds for the Plaintiffs on the breach of duty of prudence, breach of duty of loyalty, and breach of duty to monitor claims, regarding the recordkeeping fees. The Court imposes a surcharge of

[18] Calculated from April 1, 2021, through September 28, 2026.

$715,264.00 with prejudgment interest of $471,957.00. Judgment shall enter accordingly.

**SO ORDERED.**

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[19]

[19] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 48 years.